## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x

In re                                                  :        **Chapter 11**
                                                       :
**CLAIRE'S STORES, INC.**, *et al.*,                   :        **Case No. 18– _____ (   )**
                                                       :
                                                       :
              **Debtors.**[1]                          :        **(Joint Administration Requested)**

---------------------------------------------------------- x

### DECLARATION OF SCOTT E. HUCKINS IN SUPPORT
### OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Scott E. Huckins, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Executive Vice President and Chief Financial Officer of Claire's Stores, Inc. ("**Claire's Stores**") and its debtor affiliates in the above-captioned chapter 11 cases (together with Claire's Stores, the "**Debtors**"). I have served in this position since October 2016. Prior to joining the Debtors, I served as Vice President and Treasurer of Sears Holdings Corporation from June 2012 through September 2016. I have over 20 years of diversified experience as a financial professional. I received a B.S. in Finance from Arizona State University and an M.B.A. from Northwestern University's Kellogg School of Management.

2.     On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"). I am knowledgeable and familiar with

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Claire's Inc. (6919); Claire's Stores, Inc. (0416); Claire's Puerto Rico Corp. (6113); CBI Distributing Corp. (5574); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); BMS Distributing Corp. (4117); and CSI Canada LLC (7936). The location of the Debtors' corporate headquarters and the Debtors' service address is 2400 West Central Road, Hoffman Estates, Illinois 60192.

the Debtors' day-to-day operations, businesses and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases.

3.     Except as otherwise indicated herein, the facts set forth in this declaration (this "**Declaration**") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Company, or my opinion based upon my experience, knowledge, and information concerning the Company's operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration on that basis.

4.     The Debtors have requested a variety of relief in their "first day" motions and applications (collectively, the "**First Day Motions**") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary to permit the Debtors an effective transition into chapter 11.  I further believe that the relief requested in the First Day Motions will preserve and maximize the value of the Debtors' estates.

## I.
## Preliminary Statement[2]

5.     The Debtors, together with their 33 non-Debtor affiliates (collectively, the "**Claire's Group**" or the "**Company**"),[3] are one of the world's leading specialty retailers of jewelry, accessories, and beauty products for young women, teens, "tweens," and kids.  Through the *Claire's*® brand, the Claire's Group has a presence in 45 nations worldwide, through a total combination of over 7,500 Company-owned stores, concessions locations, and franchised stores.

---

[2] Capitalized terms used but not defined in this overview section shall have the meanings assigned to them below.

[3] The corporate organizational structure of the Claire's Group as of the Commencement Date is depicted on the chart attached hereto as **Exhibit B**.

2

Within the Claire's Group, the Debtors operate a combination of more than 5,300 store locations and concessions locations under the *Claire's*® and *Icing*® marks in the United States and Puerto Rico.

6.      Through their broad-based merchandise offerings, "treasure hunt" retail experience, and trusted brand names, the Debtors enjoy a strong reputation for providing their customers with age-appropriate and on-trend merchandise.   The Debtors also are trusted by parents to provide a safe and exciting shopping experience for their core customers.   Indeed, a key aspect of the "Claire's experience" are the Debtors' ear piercing services.   These services establish a unique level of trust with customers (and their families) that cannot be replicated by shopping online.   To date, the Company estimates that it has pierced over 100,000,000 ears worldwide.   This trusted market presence, combined with the Debtors' carefully curated merchandise assortment, has translated into strong revenue performance and operating margins: the Claire's Group reported adjusted EBITDA of approximately $212 million on a consolidated 52-week basis in the fiscal year ended February 3, 2018, versus revenues of approximately $1.3 billion over that same time period.[4]

7.      Notwithstanding their core operating strengths, the Debtors are burdened by a substantial debt load, in addition to facing many of the same pressures affecting U.S. retailers more generally.   As of the Commencement Date, the Debtors' capital structure includes approximately $1.9 billion in funded debt, excluding approximately $245 million in funded debt of the Debtors' non-Debtor affiliates.   In Fiscal 2017, the Debtors' cash interest expense totaled approximately $162 million.

---

[4] As is common among retailers, the Claire's Group operates on a fiscal year that ends on the Saturday closest to January 31 in any given year.  Thus, the Claire's Group's "**Fiscal 2017**" refers to the year ended February 3, 2018.

8.    Prior to the Commencement Date, the Debtors took a number of steps to enhance performance, right-size their capital structure, and position themselves for success within their current operating environment.  In September 2016, the Debtors undertook a debt-for-debt exchange through which the Debtors reduced their overall indebtedness by approximately $400 million and reduced their annual cash interest expense by approximately $24 million, not including the conversion of certain subordinated notes to PIK interest. The Debtors also engaged new leadership.  In 2016, the Debtors hired a new Chief Executive Officer, Chief Merchandising Officer, and an Executive Vice President-Chief Information Officer, in addition to my own hiring.  Since joining the Debtors, we have continued to reduce costs, improve efficiencies, and drive new operating initiatives, including by expanding the Debtors' concessions business, through which the Debtors partner with other prominent retailers (such as pharmacies, supermarkets, and others) to sell the Debtors' merchandise in a dedicated "mini-footprint" under the *Claire's*® brand.

9.    The Debtors also have proactively engaged with their stakeholder groups prior to the Commencement Date.  These groups include (i) an ad hoc group of first lien creditors (the "**Ad Hoc First Lien Group**"), which group collectively holds approximately 72% of the Debtors' first lien debt, 8% of the Debtors' Second Lien Notes (as defined herein), and 83% of the Debtors' Unsecured Notes (as defined herein), and (ii) the holder of approximately 72% of the Debtors' Second Lien Notes (as defined herein) (the "**Majority Second Lien Holder**").  The Debtors have brought these creditors to the table with the initial goal of developing a competitive process to sponsor and achieve a consensual, prearranged plan of reorganization. The Debtors achieved that goal, as both the Ad Hoc First Lien Group and the Majority Second Lien Holder

4

engaged with the Debtors, through principals and professionals, in the weeks leading up to the commencement of these chapter 11 cases.

10.     More specifically, following the formation of an independent committee led by independent director, Michael D'Appolonia, which committee was and remains charged with overseeing the Debtors' restructuring process, the Debtors requested that the members of the Ad Hoc First Lien Group and the Majority Second Lien Holder organize into groups and hire professionals.  The Debtors made these requests of both the Ad Hoc First Lien Group and the Majority Second Lien Holder at the same time in mid January 2018. Those stakeholders' professionals executed non-disclosure agreements with the Debtors and were provided with access to the same information at the same time.  Both groups were presented with the Debtors' business plan and were requested to submit plan proposals at the first meetings held with each group in February 2018.  Both before and after those initial meetings, this process involved substantial diligence and arm's-length discussions among the Debtors, creditors, and each of their respective advisors, with such advisors' fees and expenses having been paid by the Debtors prior to the Commencement Date. Both the Ad Hoc First Lien Group and the Majority Second Lien Holder also were involved in the Debtors' competitive process to secure debtor-in-possession financing.

11.     Engagement with these parties increased ahead of March 15, 2018, the due date for an approximately $68 million coupon payment with respect to the Debtors' First Lien Notes (as defined herein) and Second Lien Notes (the "**March 15 Coupon Payment**").  Further, the Debtors solicited plan proposals and engaged in substantial negotiations with the Ad Hoc First Lien Group and the Majority Second Lien Holder.  The Ad Hoc First Lien Group engaged quickly in good faith.  The Majority Second Lien Holder did not provide a plan proposal or

response to the Debtors' suggested plan proposal until the weekend prior to the commencement of these chapter 11 cases. During this time, operating pressures, including from vendors, continued to mount as the due date of the March 15 Coupon Payment approached.

12.     After careful deliberations in the weeks leading up to the commencement of these cases, the Debtors determined that it would be in the best interests of their estates to defer payment of the March 15 Coupon Payment, utilize the 30-day grace period available under the relevant indentures, and continue engaging with stakeholders toward reaching a consensual deal with one or more groups of creditors.

13.     Following near-constant negotiations with the Ad Hoc First Lien Group, the Debtors are pleased to report that they have finalized the terms of and executed a restructuring support agreement (the "**RSA**") with the members of the Ad Hoc First Lien Group and the Debtors' equity sponsor, Apollo Global Management, LLC. A copy of the RSA is attached hereto as **Exhibit A**. Attached as <u>Exhibit A</u> to the RSA is a term sheet (the "**Plan Term Sheet**") outlining the material terms of a plan of reorganization (the "**Pre-negotiated Plan**") for the Debtors. Among other things, the transactions contemplated by the Plan Term Sheet will substantially deleverage the Debtors' capital structure and bring the Debtors' otherwise healthy business into alignment with its operating environment.

14.     <u>Pre-negotiated Plan</u>.   The Pre-negotiated Plan provides for (i) a new money investment of up to $575 million, comprised of (a) a $75 million new exit ABL revolving credit facility, (b) a $250 million new exit first lien term loan, and (c) up to $250 million of preferred stock or equity interests in the reorganized Debtors; and (ii) a substantial reduction of the Company's existing funded debt. The Pre-negotiated Plan and the commencement of these pre-negotiated chapter 11 cases are milestone achievements that will benefit the Debtors and all

of their stakeholders.  The transactions contemplated by the Plan Term Sheet provide for a comprehensive balance-sheet restructuring, effort to right-size the Debtors' footprint, preserve the going-concern value of the Claire's Group's businesses, and protect the jobs of thousands of the Debtors' employees.

15.     <u>Restructuring Support Agreement</u>.  The RSA confers significant benefits on the Debtors' estates.  In addition to providing a means for the Debtors' emergence from chapter 11 with a substantially deleveraged capital structure, the RSA provides that the Ad Hoc First Lien Group, which I understand represents holders of over 72% of the Company's first lien debt, 8% of the Second Lien Notes, and 83% of the Unsecured Notes, must support confirmation of the Pre-negotiated Plan.

16.     In addition, the RSA contains an affirmative "go-shop" provision (the "**Go-Shop Provision**"), pursuant to which the Debtors are permitted to affirmatively solicit, develop, and negotiate a "Payout Event" under the RSA.[5] The RSA also contains a customary "fiduciary out" provision.

17.     Finally, the RSA also does not require the Debtors to seek Court approval of any backstop commitment or break-up fees outside of the plan confirmation process.  Upon termination of the RSA, including for the purpose of consummating a Payout Event, the Debtors will be required to pay the Backstop Parties (as defined in the RSA) a break-up fee in the amount

---

[5] As used in the RSA, a "**Payout Event**" means a chapter 11 plan, other than the Pre-negotiated Plan, providing for the (i) indefeasible payment in full in cash, including any accrued but unpaid interest (including postpetition interests at the default contract rate), of (a) all of the First Lien Claims (as defined in the RSA) and (b) all claims arising under (1) the Debtors' proposed debtor-in-possession financing facility (the "**DIP Facility**"), (2) the CLISP Term Loan, (3) the Gibraltar Secured Term Loan, (4) the Gibraltar 2019 Unsecured Term Loan, and (5) the Gibraltar 2021 Unsecured Term Loan; and (ii) treatment of all other claims against the Company on terms that are not less favorable than as provided in the Plan Term Sheet.

7

of $38.75 million.[6] As set forth below, unless the RSA is otherwise terminated prior thereto, the

Debtors intend to solicit votes on the Pre-negotiated Plan in or around mid-June 2018.

18.     Proposed Timeline.   The Debtors intend to prosecute their chapter 11

cases in a measured, but efficient manner. The terms of the RSA reflect that intention.

Specifically, the RSA establishes the following timeline for these chapter 11 cases (subject to the

Court's calendar):

| Milestones[7] | |
|---|---|
| Commencement Date | March 19, 2018 |
| Entry of Interim DIP Order | March 26, 2018 |
| File the New Money Backstop Commitment Agreement | Seven (7) calendar days after the hearing to consider the Debtors' First Day Motions |
| File Pre-negotiated Plan, Disclosure Statement, and motion for approval of the Disclosure Statement, the rights offering procedures, and the solicitation procedures | April 9, 2018 |
| Entry of Final DIP Order | May 3, 2018 |
| Entry of Disclosure Statement Order | June 4, 2018 |
| Commence Rights Offering and solicitation of votes on Pre-negotiation Plan | Seven (7) calendar days after entry of Disclosure Statement Order |

[6] The Ad Hoc First Lien Group reserves the right to seek payment of this fee as an administrative expense claim. The Debtors have not waived any rights to the treatment of such claim in these chapter 11 cases.  Further, in the event the RSA is terminated by (i) the Consenting Creditors following a breach of the RSA by the Sponsor in respect of which the Consenting Creditors may terminate the RSA, or (ii) the Debtors upon a breach by the Consenting Creditors in respect of which the Debtors may terminate the RSA, the Debtors will not be required to pay to the Backstop Parties any such break-up fee.

[7] Capitalized terms used but not defined in this chart shall have the respective meanings ascribed to such terms in the RSA.

| Milestones[7] | |
|---|---|
| Entry of Confirmation Order | 75 calendar days after entry of entry of Disclosure Statement Order |
| Effective Date of Pre-negotiated Plan | September 14, 2018 |

19.     The Debtors believe that conducting their chapter 11 cases with alacrity is essential to preserving and maximizing the going-concern value of their estates.  Both the Debtors and the Ad Hoc First Lien Group are aligned in their support of an efficient balance-sheet restructuring that minimizes the impact to the Company's operations, vendors, and employees.  The proposed timeline for these chapter 11 cases appropriately balances the Debtors' need to complete their restructuring process quickly and their need to sufficiently test value in the market.

## II.
## The Claire's Group Business

### A.     History and Formation

20.     Currently headquartered in Hoffman Estates, Illinois, the Company began as a wig retailer by the name of "Fashion Tress Industries" founded by Rowland Schaefer in 1961.  In 1973, Fashion Tress Industries acquired the Chicago-based Claire's Boutiques, a 25-store jewelry chain that catered to women and teenage girls.  Following that acquisition, Fashion Tress Industries changed its name to "Claire's Stores, Inc." and shifted its focus to a full line of fashion jewelry and accessories.  In 1978, the Company kicked off its now iconic ear piercing business. The Claire's Group continued to expand its footprint throughout the 1980s and 1990s. In 1996, the Company purchased The Icing ("**Icing**"), an American retail chain targeting a more mature customer base.  In 2007, the Company was taken private and acquired by investment

funds affiliated with, and co-investment vehicles managed by, Apollo Management VI, L.P. (together with such funds and co-investment vehicles, "**Apollo**").

B.     **The Debtors' Business Operations**

21.     Today, the Debtors, together with their non-Debtor affiliates, are one of the world's leading specialty retailers of fun, affordable fashionable jewelry, accessories, and beauty products for young women, teens, "tweens," and kids.  The Debtors also believe that the Claire's Group is the world's leading ear piercer, having pierced over 100,000,000 ears since it began offering the service in 1978. The Claire's Group's operates its retail stores under two distinct brands: (i) the *Claire's*® brand, which is the Debtors' primary global brand; and (ii) the *Icing*® brand, which is dedicated to serving a more mature customer base. From an organizational perspective, the Claire's Group's operations are organized by geography between two divisions: (i) the North American division, which encompasses the Debtors' operations in the United States and Puerto Rico, together with Canadian operations undertaken by non-Debtor Claire's Stores Canada Corp; and (ii) the European division, which encompasses the Claire's Group's operations outside of North America.

   **(i)**     ***The Claire's Group's Retail Brands***

22.     The Company operates *Claire's*® through a combination of Company-operated stores, franchised stores, and concessions stores in 45 countries across the globe.  The *Claire's*® mission is to be a "girl's best friend" and a favorite shopping destination for teens, tweens, and kids. The target *Claire's*® customer is a girl between the ages of three and 18 years old.  As detailed below, the Claire's Group operates approximately 2,328 *Claire's*® stores across North America and Europe, franchises 695 *Claire's*® stores in 31 countries across the globe, and operates 4,484 *Claire's*® concessions locations in twelve countries.  A *Claire's*® store is located in approximately 99% of major shopping malls throughout the United States.

23.     Additionally, the Claire's Group operates approximately 285 *Icing*®-branded stores, including 261 Company-operated locations and 24 franchised locations.  The *Icing*® mission is to be a "say something" brand that caters to a more mature customer base, with the target *Icing*® customer being an independent, fashion-conscious young woman between the ages of 18 and 35 years old.  As with *Claire's*®-branded stores, *Icing*®-branded stores are designed to create a "treasure hunt" experience that encourages customers to visit often and explore an ever-changing merchandise assortment.  The differentiation between *Claire's*® and *Icing*® allows the Company to operate multiple store locations within a single mall or in close proximity and to serve a wider demographic.  Further, the Company aims to establish long-term, meaningful relationships with young *Claire's*® customers who mature to become loyal *Icing*® customers.

### (ii)     *Store Footprint and Retail Operations*

24.     As noted above, the Claire's Group maintains a diversified geographic footprint, with an established retail presence worldwide.  As of the Commencement Date, the Debtors operate approximately 1,440 store locations in the United States and Puerto Rico.  Each of the Debtors' store locations are leased, and are typically located in traditional shopping malls with, on average, approximately 1,000 square feet of selling space.  Outside the United States, the Debtors' non-Debtor affiliates operate approximately 1,150 Company-run stores and 563 concessions locations.  The Claire's Group franchises approximately 719 stores across Africa, Asia, Europe, Latin America, and the Middle East.  Maps presenting the Claire's Group's North American stores, including the Debtors' *Claire's*® and *Icing*® store locations in the United States and Puerto Rico, are set forth below:

RLF1 19027853V.1

*Claire's*® **North America Store Locations**          *Icing*® **North America Store Locations**

    

25.     In addition to its Company-operated and franchised store locations, the Claire's Group sells its merchandise through a "concessions" channel.  The Claire's Group operates its concessions business by partnering with prominent retailers to provide branded merchandise for sale within the partners' own retail locations.   The Company's typical concessions partners are retailers with store locations benefitting from heavy daily foot traffic, such as pharmacies, supermarkets, and other specialty retail locations located outside of the traditional shopping mall format.   Concessions partners, in turn, are paid a commission in connection with the sale of the Claire's Group's goods at those locations.  By partnering with other retailers, the Claire's Group is able to gain access to new sales channels without encroaching on its traditional mall-based operations.   Examples of the Claire's Group's concessions store format are depicted below:

 

26.     As of the Commencement Date, the Debtors operate approximately 3,921 concessions locations in the United States and Puerto Rico.  Worldwide, the Claire's Group operates approximately 4,484 concessions locations across 12 countries, including those Debtor-operated concessions locations.

27.     Finally, the Claire's Group operates a digital sales platform through which new and existing customers can purchase products directly through the *Claire's*® and *Icing*® websites and mobile application.

**(iii)     *The Claire's Group Merchandising Operations and Employees***

28.     On average, each of the Debtors' store locations maintains approximately 13,000 different stock keeping units at any given time.  This level of product diversity is a critical component of the *Claire's*® and *Icing*® "treasure hunt" shopping experience.    The Debtors also move quickly to adjust product selections to respond to developing trends and shifting customer preferences.  The Claire's Group does not own or operate any manufacturing facilities.  Instead, the Claire's Group sources merchandise from approximately 500 vendors, a substantial majority of whom are located outside of the United States.    Through RSI International Ltd., a non-Debtor subsidiary organized under Hong Kong law, the Claire's Group manages buying operations for approximately 60% to 65% of its worldwide inventory needs.

RLF1 19027853V.1

Imported inventory, in turn, is consolidated into the Debtors' warehouse and distribution center located in Hoffman Estates, Illinois, before being shipped by common carrier to the Debtors' stores and concessions locations.[8]

29.    The Debtors believe that their diverse supply chain and global sourcing platform provide them with a key competitive advantage.  The Debtors have developed a global network of suppliers than can adhere to product standards required by the Debtors and quickly respond to shifts in consumer demands.  Vendors participating in the Claire's Group supply chain are subject to rigorous and ongoing quality-control evaluations, through which new suppliers may be vetted for more than six months.  The Debtors believe that their standards of quality and safety are a critical differentiating factor among their competitors and an important reason why parents trust the *Claire's*[®] brand, in particular, for their children, and why young *Claire's*[®] customers grow up to become loyal *Icing*[®] followers.

30.    The Debtors employ approximately 10,000 individuals, including approximately 6,400 employees who are employed on a part-time basis.  None of the Debtors' workforce is unionized or subject to collective bargaining agreements or other similar labor contracts.  On a global basis, the Claire's Group employs approximately 17,000 employees, including the Debtors' employees.

### III.
### The Debtors' Corporate and Capital Structure

**A.    Corporate Structure**

31.    As set forth on the organizational chart attached hereto as **Exhibit B**, Debtor Claire's, Inc. ("**Claire's Parent**") is the Company's ultimate parent through its 100%

---

[8] Through one of the Debtors' non-Debtor affiliates, the Claire's Group operates a similar warehousing and distribution center in Birmingham, United Kingdom for its international operations.

ownership of Claire's Stores.  Claire's Stores owns, directly or indirectly, each of the Debtors and each of the Debtors' non-Debtor affiliates.

32.    The substantial majority of the Claire's Group's international operations are undertaken by the direct and indirect subsidiaries of non-Debtor Claire's (Gibraltar) Holdings Limited ("**Gibraltar Holdings**"), the holding company for the Company's European division.[9] None of Gibraltar Holdings' subsidiaries are Debtors in these chapter 11 cases.  Additionally, the Claire's Group's Canadian operations are undertaken by Claire's Stores Canada Corp., a non-Debtor entity organized under Canadian law.[10]  In Fiscal 2017, the Claire's Group's international operations outside of North America accounted for approximately 37% of the Company's total revenue.

33.    The Claire's Group's corporate structure also includes non-Debtors CLSIP LLC ("**CLSIP**") and CSLIP Holdings LLC ("**CLSIP Holdings**" and, together with CLSIP, the "**CLSIP Entities**"), each of which were formed in connection with the 2016 Exchange and the CLSIP Term Loan (each as defined below).  Through this exchange transaction, Debtor CBI Distributing Corp. ("**CBI**"), the entity that holds the Claire's Group's intellectual property, contributed certain Transferred IP[11] to CLSIP in exchange for, among other things, a six-year

---

[9] As set forth on **Exhibit B**, the immediate parent of Gibraltar Holdings is Claire's Swiss Holdings LLC ("**Claire's Swiss Holdings**"), a limited liability company organized under Delaware law.  As noted above, Claire's Swiss Holdings is neither a Debtor in these chapter 11 cases nor an obligor with respect to any of the Claire's Group's funded debt.

[10] As set forth on **Exhibit B**, Claire's Stores Canada Corp. is neither a Debtor in these chapter 11 cases nor an obligor with respect to any of the Claire's Group's funded debt.  Claire's Stores Canada Corp. is a direct subsidiary of Claire's Canada Corp., which is a Debtor in these chapter 11 cases.

[11] The "**Transferred IP**" consists of (i) an undivided 17.5% interest in all (a) trademark registrations and applications for trademark registration issued by or filed with any federal government authority in the United States related to the *Claire's*® brand, (b) common law trademark rights in and to the *Claire's*® brand in the United States, and (c) the associated goodwill of the assets described in clauses (a) and (b); in each case, whether in existence or later adopted, filed, or acquired (collectively, the "US Claire's Marks"); (ii) all (a) trademark registrations and applications for trademark registration issued by or filed with any federal government authority in the United States related to the *Icing*® brand, (b) common law trademark rights in and to the *Icing*® brand in the United States, and

royalty licensing agreement, which gave Claire's Stores the exclusive right, through CBI, to use the Transferred IP (the "**Transferred IP Agreement**").[12]   Pursuant to the CLSIP Term Loan, Claire's Parent contributed $11.5 million of cash to the capital of Claire's Stores.  Pursuant to the Transferred IP Agreement, Claire's Stores agreed to pay CLSIP annual royalties of $12 million, (paid in two $6 million semi-annual payments), for six years, in exchange for the exclusive right to use the Transferred IP.  CBI sublicenses the Transferred IP to certain affiliates in the Claire's Group.  As detailed below, the CLSIP Entities are obligors on the CLSIP Term Loan, the aggregate principal amount outstanding under which is approximately $105 million as of the Commencement Date.  The CLSIP Entities are not obligors with respect to any of the Debtors' funded debt.

34.     As described in further detail below and depicted on **Exhibit B**, although the Debtors and their non-Debtor affiliates regularly engage in ordinary-course intercompany transactions, none of the Debtors are obligated on any of their non-Debtor affiliates' funded debt (collectively, the "**Non-Debtor Obligations**"); and, conversely, none of the Debtors' non-Debtor affiliates are obligated on any of the Debtors' funded debt (collectively, the "**Debtors' Obligations**").

---

(c) the associated goodwill of the assets described in the preceding clauses (a) and (b); in each case, whether in existence or later adopted, filed, or acquired (collectively, the "**US Icing Marks**"); (iii) certain internet domain names that incorporate, correspond with or are otherwise related to the *Claire's*® and *Icing*® brands (the "**Domain Names**"); and (iv) a mobile application agreement pursuant to which the *Claire's*® mobile application is licensed from a third party (the "**Mobile Application Agreement**").

[12] In connection with entry into the CLSIP Term Loan, CLSIP entered into that certain Intellectual Property Agreement, dated as of September 20, 2016 (the "**Transferred IP Agreement**") with Claire's Stores, CBI, and certain other of Claire's Stores' domestic subsidiaries, pursuant to which Claire's Stores and certain of its domestic subsidiaries agreed to pay CLSIP an annual fee of $12 million in exchange for (i) the exclusive right to use and exploit the US Icing Marks, the Domain Names and the Mobile Application Agreement; (ii) the exclusive right to use, exploit, register, enforce and defend the US Claire's Marks; and (iii)  CLSIP's acknowledgment that it will not exercise any rights in or to the US Claire's Marks, either directly or indirectly, during the term of the Transferred IP Agreement without CBI's prior written consent; in each case, solely during the term of the Transferred IP Agreement and subject to the terms contained therein.

**B.      Capital Structure**

35.      As of the Commencement Date, the Claire's Group's prepetition capital structure includes approximately $2.1 billion in funded debt.  The Debtors' Obligations and the Non-Debtor Obligations are summarized below:

| As of Commencement Date:<br>Debt Instrument (Aggregate Principal) | | Funded Debt<br>($ millions) |
|---|---|---|
| Prepetition ABL Credit Facility | $ | 71 |
| Prepetition Revolving Credit Facility | | -- |
| Prepetition LC Facility | | 1.3 |
| First Lien Term Loan | | 32.3 |
| 9.000% First Lien Notes | | 1,125 |
| 6.125% First Lien Notes | | 210 |
| Total First Lien Debt | $ | 1,438.3 |
| Second Lien Notes | | 222.3 |
| Unsecured Notes | | 216.7 |
| **Total Debtor Funded Debt** | **$** | **1,878.7** |
| **Non-Debtor Obligations** | | |
| CLSIP Term Loan | $ | 105 |
| Gibraltar Secured Term Loan | | 51.5 |
| Gibraltar 2019 Unsecured Term Loan | | 40 |
| Gibraltar 2021 Unsecured Term Loan | | 48.5 |
| **Total Non-Debtor Funded Debt** | **$** | **245** |
| **Total Claire's Group Funded Debt** | **$** | **2,122.4** |

**C.      The Debtors' Funded Debt Obligations**

**(i)      *Prepetition ABL Credit Facility***

36.      On August 12, 2016, certain of the Debtors entered into that certain ABL Credit Agreement, effective as of September 20, 2016, by and among Claire's Stores, as borrower, Claire's Parent, as Holdings, the other guarantors party thereto (the "**Subsidiary Guarantors**"[13] and, together with Claire's Stores and Claire's Parent, the "**ABL Obligors**"), Credit Suisse AG, Cayman Islands Branch ("**Credit Suisse**"), as administrative agent, and the

---

[13] The Subsidiary Guarantors include Debtors Claire's Puerto Rico Corp., CBI Distributing Corp., Claire's Boutiques, Inc., BMS Distributing Corp., Claire's Canada Corp., and CSI Canada LLC.

lenders party thereto (collectively, the "**ABL Lenders**"), pursuant to which the ABL Lenders agreed to provide Claire's Stores with revolving credit loans, subject to a borrowing base availability, in an amount up to $75 million (the "**Prepetition ABL Credit Facility**") less any amounts outstanding under the Prepetition Revolving Credit Facility and issued letters of credit (as defined below).

37.     The Debtors' obligations under the Prepetition ABL Credit Facility are unconditionally guaranteed by Claire's Parent and each of the Subsidiary Guarantors.   All obligations under the Prepetition ABL Credit Facility, and the guarantees of those obligations, are secured, subject to certain exceptions and permitted liens, by (i) a first-priority security interest in the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below)), which includes, among other things, cash, deposit accounts, accounts receivable, inventory, and chattel paper; and (ii) versus obligations outstanding under the First Lien Term Loan and the First Lien Notes (each as defined below), a second-priority security interest in the Notes Priority Collateral (as defined in the ABL Intercreditor Agreement), which generally includes all collateral other than the ABL Priority Collateral, including all real estate, equipment, intellectual property, and equity interests in subsidiaries.

38.     I believe that the aggregate balance of the Debtors' accounts receivable and inventory exceeds $80 million as of February 3, 2018,[14] based on the Debtors' then-current borrowing base calculation.  I do not believe that those values have materially declined since that date.  Additionally, the Debtors have cash on hand totaling approximately $37 million in their main concentration account as of March 16, 2018.

---

[14] February 3, 2018 is the date the financial data supporting the last available borrowing base for the Prepetition ABL Credit Facility.

39.     The Prepetition ABL Credit Facility matures in February 2019.  As of the Commencement Date, the aggregate principal amount outstanding under the Prepetition ABL Credit Facility is approximately $71 million. Additionally, as of the Commencement Date, there are approximately $4 million in issued and outstanding letters of credit under the Prepetition ABL Credit Facility.

(ii)     *Prepetition Revolving Credit Facility*

40.     On August 12, 2016, certain of the Debtors entered into that certain Second Amended and Restated Credit Agreement, effective as of September 20, 2016, by and among Claire's Stores, as borrower, Claire's Parent, as Holdings, the Subsidiary Guarantors, as guarantors, Credit Suisse, as administrative agent, and the lenders party thereto (collectively, the "**RCF Lenders**"), pursuant to which the RCF Lenders agreed to provide Claire's Stores with revolving credit loans in an amount up to $75 million less any amounts outstanding under the Prepetition ABL Credit Facility and issued letters of credit (the "**Prepetition Revolving Credit Facility**").

41.     The Debtors' obligations under the Prepetition Revolving Credit Facility are unconditionally guaranteed by Claire's Parent and each of the Subsidiary Guarantors.  All obligations under the Prepetition Revolving Credit Facility, and the guarantees of those obligations, are secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the First Lien Term Loan (as defined below) and the First Lien Notes (as defined below) by (i) a first-priority lien on the Notes Priority Collateral, and (ii) a second-priority lien on the ABL Priority Collateral versus obligations outstanding under the Prepetition ABL Credit Facility.

42.     The Prepetition Revolving Credit Facility matures in February 2019.  As of the Commencement Date, the aggregate principal amount outstanding under the Prepetition Revolving Credit Facility is $0.

19

(iii)    *First Lien Notes*

43.    Claire's Stores, successor to Claire's Escrow II Corporation ("**Claire's Escrow II**"),[15] as issuer, the Subsidiary Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A. ("**Bank of New York**"), as indenture trustee and collateral agent, are parties to that certain indenture, dated as of February 28, 2012 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**9.00% First Lien Notes Indenture**") governing the 9.00% senior secured first lien notes issued by Claire's Escrow II (the "**9.00% First Lien Notes**").   Interest is payable on the 9.00% First Lien Notes on March 15 and September 15 of each year prior to their maturity.

44.    The 9.00% First Lien Notes are unconditionally guaranteed, jointly and severally, by the Subsidiary Guarantors, and are secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Prepetition Revolving Credit Facility, the First Lien Term Loan (as defined below), and the 6.125% First Lien Notes (as defined below) by  (i)  a first-priority lien on the Notes Priority Collateral, and (ii) a second-priority lien on the ABL Priority Collateral versus obligations outstanding under the Prepetition ABL Credit Facility.

45.    The 9.00% First Lien Notes mature in March 2019.   As of the Commencement Date, the aggregate principal amount outstanding under the 9.00% First Lien Notes is approximately $1,125 million.

46.    Claire's Stores, as issuer, the Subsidiary Guarantors, as guarantors, and Bank of New York, as indenture trustee and collateral agent, are parties to that certain indenture, dated as of March 15, 2013 governing the 6.125% senior secured first lien notes (the "**6.125%**

---

[15] On March 2, 2012, Claire's Escrow II merged with Claire's Stores, with Claire's Stores being the surviving entity following the merger.  In accordance with the 9.00% First Lien Notes Indenture and pursuant to that certain supplemental indenture, dated as of March 2, 2012, Claire's assumed Claire's Escrow II's obligations with respect to the 9.00% First Lien Notes.

First Lien Notes" and, together with the 9.00% First Lien Notes, the "**First Lien Notes**"). Interest is payable on the 6.125% First Lien Notes on March 15 and September 15 of each year prior to their maturity.

47.     The 6.125% First Lien Notes are unconditionally guaranteed, jointly and severally, by the Subsidiary Guarantors and are secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Prepetition Revolving Credit Facility, the First Lien Term Loan (as defined below), and the 9.00% First Lien Notes by (i) a first-priority lien on the Notes Priority Collateral, and (ii) a second-priority lien on the ABL Priority Collateral versus obligations outstanding under the Prepetition ABL Credit Facility.

48.     The 6.125% First Lien Notes mature in March 2020.   As of the Commencement Date, the aggregate principal amount outstanding under the 6.125% First Lien Notes is approximately $210 million.

**(iv)    *First Lien Term Loan***

49.     Claire's Stores, as borrower, the Subsidiary Guarantors, as guarantors, Wilmington Trust, National Association ("**Wilmington Trust**"), as administrative and collateral agent, and the lenders party thereto (collectively, the "**First Lien Term Loan Lenders**"), entered into that certain Term Loan Credit Agreement, dated as of September 20, 2016, pursuant to which Claire's Stores, as borrower, was deemed to have borrowed an aggregate principal amount of $40 million in term loans (collectively, the "**First Lien Term Loan**" and, together with the Prepetition Revolving Credit Facility and the First Lien Notes, the "**Non-ABL First Lien Debt**" and, together with the Prepetition ABL Credit Facility, the "**First Lien Obligations**") from the First Lien Term Loan Lenders.

50.     The First Lien Term Loan is secured on a *pari passu* basis with the Prepetition Revolving Credit Facility and the First Lien Notes by (i) a first-priority interest in the

Notes Priority Collateral and (ii) a second-priority interest in the ABL Priority Collateral versus obligations outstanding under the Prepetition ABL Credit Facility.

51.    The First Lien Term Loan matures in September 2021.    As of the Commencement Date, the aggregate principal amount outstanding under the First Lien Term Loan is approximately $32.3 million.

   (v)    *Prepetition Letter of Credit Facility*

52.    On February 12, 2018, certain of the Debtors entered into that certain Letter of Credit Reimbursement and Security Agreement (as may be amended, restated, modified, or supplemented from time to time, the "**Prepetition LC Agreement**"), by and among Claire's Stores, as applicant, Claire's Parent, as holdings, and Credit Suisse, as issuer and collateral agent (in such capacity, the "**Prepetition LC Issuer**"), pursuant to which the Prepetition LC Issuer agreed to issue letters of credit in an aggregate maximum amount of up to $1,253,446.45 (the "**Prepetition LC Facility**").    All obligations under the Prepetition LC Facility are secured by a first priority security interest in amounts on deposit in a cash collateral account (the "**Collateral Account**").    The Prepetition LC Agreement requires Claire's Stores to maintain a balance in the Collateral Account of at least 105% of the aggregate amount of letters of credit issued thereunder.    The Prepetition LC Facility matures in February 2019 and, as of the Petition Date, one letter of credit with a face amount of $1,253,446.45 has been issued thereunder.

RLF1 19027853V.1

(vi)   *Second Lien Notes*

53.     Claire's Stores, as successor to Claire's Escrow Corporation ("**Claire's Escrow**"),[16] as issuer, the Subsidiary Guarantors, as guarantors, and Bank of New York, as indenture trustee and collateral agent are parties to that certain indenture, dated as of March 4, 2011 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Second Lien Notes Indenture**") governing the 8.875% senior secured notes issued by Claire's Escrow (the "**Second Lien Notes**").  Interest is payable on the Second Lien Notes on March 15 and September 15 of each year prior to their maturity.

54.     The Second Lien Notes are irrevocably and unconditionally guaranteed, jointly and severally by the Subsidiary Guarantors and are secured, subject to certain exceptions and permitted liens, by substantially the same collateral securing the First Lien Obligations.  As discussed in further detail below, pursuant to the Second Lien Intercreditor Agreement (as defined below), such liens securing the Second Lien Notes are subordinated to the liens securing the First Lien Obligations.

55.     The Second Lien Notes mature in March 2019. As of the Commencement Date, the aggregate principal amount outstanding under the Second Lien Notes is approximately $222.3 million.

(vii)   *Unsecured Notes*

56.     Claire's Stores, as issuer, the Subsidiary Guarantors, as guarantors, and Bank of New York, as indenture trustee and collateral agent, are parties to that certain indenture, dated as of March 14, 2013, governing 7.750% senior unsecured notes issued by Claire's Stores

---

[16] On March 4, 2011, Claire's Escrow merged with Claire's Stores, with Claire's Stores being the surviving entity following the merger.  In accordance with section 13.20 of the Second Lien Notes Indenture and pursuant to that certain Senior Secured Second Lien Notes Supplemental Indenture, dated as of March 4, 2011, Claire's Stores assumed Claire's Escrow's obligations with respect to the Second Lien Notes

(the "**Unsecured Notes**").   The Unsecured Notes mature in June 2020.   As of the Commencement Date, the aggregate principal amount outstanding under the Unsecured Notes is approximately $216.7 million.

    **(viii)** *Intercreditor Agreements*

    (a)    **ABL Intercreditor Agreement**

57.   The relative contractual rights of the ABL Lenders, on the one hand, and the holders of the Non-ABL First Lien Debt, on the other hand, are governed by that certain Intercreditor Agreement, dated as of September 20, 2016 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**ABL Intercreditor Agreement**"). The ABL Intercreditor Agreement controls the rights and obligations of holders of the Debtors' Obligations outstanding under the Prepetition ABL Credit Facility and the Non-ABL First Lien Debt with respect to, among other things, priority, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

    (b)    **Non-ABL First Lien Intercreditor Agreement**

58.   The relative contractual rights of the holders of each series of Non-ABL First Lien Debt, vís a vís one another, are governed by that certain Intercreditor Agreement, dated as of March 2, 2012 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Non-ABL First Lien Intercreditor Agreement**").   The Non-ABL First Lien Intercreditor Agreement controls the rights and obligations of holders of the Debtors' Obligations outstanding under the Non-ABL First Lien Debt with respect to, among other things, priority, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

RLF1 19027853V.1

(c)      **Second Lien Intercreditor Agreement**

59.      The relative contractual rights of the holders of the Non-ABL First Lien

Debt, on the one hand, and the holders of the Second Lien Notes, on the other hand, are governed

by that certain Intercreditor Agreement, dated as of March 4, 2011 (as may be amended, restated,

supplemented, or otherwise modified from time to time, the "**Second Lien Intercreditor**

**Agreement**").  The Second Lien Intercreditor Agreement controls the rights and obligations of

holders of the Debtors' Obligations outstanding under the Non-ABL First Lien Debt and the

Second Lien Notes with respect to, among other things, priority, matters of debtor-in-possession

financing, the use of cash collateral, and adequate protection.

**D.      Non-Debtors Affiliates' Funded Debt Obligations**

60.      As set forth above, certain of the Debtors' non-Debtor affiliates are party

to certain secured and unsecured debt facilities.  Although the Debtors are not obligated on any

of the Non-Debtor Obligations, in certain instances, provisions in the debt instruments governing

the Non-Debtor Obligations may, from time to time, impose restrictions on the Debtors'

liquidity.  The Non-Debtor Obligations are described in further detail below.

(i)      *CLSIP Term Loan*

61.      CLSIP, as borrower, CLSIP Holdings, as holdings, Wilmington Trust, as

administrative and collateral agent, and the lenders party thereto (collectively, the "**CLSIP Term**

**Loan Lenders**") entered into that certain Term Loan Credit Agreement, dated as of September

20, 2016, pursuant to which CLSIP was deemed to have borrowed an aggregate principal amount

of $130 million in term loans (collectively, the "**CLSIP Term Loan**") from the CLSIP Term

Loan Lenders.

62.      The CLSIP Term Loan is guaranteed by CLSIP Holdings and is secured

by a first-priority lien on (i) substantially all assets of CLSIP, which consist of, among other

25

things, CLSIP's rights in the Transferred IP and CLSIP's rights under the Transferred IP Agreement and (ii) substantially all assets of CLSIP Holdings, including all equity interests of CLSIP held by CLSIP Holdings (together with the Transferred IP, the "**CLSIP Collateral**"). The CLSIP Term Loan is structurally senior to the Debtors' Obligations with respect to the CLSIP Collateral.

63.    The CLSIP Term Loan matures in September 2021.    As of the Commencement Date, the aggregate principal amount outstanding under the CLSIP Term Loan is approximately $105 million.  None of the Debtors are obligated on the CLSIP Term Loan.

**(ii)**    *Gibraltar Secured Term Loan*

64.    Claire's (Gibraltar) Intermediate Holdings Limited ("**Gibraltar Intermediate**" and, together with Gibraltar Holdings, the "**Gibraltar Entities**") and Claire's Germany GMBH ("**Claire's Germany**"), as borrowers, the guarantors party thereto, Botticelli LLC, as administrative agent, Cortland Capital Markets Services LLC, as collateral agent, and the lenders party thereto (the "**Gibraltar Secured Term Loan Lenders**") entered into that certain Credit Agreement, dated as of January 5, 2017 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Gibraltar Secured Term Loan Agreement**"), pursuant to which the Gibraltar Secured Term Loan Lenders agreed to provide Gibraltar Intermediate and Claire's Germany with a secured term loan in the aggregate principal amount of $50 million (the "**Gibraltar Secured Term Loan**").  The Gibraltar Secured Term Loan matures in January 2019.  As of the Commencement Date the aggregate principal amount outstanding under the Gibraltar Secured Term Loan is approximately $51.5 million.

65.    All obligations under the Gibraltar Secured Term Loan have been guaranteed by certain of Gibraltar Intermediate's direct and indirect wholly-owned subsidiaries (collectively, the "**Gibraltar Guarantors**"), none of which are Debtors in these chapter 11

26

cases.  The obligations under the Gibraltar Secured Term Loan are secured by liens on the assets of Gibraltar Intermediate, Claire's Germany, and the Gibraltar Guarantors.  None of the Debtors are obligated on Gibraltar Secured Term Loan; however, a provision in the Gibraltar Secured Term Loan Agreement restricts cash transfers from the Gibraltar Entities to the Claire's Group's domestic entities, including the Debtors, if an event of default exists under any of the Debtors' Obligations or under the CLSIP Term Loan.

      **(iii)**    ***Gibraltar 2019 Unsecured Term Loan***

66.     Gibraltar Holdings, as borrower, Credit Suisse, as administrative agent, and the lenders party thereto (the "**Gibraltar 2019 Unsecured Term Loan Lenders**") entered into that certain Credit Agreement, dated as of August 12, 2016, effective as of September 20, 2016 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Gibraltar 2019 Unsecured Term Loan Agreement**"), pursuant to which Gibraltar Holdings, as borrower, was deemed to have borrowed an aggregate principal amount of $40 million from the Gibraltar 2019 Unsecured Term Loan Lenders (the "**Gibraltar 2019 Unsecured Term Loan**") for the purpose of paying down outstanding indebtedness under the Prepetition Revolving Credit Facility in connection with the 2016 Exchange (as described in further detail below). The Gibraltar 2019 Unsecured Term Loan matures in February 2019.  As of the Commencement Date, the aggregate principal amount outstanding under the Gibraltar 2019 Unsecured Term Loan is approximately $40 million.

67.     None of the Debtors are obligated on the Gibraltar 2019 Unsecured Term Loan; however, the Gibraltar 2019 Term Unsecured Term Loan Agreement contains a cash sweep provision that requires that aggregate cash on hand at the Claire's Group's domestic entities, including the Debtors, in excess of $30 million for thirty (30) consecutive days be transferred to Gibraltar Holdings (the "**Gibraltar Cash Sweep Provision**").  Failure to comply

27

with the Gibraltar Cash Sweep Provision triggers an event of default under the Gibraltar 2019 Unsecured Term Loan.

**(iv)**   ***Gibraltar 2021 Unsecured Term Loan***

68.     Gibraltar Holdings, as borrower, and Wilmington Trust, as administrative agent, and the lenders party thereto (the "**Gibraltar 2021 Unsecured Term Loan Lenders**") entered into that certain Term Loan Credit Agreement, dated as of September 20, 2016, pursuant to which Gibraltar Holdings, as borrower, was deemed to have borrowed $60 million in aggregate principal amount of term loans (collectively, the "**Gibraltar 2021 Unsecured Term Loan**" and, together with the Gibraltar Secured Term Loan and the Gibraltar 2021 Unsecured Term Loan, the "**Gibraltar Loans**") from the Gibraltar 2021 Unsecured Term Loan Lenders. The Gibraltar 2021 Unsecured Term Loan matures in September 2021.   As of the Commencement Date, the aggregate principal amount outstanding under the Gibraltar 2021 Unsecured Term Loan is approximately $48.5 million.  None of the Debtors are obligated on the Gibraltar 2021 Unsecured Term Loan.

69.     The Gibraltar Loans are structurally senior to the Claire's Group's other funded debt with respect to the Company's non-North American international operations.

**(iv)**   ***Intercompany Transactions***

70.     As is customary for a global company of the Claire's Group's size and scale, the Debtors are party to a series of ordinary-course formal and informal relationships with each other and with certain of their non-Debtor affiliates. Certain of the Company's intercompany transactions result in various intercompany balances, claims, and obligations. Such intercompany transactions include, among others, (i) entering into and performing under IP licensing arrangements, such as the Transferred IP Agreement; (ii) consolidated product sourcing and distribution on behalf of the Claire's Group; (iii) entering into and performing under

28

administrative support services arrangements, and (iv) ordinary-course payments, such as payments related to insurance and taxes, made by one entity on behalf of other entities in the Claire's Group. These intercompany transactions are booked in a number of different ways, including as accounts receivable/payable entries on Claire's Group entity-level balance sheets and through contractual obligations and intercompany loans.

## IV.
## Events Leading to Commencement of Chapter 11 Cases

71.     The Debtors' core business remains strong. The *Claire's*® and *Icing*® experiential retail offering and "treasure hunt" shopping atmosphere simply cannot be replicated online. The Debtors also continue to benefit from healthy margins across their store footprint as a whole. The overall retail landscape remains challenging, however, and especially so for an over-levered retailer like the Debtors. For Fiscal 2017, the Claire's Group reported approximately $212 million of adjusted EBITDA (on a consolidated 52-week basis) versus approximately $2.1 billion of total debt—implying leverage of approximately 10x EBITDA. Further, approximately $1.4 billion of the Claire's Group's funded debt is scheduled to mature in the first calendar quarter of 2019.

## A.      The Debtors Operate in a Highly Competitive Market

72.     The retail industry as a whole has been challenged by shifts in consumer purchasing preferences and habits. Recent data has indicated that year-over-year mall traffic has declined by approximately eight percent (8%).[17] This decline may be attributable to several factors, including competition from big box retailers, large tenant closures (leaving malls without an "anchor" tenant to drive foot traffic), and the increased popularity of online shopping. And,

---

[17] This data represents mall traffic year-over-year decline in June 2017 and is based on public data made available by Cowen & Company, National Traffic Devices.

while the Debtors believe their business model and product offerings remain a compelling proposition over the long term, the Debtors have not been immunized from these broader trends. Consolidated revenue for the Claire's Group has declined from approximately $1.5 billion in Fiscal 2014[18] to approximately $1.3 billion in Fiscal 2017.

**B.      The Debtors are Highly Levered**

73.     As noted above, the Claire's Group is levered approximately 10x as of the end of Fiscal 2017.  The Debtors do not believe that their current balance sheet is sustainable over the long term.  Indeed, the Debtors have approximately $1.4 billion in funded debt that will mature in approximately one year or less.  The Debtors' levered balance sheet has had a corresponding impact on the Debtors' liquidity and growth.  Over the last three years, the Debtors' cash interest expense has averaged approximately $183 million per year.  The costs of such debt service has, of course, impacted the Debtors' ability to refresh store locations, drive product and growth initiatives, and further enhance their customer experience.

**C.      Prepetition Initiatives**

**(i)      *Operational Initiatives***

74.     The Claire's Group has undertaken a number of steps to improve its operational performance and drive organic growth.  This process has involved installing a new and highly experienced management team, with the Debtors engaging a new Chief Executive Officer and heads of merchandising and supply chain management, in addition to my own engagement, in 2016.  With new leadership, the Debtors have actively pursued growth opportunities.  For example, in 2017, the new management team secured major concessions partnerships with a national pharmacy and regional grocery chain.  These partnerships have expanded the Debtors' concessions business by approximately 4,000 concessions stores, and are

---

[18] "**Fiscal 2014**" refers to the Debtors' fiscal year ending February 1, 2015.

projected to grow the business even further in 2018.  The Debtors' management team also has worked to decrease the Debtors' occupancy costs by negotiating concessions with landlords and developing a plan for closing underperforming stores.  These efforts have had a corresponding positive impact on cash flow.  In Fiscal 2017, the Claire's Group reported an adjusted EBITDA margin of 16.1% (on a consolidated 52-week basis), an improvement of approximately 170 basis points from Fiscal 2016.[19]

      **(ii)**    ***2016 Exchange***

      75.    The Claire's Group further sought to reduce its overall leverage and cash interest expense through a debt-for-debt exchange in September 2016 (the "**2016 Exchange**"). Through the 2016 Exchange, participating holders of the Company's (i) Second Lien Notes, (ii) Unsecured Notes, (iii) then-outstanding 10.50% senior subordinated notes due 2017[20], and (iv) then-outstanding 10.50% PIK senior subordinated notes due 2017[21] agreed to exchange their respective debt (the "**Exchanged Debt**") for new issuances of indebtedness under the First Lien Term Loan, the CLSIP Term Loan, and the Gibraltar 2021 Unsecured Term Loan.

      76.    The 2016 Exchange occurred in two parts. The initial phase began with a preliminary public offer to third-party holders of the Exchanged Debt to participate in the 2016 Exchange (the "**Non-Affiliate Exchange Offer**").  The second phase included a conditional offer to Apollo and Claire's Parent to participate in the 2016 Exchange if the Non-Affiliate Exchange Offer did not result in a minimum subscription of $400 million (the "**Affiliate Exchange Offer**").  Pursuant to the Non-Affiliate Exchange Offer, unaffiliated holders tendered

---

[19] "Fiscal 2016" refers to the Company's fiscal year ended January 28, 2017.

[20] In 2017, the Company discharged its remaining obligations with respect to these 10.5% senior subordinated notes due 2017.

[21] 100% of these 10.5% PIK senior subordinated notes due 2017 were exchanged in the 2016 Exchange.

approximately $332 million aggregate principal amount of Exchanged Debt. Accordingly, Apollo and Claire's Parent then participated in the 2016 Exchange on the same terms as those offered to unaffiliated holders under the Non-Affiliate Exchange Offer. Pursuant to the Affiliate Exchange Offer, Apollo exchanged approximately $183.6 million in then-outstanding 10.50% PIK senior subordinated notes, and Claire's Parent exchanged approximately $58.7 million in then-outstanding 10.50% senior subordinated notes for approximately (i) $10.5 million of First Lien Term Loans, (ii) $34.2 million of CLSIP Term Loans, and (iii) $15.8 million of Gibraltar 2021 Unsecured Term Loans.[22]

77.     To effectuate the 2016 Exchange and to help manage its maturity profile and near-term debt service obligations, the Claire's Group also (i) entered into the Prepetition ABL Credit Facility; (ii) extended the maturity date under the Prepetition Revolving Credit Facility from September 2017 to February 2019 in exchange for (x) a $40 million paydown with the proceeds of the Gibraltar 2019 Unsecured Loan, and (y) a reduction of borrowing availability to $75 million; (iii) amended its European asset-based lending credit facility to allow debt to be issued at Gibraltar Holdings and to permit cash transfers from Gibraltar Holdings to Claire's Stores; and (iv) transferred the Transferred IP to CLSIP pursuant to the Transferred IP Agreement.[23]

78.     The 2016 Exchange reduced the Debtors' overall indebtedness by approximately $400 million, extended the maturity of the Prepetition Revolving Credit Facility

---

[22] As of the Commencement Date, the Debtors understand that Apollo beneficially owns or controls  approximately (i) $9 million in First Lien Term Loans,  (ii) $26 million of CLSIP Term Loans, and (iii) $13 million in Gibraltar 2021 Unsecured Term Loans.  As of the Commencement Date, the Debtors understand Claire's Parent further owns approximately (i) $3 million of First Lien Term Loans, (ii) $9 million of CLSIP Term Loans, and (iii) $4 million of Gibraltar 2021 Unsecured Term Loans.

[23] Shortly after the 2016 Exchange, the Claire's Group refinanced its European asset-based lending credit facility with the Gibraltar Secured Term Loan.

from September 2017 to February 2019, and realized annual cash interest savings of approximately $24 million (not including conversion of certain subordinated notes to PIK interest).

  **(iii)**  ***Stakeholder Engagement***

  79.  As set forth above, prior to the commencement of these chapter 11 cases, the Claire's Group, with the assistance of its restructuring advisors, engaged with its creditor groups with the goal of building a consensus around a deleveraging transaction. These stakeholder constituencies include the Ad Hoc First Lien Group, the Majority Second Lien Holder, and the Sponsor. Engagement with these creditor groups has involved, among other things, (i) the provision of a substantial amount of diligence to those entities and their advisors; (ii) ongoing communication regarding the Claire's Group, its operations, and prospects; (iii) in-person meetings to discuss the Debtors' restructuring path; and (iv) the Debtors' undertaking to pay fees and expenses incurred by such stakeholders in connection with the Debtors' restructuring process prior to the Commencement Date.

  80.  The Debtors' engagement with these stakeholders increased ahead of the due date of the March 15 Coupon Payment. As noted above, the Debtors did not make the March 15 Coupon Payment, and instead, elected to utilize the grace period afforded to them under the First Lien Notes Indentures and the Second Lien Notes Indenture to complete the negotiations of the RSA and Plan Term Sheet. On the eve of the commencement of these chapter 11 cases, the Debtors, the Sponsor, and the members of the Ad Hoc First Lien Group executed the RSA attached hereto as **Exhibit A** and paved the way for the Debtors to substantially deleverage the Claire's Group's balance sheet and position the Company for a brighter, more profitable future.

(iv)     *DIP Financing*

81.     The Debtors' chapter 11 cases are well-funded.    Prior to the Commencement Date, the Debtors and their advisors worked to ensure that the Debtors would have ample liquidity available should the Debtors be obliged to commence these cases.   The process for raising the Debtors' proposed postpetition financing (the "**DIP Financing**") involved extensive marketing efforts undertaken by the Debtors' proposed investment banker, Lazard Frères & Co., LLC ("**Lazard**").   Lazard engaged both third-party lenders and the Debtors' existing stakeholders to obtain financing on the most competitive terms possible.   The Debtors are pleased to report that this process has been a success, and that contemporaneously herewith, the Debtors have filed a motion seeking approval of a fully underwritten $135 million DIP Facility with attractive pricing.   The DIP Facility will refinance the Debtors' Prepetition ABL Credit Facility and the Prepetition Revolving Credit Facility.   In addition, the DIP Facility will provide the Debtors with "day 1" incremental liquidity.

82.     The DIP Facility is also notable insofar as it contains limited case milestones that may have otherwise limited the Debtors' flexibility to implement the transactions contemplated by the Plan Term Sheet or to exercise their rights under the Go-Shop Provision in the RSA. The DIP Financing sends a clear message to the Debtors' stakeholders, including their customers and vendors, that the Debtors have the confidence of the capital markets and the resources necessary to successfully complete their restructuring path through these chapter 11 cases.

**V.**
**First Day Motions**

83.     Contemporaneously herewith, the Debtors have filed with the Court First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors'

business operations, facilitate the efficient administration of these chapter 11 cases, and expedite

a swift and smooth restructuring of the Debtors' capital structure.  The First Day Motions include

the following:

- *Motion of Debtors for Entry of Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief;*

- *Motion of Debtors for Entry of Order (I) Authorizing Debtors to File Under Seal Fee Letter Related to Proposed Debtor-in-Possession Financing, (II) Restricting Access to the Fee Letter, and (III) Granting Related Relief;*

- *Motion of Debtors for Entry of Order (I) Authorizing Debtors to (A) Continue Participating in Existing Cash Management System and Using Bank Accounts and Business Forms, and (B) Continue Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, and (III) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs, and (B) Continue Compensation and Benefits Programs, and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Obligations to Critical Vendors and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Obligations to Foreign Vendors and (II)Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Maintain Their Insurance Policies and*

*Programs, and (B) Honor All Insurance Obligations, and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of (A) Shippers and Lienholders, and (B) 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief;*

- *Motion of Debtors for Entry of Order (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service, (IV) Authorizing the Debtors to Honor Obligations to Payment Processors in the Ordinary Course of Business, and (V) Granting Related Relief;*

- *Motion of Debtors for Entry of Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors and Claiming a Worthless Stock Deduction; and*

- *Application of Debtors for Appointment of Prime Clerk LLC as Claims and Noticing Agent Nunc Pro Tunc to the Commencement Date.*

84.     The First Day Motions seek authority to, among other things, obtain postpetition financing, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these chapter 11 cases.  I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work toward a successful restructuring that will inure to the benefit of all of their stakeholders.

RLF1 19027853V.1

85.     Several of the First Day Motions request authority to pay certain prepetition claims against the Debtors.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking other relief to subsequent hearings before the Court.

86.     I am familiar with the content and substance of each of the First Day Motions.  I believe approval of the relief sought in each of the First Day Motions is critical to the Debtors' ability to successfully implement their chapter 11 strategy, with minimal disruption to their business operations.  Obtaining the relief sought in the First Day Motions will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.

[*remainder of page intentionally left blank*]

37

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 19th day of March, 2018

/s/ Scott E. Huckins
Scott E. Huckins
Executive Vice President & Chief
Financial Officer

Claire's Stores, Inc. and its Debtor
affiliates

## Exhibit A

**Restructuring Support Agreement**

<div align="center">

**CLAIRE'S INC., ET AL.**

**RESTRUCTURING TERM SHEET**

**March 19, 2018**

</div>

This term sheet (the "<u>Term Sheet</u>") sets forth the principal terms of a comprehensive restructuring of the existing debt and other obligations of the Company (on the terms set forth herein, the "<u>Restructuring</u>"). The Restructuring will be consummated through prearranged cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and as otherwise set forth in the restructuring support agreement to which this Term Sheet is attached as **Exhibit A** (the "<u>RSA</u>") and this Term Sheet.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAW.

| Material Terms of the Restructuring | |
| --- | --- |
| **Term** | **Description** |
| Overview of the Restructuring | This Term Sheet contemplates the Restructuring of Claire's Inc. and certain of its wholly-owned direct and indirect domestic subsidiaries that are listed on **Schedule A** hereto (collectively, the "<u>Debtors</u>", and together with CLSIP Holdings LLC, CLSIP LLC, Claire's Stores Canada Corp, and Claire's Swiss Holdings LLC and its direct and indirect subsidiaries, the "<u>Company</u>"). |
| | To implement the Restructuring, the Company will consummate the transactions set forth in this Term Sheet, which include the Debtors filing voluntary petitions for relief under the Bankruptcy Code by March 19, 2018 (the date of commencement of the Chapter 11 Cases, the "<u>Petition Date</u>") and obtaining confirmation from the Bankruptcy Court of the Plan (as defined in the RSA) within the deadlines set forth in the Milestones set forth below.  For the avoidance of doubt, none of (i) CLSIP Holdings LLC, (ii) CLSIP LLC, (iii) Claire's Stores Canada Corp., a Canadian corporation, or (iii) Claire's Swiss Holdings LLC or any of its subsidiaries will file voluntary petitions for relief under the Bankruptcy Code or commence comparable proceedings under local law. |
| | The initial parties to the RSA will be: |
| | (i) Claire's Inc. and each of its direct and indirect wholly-owned domestic subsidiaries;[1] |
| | (ii) the Initial Consenting Creditors (as defined in the RSA) represented by Willkie Farr & Gallagher LLP and Millstein & Co., LLC (the "<u>Ad Hoc First Lien Group</u>") |
| | As of the date hereof, the Ad Hoc First Lien Group beneficially holds or controls:  (a) |

---

[1] Including CLSIP Holdings LLC, and CLSIP LLC, but not Claire's Swiss Holdings LLC, as parties to the RSA. Company parties to the RSA shall cause all direct and indirect subsidiaries to comply with RSA as provided therein.

<div align="center">1</div>

26.1%% of the aggregate principal amount of outstanding loans under that certain ABL Credit Agreement, dated September 20, 2016 (as amended, modified, or supplemented from time to time, the "Existing ABL Revolver"); (b) 26.1%% of the aggregate principal amount of outstanding loans under that certain Second Amended and Restated Credit Agreement, dated as of September 20, 2016 (as amended, modified, or supplemented from time to time, the "Existing RCF"); (c) 59.5% of the aggregate principal amount of outstanding Senior Secured First Lien Term Loan due 2021 (the "Claire's Term Loan") issued by Claire's Stores Inc. under that certain Term Loan Credit Agreement, dated September 20, 2016 (as amended, modified, or supplemented from time to time, the "Claire's Term Loan Credit Agreement"); (d) 69.6% of the aggregate principal amount of outstanding 9% Senior Secured First Lien Notes due 2019 (the "Claire's 2019 1L Notes") issued by Claire's Stores Inc. pursuant to that certain Senior Secured First Lien Notes Indenture, dated February 28, 2012 (as amended, modified, or supplemented from time to time, the "Claire's 2019 1L Notes Indenture"); (e) 89.4% of the aggregate principal amount of outstanding 6.125% Senior Secured First Lien Notes due 2020 (the "Claire's 2020 1L Notes") issued by Claire's Stores Inc. pursuant to that certain Senior Secured First Lien Notes Indenture, dated March 15, 2013 (as amended, modified, or supplemented from time to time, the "Claire's 2020 1L Notes Indenture" and all claims arising under the Claire's Term Loan Credit Agreement, the Claire's 2019 1L Notes Indenture, and the Claire's 2020 1L Notes Indenture, and the term loans and notes issued pursuant to the foregoing instruments shall be referred to herein collectively as the "First Lien Claims")[2]; (f) 26.1% of the aggregate principal amount of outstanding Gibraltar Unsecured Term Loan due 2019 (the "Gibraltar 2019 Term Loan") issued by Claire's Gibraltar Holdings Limited. pursuant to that certain Credit Agreement, dated as of August 12, 2016 (as amended, modified, or supplemented from time to time, the "Gibraltar 2019 Term Loan Credit Agreement"); (g) 60.2% of the aggregate principal amount of outstanding 9% Gibraltar Unsecured Term Loan due 2021 (the "Gibraltar 2021 Term Loan") issued by Claire's Gibraltar Holdings Limited. pursuant to that certain Term Loan Credit Agreement, dated September 20, 2016 (as amended, modified, or supplemented from time to time, the "Gibraltar 2021 Term Loan Credit Agreement"); (h) 60.1% of the aggregate principal amount of outstanding CLSIP Senior Secured Term Loan due 2021 (the "CLSIP Loan") issued by CLSIP LLC pursuant to that certain Term Loan Credit Agreement, dated September 20, 2016 (as amended, modified, or supplemented from time to time, the "CLSIP Loan Credit Agreement"); and (i) 7.9% of the aggregate principal amount of outstanding 8.875 % Senior Notes Due 2020 (the "Claire's 2L Notes") issued by Claire's Stores, Inc. pursuant to the certain Senior Secured Second Lien Notes Indenture, dated as of March 4, 2011 (as amended, modified or supplemented from time to time, the "Claire's 2L Notes Indenture") (all claims arising under the Claire's 2L Notes Indenture and the Claire's 2L Notes shall be referred to herein collectively as the "Second Lien Claims"); and (j) 83.0% of the aggregate principal amount of outstanding 7.775% Senior Notes Due 2020 (the "Unsecured Notes") issued by Claire's Stores, Inc. pursuant to the certain Senior Notes Indenture, dated as of May 14, 2013 (as amended, modified or supplemented from time to time, the "Unsecured Notes Indenture") (all claims arising under the Unsecured Notes Indenture and the Unsecured Notes shall be referred to herein collectively as the "Unsecured Notes Claims) and does not beneficially own or control any other debt claims not disclosed here; and

(iii) Apollo Management Holdings, L.P., as manager and/or investment advisor of funds that are the owners and/or beneficial holders of interests in and claims against the Company (the "Sponsor") ("Sponsor"), which, as of the date hereof, consist of

---

[2] For the avoidance of doubt "First Lien Claims" excludes claims outstanding with respect to the Existing ABL Revolver and the Existing RCF.

WEIL:\96489994\2\36182.0003

| | |
|---|---|
| | approximately 28% of the Claire's Term Loan, approximately 28% of the Gibraltar 2021 Term Loan, approximately 28% of the CLSIP Loan, and 97.66% of the outstanding equity interests of the Company and does not beneficially own or control any other debt or equity claims not disclosed here, (collectively with the Initial Consenting Creditors and the Company, the "<u>Restructuring Support Parties</u>"). |
| **Financing** | |
| DIP Financing | Prior to the Petition Date, the Debtors shall have entered into a debt financing commitment letter with Citibank Global Markets Inc. providing for debtor-in-possession financing on the terms attached hereto as **Exhibit 1** (the "**DIP Term Sheet**"). |
| Permitted Refinancing Stipulation | The Consenting Creditors hereby stipulate that entry into the agreement governing the DIP Facilities (as defined in the DIP Term Sheet) (the "<u>DIP Credit Agreement</u>") constitutes a "**Permitted Refinancing**" as such term is defined by the ABL Intercreditor Agreement. |
| Adequate Protection | During the Chapter 11 Cases, the Company shall provide adequate protection with respect to First Lien Claims consisting of:<br><br>(i) the adequate protection provided by clauses (c), (d), and (e) of the "Adequate Protection" provision of the DIP Term Sheet;<br><br>(ii) customary lien stipulations, and (iii) timely payment of the reasonable and documented fees and expenses (but not success fees, transaction fees, or similar fees), including reasonable and documented professional fees and expenses, incurred by (A) the Ad Hoc First Lien Group, and (B) the agents under the Existing ABL Revolver, the Existing RCF, and the Claire's Term Loan, and the trustees under the Claire's 2019 1L Notes Indenture and the Claire's 2020 1L Notes Indenture; <u>provided</u> <u>that</u> the payment of all such fees and expenses shall be subject to the Debtors' or any party in interest's rights to seek a determination that such payments should be recharacterized as repayment on account of the secured portion of First Lien Claims as of the Petition Date.<br><br>Upon the termination of the RSA by the Requisite Consenting Creditors (as defined in the RSA) in accordance with its terms, the Requisite Consenting Creditors shall have the right to file a motion with the Bankruptcy Court requesting additional adequate protection on account of First Lien Claims with respect to their interest in the Notes Priority Collateral (as defined in the ABL Intercreditor Agreement), including in the form of cash-pay interest at the default rate on account of First Lien Claims; <u>provided</u> <u>that</u> the Debtors' or any party in interest's rights to contest any such request on any basis whatsoever are fully reserved.<br><br>For the avoidance of doubt, in no instance shall the Debtors be required to provide adequate protection on account of First Lien Claims in the form of cash-pay interest unless otherwise ordered by the Bankruptcy Court after the occurrence of an RSA Milestone Event. |
| CLSIP Loan Amendment/Refinancing | Not later than seven (7) days following the Petition Date, the Company shall enter into a forbearance with respect to the CLSIP Loan Credit Agreement, with the holders of the CLSIP Loan other than insiders of the Company (as insider is defined in the Bankruptcy Code) (the "<u>CLSIP Creditors</u>") on terms consistent with this Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors (the "<u>CLSIP Forbearance Agreement</u>"), to provide, among other things, that any "going concern" default arising with respect to the CLSIP Loan, |

| | |
|---|---|
| | and any other defaults arising on account of the transactions and agreements contemplated hereby, shall be waived during the pendency of the Chapter 11 Cases.<br><br>CLSIP Creditors consenting to the CLSIP Forbearance Agreement and the Sponsor, solely with respect to the Sponsor's CLSIP Loan claims, will receive a one-time forbearance fee paid in kind (i.e. additional CLSIP loan principal amount owed) of 2.75% of their holdings under the CLSIP Loan.  Such forbearance fee paid in kind shall accrue interest at the default rate from the closing date of the CLSIP Forbearance Agreement and be paid interest as set forth below.  Additionally, the CLSIP Forbearance Agreement will:<br><br>• provide for payment of interest in cash on a regularly scheduled basis while the CLSIP Forbearance Agreement is in effect at the default rate; and<br><br>• provide that the CLSIP Loan, including amounts on account of the forbearance fee and interest on such forbearance fee, will be repaid in full on the Effective Date (as defined in the RSA). |

| **Chapter 11 Plan Implementation** |
|---|

| | |
|---|---|
| New Money Investment | On or prior to seven (7) days after the "first day" hearing, the Company, the Initial Consenting Creditors and the Sponsor shall execute the backstop commitment agreement on terms consistent with this Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors (the "New Money Backstop Commitment Agreement") pursuant to which the Initial Consenting Creditors and the Sponsor will backstop an investment in the Company, in the allocations set forth on Schedule I to the RSA, up to $575 million (the "New Money Investment") comprised of (i) a $75 million new exit ABL revolver (the "New ABL Revolver"), (ii) $250 million of a new first lien exit term loan (the "New First Lien Term Loan") and (iii) up to $250 million of preferred stock or equity interests of reorganized Claire's (the "Preferred Equity Interests").  The Backstop Agreement shall further provide for the payment, on the Effective Date, of First Lien Fees and Expenses (as defined in the RSA) that are accrued but unpaid as of the Effective Date.<br><br>As part of the solicitation of acceptances for the Plan, the Company shall commence a rights offering through which holders of First Lien Claims that are qualified institutional buyers and/or accredited investors (each, an "Eligible Holder") will receive rights to participate, on a *pro rata* basis, in the New Money Investment less the Holdback Amount (defined below) (the "Rights Offering").  The Backstop Parties (defined below) will purchase any and all of the New Money Investment not subscribed in the Rights Offering.  The amount of the New Money Investment each participant purchases through the Rights Offering and the Plan will be allocated as follows (as may be adjusted to account for the adjusted Preferred Investment Amount):  (i) 13.0434782% to commitments under the New ABL Revolver; (ii) 43.4782609% to the purchase of notes issued under the New First Lien Term Loan; and (iii) 43.4782609% to the investment of the Preferred Investment Amount (defined below).<br><br>Each holder of First Lien Claims that executes a joinder to the RSA on or prior to ten (10) business days after the Petition Date, and subsequently subscribes for their *pro rata* share of the Rights Offering (collectively, excluding the Backstop Parties, the "Supporting Parties").  Each Supporting Party shall receive its *pro rata* allocation of the following, where *pro rata* allocation is calculated by dividing the amount of such Supporting Party's First Lien Claims by the total amount of First Lien Claims: |

| | |
|---|---|
| | (a) a premium equal to 3.5% of the maximum Preferred Investment Amount (defined below), or $8.75 million, (the "Preferred Commitment Premium"), which Preferred Commitment Premium shall be paid in additional Preferred Equity Interests issued to the Supporting Parties on the Effective Date; and |
| | (b) a premium equal to 1.5% of the total commitment amount of the New First Lien Term Loan, or $3.75 million (the "Term Commitment Premium" and together with the Preferred Commitment Premium, the "Commitment Premiums"), which Term Commitment Premium shall be paid in cash on the Effective Date. |
| | Proceeds of the New Money Investment, together with cash on hand, shall be used (i) to repay the DIP Facilities, the CLSIP Loan, the Gibraltar 2019 Term Loan, the Gibraltar 2021 Term Loan and the Gibraltar Intermediate Secured Term Loan due 2019, (ii) to fund the costs arising from the administration of the Debtors' Chapter 11 Cases (including "emergence" costs), and (iii) for working capital requirements and general corporate purposes. |
| New ABL Revolver | Terms for the New ABL Revolver will be on terms consistent with this Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors and shall provide that:<br><br>• the New ABL Revolver shall be secured by a first lien on assets constituting ABL Priority Collateral (as defined in that certain [ABL] Intercreditor Agreement, dated as of September 20, 2016) and a second lien on all other assets with respect to the New First Lien Term Loan; and<br><br>• the New ABL Revolver will (i) mature 4 years after the Effective Date, (ii) bear interest at L+350 bps with no floor, payable in cash quarterly, and (iii) include an undrawn commitment fee 0.75%. |
| New First Lien Term Loan | Material terms for the New First Lien Term Loan include:<br><br>The New First Lien Term Loan shall be secured by a first lien on all assets other than ABL Priority Collateral (including all foreign stock that may be pledged with no material tax consequences, and including at least 65% of the voting stock of top-tier foreign holding companies and 100% of the economic value of top tier foreign holding companies to the extent such value may be pledged without material adverse tax consequences) subject to customary exceptions and exclusions, and a second lien on assets constituting ABL Priority Collateral with respect to the New ABL Revolver. Additionally, the New First Lien Term Loan shall permit the company to incur up to $175 million of indebtedness senior in lien priority to the New First Lien Term Loan.<br><br>The New First Lien Term Loan will (i) mature 20 years from the Effective Date and (ii) bear interest at L+725 bps with a 1.5% LIBOR floor per annum, payable in cash quarterly.  The full principal amount of the New First Lien Term Loan will be due at maturity, and have no amortization.<br><br>The New First Lien Term Loan will include a make-whole redemption provision (the "Make-Whole Premium"), subject to waiver by two-thirds supermajority of holders of the New First Lien Term Loan, which shall be owed and payable upon a change of control, merger, sale of all or substantially all assets, acceleration, default, bankruptcy, insolvency, redemption or prepayment whether mandatory or at the reorganized Company's option.  "Make-Whole Premium" means, as of any date on which the New First Lien Term Loan is repaid or prepaid, the greater of (i) 1.0% of the principal amount of the New First Lien Term Loan and (ii) the excess of (A) the present value at such date of redemption of (1) the principal amount of the New First Lien Term Loan, plus (2) all remaining required interest payments (assuming that the rate of interest will be equal to (x) the U.S. dollar interest rate swap rate with a duration most nearly equal to the then remaining term of New First Lien Term Loan |

| | |
|---|---|
| | to the Maturity Date (as quoted by Bloomberg) plus 7.25% per annum or (y) if such rate in clause (x) is not available, the rate of interest applicable to the New First Lien Term Loan on the date that is two (2) business days prior to the date on which the notice of prepayment is delivered) due on the New First Lien Term Loan through the Maturity Date (excluding accrued but unpaid interest to the date of repayment or prepayment), computed using a discount rate equal to the applicable treasury rate plus 50 basis points, over (B) the principal amount of the New First Lien Term Loan. |
| | The terms for the New First Lien Term Loan shall otherwise be consistent with this Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors. |
| Preferred Equity Interests | The Preferred Equity Interests shall initially be convertible into [●]%[3] of the new common stock or equity interests of reorganized Claire's (the "New Common Interests"), at holders' option at any time. |
| | The Preferred Equity Interests will bear a 14% annual dividend on its liquidation preference (inclusive of all fees and additional Preferred Equity Interests issued as part of the Restructuring), payable in cash or, at the option of the holder (which option must be delivered to the Company at least 180 days before each payment date), accrued quarterly. |
| | The Preferred Equity Interests, which shall have an aggregate investment amount equal to the greater of (x) $200 million and (y) the investment amount of Preferred Equity Interests, not to exceed $250 million, such that the Company's consolidated cash on the Effective Date shall be not more than $100 million assuming no draw on the New ABL Revolver and pro forma for all uses of cash associated with the Restructuring[4] (the greater of (x) and (y), the "Preferred Investment Amount"), will be offered at a 37.5% discount to plan equity value, and shall have a maximum initial liquidation preference of $400 million excluding fees (or $426.25 million after accounting for the issuance of additional Preferred Equity Interests to the Supporting Parties and Backstop Parties on account of the Preferred Commitment Premium and Preferred Equity Backstop Fee). |
| | The Preferred Equity Interests shall have an early redemption premium (the "Preferred Redemption Premium"), subject to waiver by two-thirds supermajority of holders of the Preferred Equity Interests, owed and payable upon a change of control, merger, sale of all or substantially all assets, acceleration, default, bankruptcy, insolvency, redemption or prepayment whether mandatory or at the reorganized Company's option. "Preferred Redemption Premium" means, as of any date on which Preferred Equity Interests are redeemed, the greater of (i) 1.0% of the liquidation preference of such Preferred Equity Interests (inclusive of all fees and additional Preferred Equity Interests issued as part of the Restructuring) and (ii) the excess of (A) the present value at such date of redemption of (1) the liquidation preference of such Preferred Equity Interests (inclusive of all fees and additional Preferred Equity Interests issued as part of the Restructuring), plus (2) all remaining required dividends due on the such Preferred Equity Interests through the twentieth (20th) anniversary of the Effective Date assuming such dividends would be elected to |

---

[3] To be equal to (a) the total initial liquidation preference of the New Preferred Stock, including the Preferred Commitment Premium and Preferred Equity Backstop Fee (as defined below) (the "Aggregate New Preferred Stock Initial Liquidation Preference"), divided by (b) the sum of: (i) such Aggregate New Preferred Stock Initial Liquidation Preference, plus (ii) the value of the New Common Stock based on a total enterprise value upon and pro forma for the Effective Date and all payments or accruals related to the Restructuring of $1.4 billion, with such calculation being satisfactory to the Requisite Consenting Creditors in their reasonable discretion.

[4] Which amount shall be estimated in good faith by the Company prior to commencement of the Rights Offering subject to the reasonable consent of the financial advisors to the Ad Hoc First Lien Group.

WEIL:\96489994\2\36182.0003

| | |
|---|---|
| | be paid in cash, computed using a discount rate equal to the applicable treasury rate plus 50 basis points, over (B) the liquidation preference of such Preferred Equity Interests (inclusive of all fees and additional Preferred Equity Interests issued as part of the Restructuring).<br><br>The terms will also include certain standard and customary covenants, among other provisions, on terms consistent with this Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors. |
| New Money Backstop Commitment Agreement | Pursuant to the New Money Backstop Commitment Agreement, the Initial Consenting Creditors and Sponsor (the "Backstop Parties") shall, in the allocations set forth on Schedule I to the RSA, (i) have the option to purchase up to 50% of the New Money Investment (the amount of the New Money Investment purchased pursuant to this option being the "Holdback Amount"), and (ii) commit to purchase all of the New Money Investment not purchased by other holders of First Lien Claims in the Rights Offering.<br><br>The Backstop Parties shall receive, in the allocations set forth in Schedule I to the RSA, the remainder of the Commitment Premiums, and:<br><br>(a) a backstop fee earned upon execution of the New Money Backstop Commitment Agreement of 7.0% of the maximum Preferred Investment Amount, or $17.5 million, (the "Preferred Equity Backstop Fee"), which Preferred Equity Backstop Fee shall be paid in additional Preferred Equity Interests issued to the Initial Consenting Creditors on the Effective Date; and<br><br>(b) a backstop fee of 3.5% of the total commitment amount of the New First Lien Term Loan, or $8.75 million (the "New Term Loan Backstop Fee" and together with the Commitment Premiums and the Preferred Equity Backstop Fee, the "Backstop Fee"), which New Term Loan Backstop Fee shall be paid in cash on the Effective Date.<br><br>Claire's Inc. shall have the right to participate in the New Money Investment on the same terms as the Initial Consenting Creditors and in the allocation set forth on Schedule I to the RSA. |
| Conditions Precedent to Emergence | The occurrence of the Effective Date shall be subject to the following conditions precedent; provided that any condition could be waived with the consent of the Debtors and the Requisite Consenting Creditors (as defined in the RSA):<br><br>• the RSA shall not have been terminated and remains in full force and effect, other than on account of a breach by the Sponsor or one or more of the Consenting Creditors;<br><br>• the Bankruptcy Court shall have entered:<br><br>   o the DIP Orders (defined below) in form and substance consistent with this Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors;<br><br>   o the order approving the disclosure statement (the "Disclosure Statement") and solicitation materials related to the Plan (the "Disclosure Statement Order") in form and substance consistent with this Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors; and<br><br>   o the order confirming the Plan, any exhibits or supplements thereto, and approving the assumption of the New Backstop Commitment Agreement (the "Confirmation Order") in form and substance consistent with this Term |

|  | Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors; |
|  | •     the Debtors shall not be in default under the DIP Credit Agreement or the DIP Orders that results in an acceleration of the obligations outstanding under the DIP Credit Agreement (or, to the extent that the Debtors have been in default or are in default, in each case, that results in the acceleration of outstanding obligations, on the proposed Effective Date, such default shall have been waived by the DIP Lenders or cured by the Debtors in a manner consistent with the DIP Credit Agreement and/or the DIP Orders); |
|  | •     (i) the Debtors shall have entered into credit agreements governing the terms of the New ABL Revolver and the New First Lien Term Loan (with all conditions precedent thereto having been satisfied or waived), and (ii) organizational documents and agreements providing for the terms of the Preferred Equity Interests shall be adopted, in each case, on terms consistent with this Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors; |
|  | •     the New Money Backstop Commitment Agreement shall not have been terminated and remain in full force and effect (with all conditions precedent thereto having been satisfied or waived) on terms consistent with the Term Sheet and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors; |
|  | •     the Professional Fee Escrow shall have been established and funded as provided herein; |
|  | •     the Company shall have generated consolidated Adjusted EBITDA (which shall be calculated using the same methodology and definition used in the Company's financial reporting but exclusive of restructuring costs and charges incurred in connection with the Chapter 11 Cases) of at least $185 million measured as of the last month for which internal financial statements are available, and adjusted for a 52-week year, if applicable; |
|  | •     the reorganized Company, shall have minimum consolidated cash on the Effective Date, assuming no draw on the New ABL Revolver and pro forma for all uses of cash associated with the Restructuring, after giving effect to emergence costs and funding the Professional Fee Escrow, of $75 million; and |
|  | •     the Debtors shall have assumed, rejected, and/or renegotiated their store leases in consultation with the Ad Hoc First Lien Group and in a manner reasonably acceptable to each of the Debtors and the Requisite Consenting Creditors, as evaluated by reference to the Debtors' store portfolio as a whole. |

## Treatment of Claims and Interests Under the Chapter 11 Plan

| Claim | Proposed Treatment |
|---|---|
| Administrative and Priority Claims | Allowed administrative, priority, and tax claims shall be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| DIP Claims | On the Effective Date, the claims under the DIP Facilities shall be repaid in full in cash. |
| Existing ABL Revolver and Existing RCF | Obligations outstanding under the Existing ABL Revolver and the Existing RCF as of the Petition Date, together with accrued but unpaid interest and fees, shall be paid in |

| | |
|---|---|
| Claims | full, in cash, with proceeds from the DIP Facilities. |
| First Lien Claims | On the Effective Date, each holder of First Lien Claims (including, for the avoidance of doubt, the Backstop Parties) shall receive its *pro rata* share of (i) 100% of the New Common Interests, subject to dilution by the Preferred Equity Interests and the MEIP (as defined below), and (ii) (A) for Eligible Holders, the rights to participate in the Rights Offering, and (B) for holders of First Lien Claims that are not Eligible Holders, the cash value of such rights. |
| Unsecured Claims | On the Effective Date or as soon as reasonably practicable thereafter, each holder of (i) First Lien Claims (on account of deficiency claims totaling $[●]), (ii) Second Lien Claims, (iii) Unsecured Notes Claims and (iv) allowed general unsecured claims ((i)-(iv) collectively, the "Unsecured Claims") shall receive its *pro rata* distribution from a cash pool in the amount of $[●], with such inputs, calculation and allocation being satisfactory to the Requisite Consenting Creditors in their reasonable discretion. |
| Intercompany Claims | Other than funded debt claims held by Claire's Inc. against other Company entities, on account of which Claire's Inc. shall be entitled to receive either (i) the same recovery as the Initial Consenting Creditors on account of the same debt as set forth herein, or (ii) cash consideration in an amount to be agreed by Claire's Inc. and the Initial Consenting Creditors, intercompany claims may be reinstated or cancelled as may be determined by the Debtors with the reasonable consent of the Requisite Consenting Creditors. |
| Existing Claire's Equity Interests | On the Effective Date, each holder of prepetition equity interests (including common stock, preferred stock and any options, warrants, profit interest units, or rights to acquire any equity interests) in Claire's (the "Existing Claire's Equity Interests") shall receive its *pro rata* share of any cash or other consideration recovered by Claire's Inc. on account of its funded debt claims against Company entities that is remaining after the satisfaction of all senior classes of claims against Claire's Inc. in full. |
| **Other Terms Relevant to Chapter 11 Plan Implementation** | |
| Registration Rights | Customary for any holder of claims to the extent it receives any "restricted" or "control" New Common Interests pursuant to the Securities Act, consistent with this Term Sheet and acceptable in form and substance to the Company and the Requisite Consenting Creditors. |
| Shareholders Agreement | On the Effective Date, holders of the New Common Interests and the Preferred Equity Interests will become party to the shareholders agreement. The provisions of the shareholders agreement shall be determined by and satisfactory to the Requisite Consenting Creditors in good faith. |
| Releases and Exculpation | The Plan shall provide customary releases (including third party releases) and exculpation provisions, in each case, to the fullest extent permitted by law and effective as of the Effective Date, for the benefit of the Company, the reorganized Company, the Sponsor, the Initial Consenting Creditors, the DIP Lenders, the Consenting Creditors, and such entities' respective affiliates, and such entities' and their affiliates' officers, managers, directors, predecessors, successors, and assigns, subsidiaries, and each of their officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. |

| | |
|---|---|
| Management Incentive Plan and Management Employment Agreements | The Company and the Initial Consenting Creditors will agree on the material terms of a management equity incentive plan (the "MEIP"), on terms and conditions reasonably acceptable to the Company and the Requisite Consenting Creditors, including with respect to emergence allocations.  The terms and conditions of the MEIP will be filed with the Plan Supplement prior to the hearing on confirmation of the Plan. |
| New Board | The post-Restructuring board of directors of Claire's (the "New Board") will consist of 7 directors, one of whom will be the Company's current Chief Executive Officer, one of whom will be designated by the Company, and the remaining of whom will be designated by the holders of the Preferred Equity Interests and New Common Interests based on each holder's pro forma share of the New Common Interests (with the Preferred Equity Interests treated on an as fully-converted basis), and shall be identified at or prior to the hearing on confirmation of the Plan. |
| Indemnification Obligations | The Company's indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the directors and the officers that are currently employed by, or serving on the Board of Directors of, any of the Company or its subsidiaries, as of the date immediately prior to the Effective Date, shall be assumed pursuant to the Plan. |
| Professional Fee Escrow | The Plan shall require the establishment of a professional fee escrow account (the "Professional Fee Escrow") to be funded with cash in the amount equal to the Professional Fee Reserve Amount (as defined herein).  It shall be a condition precedent to the substantial consummation of the Plan that the Company shall have funded the Professional Fee Escrow in full in cash in an amount equal to the Professional Fee Reserve Amount.<br><br>The Professional Fee Escrow shall be maintained in trust solely for the benefit of professionals retained by the Company or any official committee appointed in the Chapter 11 Cases (each a "Professional," and collectively, the "Professionals").  The Professional Fee Escrow shall not be considered property of the Debtors, their estates, or their affiliates, and no liens, claims, or interests shall encumber the Professional Fee Escrow, or funds held in the Professional Fee Escrow, in any way.<br><br>The "Professional Fee Reserve Amount" shall consist of the total amount of unpaid compensation and unreimbursed expenses incurred by Professionals retained by the Debtors or any official committee through and including the Effective Date, in each case as determined in good faith by the applicable Professional.<br><br>All accrued and unpaid fees and expenses of the professionals to the Initial Consenting Creditors shall be paid in cash on the Effective Date. |
| Tax Attributes | To the extent reasonably practicable, the Restructuring shall be structured in a manner which minimizes any current cash taxes payable as a result of the consummation of the Restructuring, and the terms of the Restructuring contemplated by this Term Sheet shall be structured to maximize the favorable tax attributes of the Company going forward. |
| Milestones | Subject to the RSA, failure to meet any of the following deadlines (each a "Milestone") shall enable the Requisite Consenting Creditors to terminate the RSA unless the Debtors shall have satisfied such Milestone prior to termination of the RSA:<br><br>• Commence the Chapter 11 Cases with respect to each of the Debtors and file |

WEIL:\96489994\2\36182.0003

| | |
|---|---|
| | first day motions no later than March 19, 2018; |
| | •     File the New Money Backstop Commitment Agreement, as executed by the Company and the Initial Consenting Creditors as soon as reasonably practicable after the Petition Date (but in no event later than seven (7) days after the first day hearing); |
| | •     Obtain entry of the interim order approving the DIP Facilities and permitting the Debtors' use of cash collateral (the "<u>Interim DIP Order</u>") by the Bankruptcy Court as soon as reasonably practicable after the Petition Date (but in no event later than the first business day that is at least five (5) calendar days after the Petition Date); |
| | •     File the Plan, the Disclosure Statement, and the motion for approval of the Disclosure Statement, the rights offering procedures and the solicitation procedures as soon as reasonably practicable after the Petition Date (but in no event later than the first business day that is at least twenty one (21) calendar days after the Petition Date); |
| | •     Obtain entry of the final order approving the DIP Facilities and permitting the Debtors' use of cash collateral (the "<u>Final DIP Order</u>" and, together with the Initial DIP Order, the "<u>DIP Orders</u>") as soon as reasonably practicable after the Petition Date (but in no event later than the first business day that is at forty five (45) calendar days after the Petition Date); |
| | •     Obtain entry of the Disclosure Statement Order as soon as reasonably practicable after the Petition Date (but in no event later than the first business day that is at least seventy-five (75) calendar days after the Petition Date); |
| | •     Commence the Rights Offering and solicitation of votes in connection with the Plan as soon as reasonably practicable after the Petition Date (but in no event later than the first business day that is at least seven (7) days after entry of the Disclosure Statement Order); |
| | •     Obtain entry of the confirmation order as soon as reasonably practicable after the Petition Date (but in no event later than the first business day that is at least sixty (75) calendar days after the Disclosure Statement Order is entered); and |
| | •     Provided that no stay pending appeal has been granted by any court, cause the Effective Date to occur as soon as reasonably practicable after the Petition Date (but in no event later than the earlier of (a) fifteen (15) calendar days after the entry of the confirmation order, and (b) one hundred eighty (180) calendar days after the Petition Date). |
| Fiduciary Duties | Notwithstanding anything to the contrary herein, nothing in this Term Sheet, the RSA, or any of the definitive documents implementing the Restructuring (collectively, the "<u>Definitive Documents</u>") shall require the Debtors, or any of their directors or officers, to take or refrain from taking any action such person or entity believes is reasonably required to comply with its or their fiduciary duties under applicable law.. |

## Schedule A

### Debtors

BMS Distributing Corp.

CBI Distributing Corp.

Claire's Inc.

Claire's Boutiques, Inc.

Claire's Canada Corp.

Claire's Puerto Rico Corp.

Claire's Stores, Inc.

CSI Canada LLC

**<u>Exhibit 1</u>**

**DIP Term Sheet**

<div align="right">

**Exhibit A to**
**Commitment Letter**

</div>

**CONFIDENTIAL**

**Claire's Stores, Inc.**

**Debtor-In-Possession Facilities**

**Summary of Terms and Conditions**

Capitalized terms used but not defined in this <u>Exhibit A</u> shall have the meanings set forth in the Letter Agreement to which this <u>Exhibit A</u> is attached and in the other annexes and schedules attached hereto and thereto.  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit A</u> shall be determined by reference to the context in which it is used.

**<u>Parties</u>**

| | |
|---|---|
| **Borrower:** | Claire's Stores, Inc., a Florida corporation (the "<u>Borrower</u>"), as a debtor and debtor-in-possession in the case in respect of the Borrower pending under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (such case, together with the cases that may be commenced in respect of certain of the Borrower's affiliates under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, the "<u>Cases</u>"). |
| **Guarantors:** | The Borrower's obligations under the DIP Facilities will be guaranteed on a joint and several basis by (a) Claire's Inc. ("<u>Holdings</u>"), (b) BMS Distributing Corp., (c) CBI Distributing Corp., (d) Claire's Boutiques, Inc., (e) Claire's Canada Corp., (f) Claire's Puerto Rico Corp., and (g) CSI Canada LLC and (collectively, with Holdings, the "<u>Guarantors</u>," and together with the Borrower, the "<u>Loan Parties</u>" or "<u>Debtors</u>"), each of which will be a debtor and debtor-in-possession in the Cases.  Each of the Cases will be commenced on or about the same date (such date, the "<u>Petition Date</u>") and administered jointly. |
| | For the avoidance of doubt, none of (i) CLSIP Holdings LLC, (ii) CLSIP LLC, (iii) Claire's Stores Canada Corp., a Canadian corporation, or (iv) Claire's Swiss Holdings LLC or any of its subsidiaries will be a debtor and debtor-in-possession in the Cases on the Closing Date (as defined below), commence comparable proceedings under local law, or will guarantee the Borrower's obligations under the DIP Facilities. |
| **DIP Lenders:** | Citibank, N.A. ("<u>Citibank</u>", or the "<u>Initial DIP Lender</u>") and each other bank, financial institution and other institutional lenders who become party to the DIP Documents from time to time (together with the Initial DIP Lender, the "<u>DIP Lenders</u>"). |
| | The aggregate amount of the initial commitment of each Initial DIP Lender is as set forth on <u>Schedule A</u> to this <u>Exhibit A</u>. |

<div align="center">1</div>

| | |
|---|---|
| **Arranger:** | Citigroup Global Markets Inc. shall act as sole lead arranger. |
| **Administrative Agent and Collateral Agent:** | Citibank will act as administrative agent and collateral agent (in such capacities, the "<u>DIP Agent</u>") in respect of the DIP Facilities. |

<div align="center">

**DIP Facilities**

</div>

| | |
|---|---|
| **DIP Facilities:** | Senior secured priming superpriority credit facilities in an aggregate principal amount of $135 million, consisting of: |

> A.  A superpriority senior secured multiple-draw asset-based revolving credit facility (the "<u>DIP ABL Revolver</u>" and the loans thereunder, "<u>DIP ABL Revolving Loans</u>"), in an aggregate principal amount at any time outstanding of up to $75 million (the "<u>DIP ABL Revolving Commitments</u>"), with up to $10 million of the DIP ABL Revolver available for the issuance of standby letters of credit (the "<u>Letters of Credit</u>"); and

> B.  A superpriority senior secured "last-out" term loan facility (the "<u>DIP Term Loan Facility</u>" and the loans thereunder, "<u>DIP Term Loans</u>"; the DIP Term Loan Facility and the DIP ABL Revolver, the "<u>DIP Facilities</u>"), in an aggregate principal amount of $60 million.

> The DIP ABL Revolving Loans together with the DIP Term Loans shall be referred to herein as the "<u>DIP Loans</u>".

| | |
|---|---|
| **Use of Proceeds:** | The DIP ABL Revolving Loans and the DIP Term Loans shall be made available to the Borrower: (i) on the Closing Date (a) in the case of the DIP ABL Revolving Loans, to refinance all outstanding obligations and replace commitments under Borrower's ABL Credit Agreement, dated as of August 12, 2016 (as amended prior to the Petition Date, the "<u>Prepetition ABL Revolver</u>"), including cash collateralization of those letters of credit which are issued, outstanding and undrawn as of the Closing Date (the "<u>Prepetition Letters of Credit</u>") under the Prepetition ABL Revolver, to the extent of 105% of the face amount of such Prepetition Letters of Credit (such amount on deposit to cash collateralize Prepetition Letters of Credit, the "<u>L/C Cash Collateral Amount</u>") unless backstop Letters of Credit are issued on the Closing Date under the DIP ABL Revolver with respect to such Prepetition Letters of Credit (it is understood that such refinancing will occur together with the corresponding termination of the Borrower's Second Amended and Restated Credit Agreement, dated as of August 12, 2016), and (b) to pay the fees, costs and expenses incurred in connection with the transactions contemplated hereby and other administration expenses incurred in connection with the Cases; and (ii) on and/or after the Closing Date (a) for the Loan Parties' and their subsidiaries' working capital requirements and for general corporate purposes in accordance with the provisions governing the Approved Budget (as defined below) (including the Permitted Variance provisions) and (b) to fund the Professional Fees Account (as defined below) and obligations benefitting from the Carve Out (without regard to whether such obligations are provided for in an Approved Budget), in each case of (i) and (ii) above, in |

<div align="center">2</div>

accordance with the terms of the DIP Documents.

**Availability:** Subject to the conditions precedent thereto: (a) the DIP ABL Revolver will be available for the purposes and at the times set forth under the section titled "Use of Proceeds" above, provided, that the aggregate amount of DIP ABL Revolving Loans outstanding shall not, at any time, exceed the lesser of (i) the Borrowing Base at such time and (ii) the DIP ABL Revolving Commitments (the "DIP ABL Loan Cap"); and (b) on the Closing Date, up to $30 million (or such lesser amount that is specified for such draw in the Interim Order) of DIP Term Loans shall be drawn by the Borrower.

The undrawn amount of the DIP Term Loan Facility shall be drawn by the Borrower not later than (3) business days following entry of the Final Order.

Amounts under the DIP Term Loan Facility not funded in accordance with the foregoing shall be unavailable to the Borrower (and the related commitments of the DIP Lenders to make such amounts available shall be terminated accordingly).

**Borrowing Base:** "Borrowing Base" means, as of any date of determination by the DIP Agent, from time to time, an amount equal to the sum of:

(a) up to 90% of the book value of Eligible Credit Card Accounts at such time; plus

(b) up to 85% of the book value of Eligible Concession Accounts at such time; plus

(c) up to 85% of the book value of Eligible Royalty Accounts at such time; plus

(d) up to 85% of the book value of Eligible Wholesale Accounts at such time; plus

(e) up to 90% of the Net Orderly Liquidation Value of the cost of Eligible Inventory on a first- in, first- out basis; minus

(f) customary reserves for DIP ABL transactions (which may be imposed upon the DIP Agent's customary permitted reasonable good faith discretion, and which shall include a customary reserve for the Carve-Out).

The components of the Borrowing Base shall be defined in a manner substantially similar to the definitions of such terms in the Prepetition ABL Revolver (and shall in any event exclude any element of the Borrowing Base that the DIP Agent does not have a first priority security interest over), with such changes as may be agreed by the Borrower and the DIP Agent.

The Borrower will be required to deliver, not later than (i) 60 days after the Closing Date (or such longer period of time as the DIP Agent may agree in its sole discretion) (the "Appraisal Required Date"), an asset appraisal (the "Initial

<u>Asset Appraisal</u>") and (ii) 90 days after the Closing Date (or such longer period of time as the DIP Agent may agree in its sole discretion) (the "<u>Field Exam Required Date</u>"), a field exam (the "<u>Initial Field Exam</u>"), in each case, from one or more third parties that are reasonably satisfactory to the DIP Agent (it being understood and agreed that Hilco Valuation Services is acceptable to the DIP Agent).

In the event the DIP Agent has not received the Initial Asset Appraisal and the Initial Field Exam prior to the Closing Date, during the period from the Closing Date and until DIP Agent's receipt of the Initial Asset Appraisal and the Initial Field Exam, the Borrowing Base shall be calculated to be 90% of the "Borrowing Base" under the Prepetition ABL Revolver (with updated Borrowing Base certificates to be delivered on the schedule set forth herein but calculated in a manner consistent with the Prepetition ABL Revolver and reflecting the above advance rates) (the "<u>Alternative Borrowing Base</u>").

On and after the DIP Agent's receipt of the Initial Asset Appraisal and the Initial Field Exam, the Borrowing Base shall no longer be based on the Alternative Borrowing Base but shall be based on the Borrowing Base as provided above.  In the event that the DIP Agent has not received the Initial Asset Appraisal by the Appraisal Required Date and the Initial Field Exam by the Field Exam Required Date, respectively, the Borrowing Base shall be deemed to be $0 until the Initial Asset Appraisal and the Initial Field Exam is delivered.

**Termination Date:**    The DIP Loans, and all other obligations under the DIP Documents, shall be required to be repaid in cash in full on the date (the "<u>Termination Date</u>") that is the earliest to occur of:

    A. the one-year anniversary of the Closing Date; <u>provided</u> <u>that</u> the Borrower may extend maturity by six (6) months subject to (i) filing a plan of reorganization, (ii) hearing being scheduled for plan of reorganization confirmation, (iii) Debtors working in good faith to confirm the plan of reorganization, (iv) updated budget and operating forecast, (v) the payment of the extension fee set forth on <u>Schedule B</u> to this <u>Exhibit A</u>, and (vi) no default or Event of Default existing at such time (the "<u>Scheduled Maturity Date</u>");

    B. the first business day that is at least 5 calendar days after the Petition Date unless, on or prior to such date, the Interim Order shall have been entered;

    C. the first business day that is at least 45 calendar days after the Petition Date unless, on or prior to such date, the Final Order shall have been entered;

    D. the date on which the Cases are converted to cases under chapter 7 of the Bankruptcy Code;

    E. the date on which a chapter 11 trustee or an examiner with expanded

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

powers is appointed in the Cases without the consent of the DIP Agent;

F.  the date on which substantial consummation (as defined in Bankruptcy Code §1101), of a plan of reorganization filed in the Cases that is confirmed pursuant to an order of the Bankruptcy Court has occurred (which for purposes hereof will be no later than the "effective date");

G.  the date on which consummation of a sale of all or substantially all of the assets of the Debtors under Bankruptcy Code §363 or otherwise has occurred; and

H.  the date on which acceleration of the DIP Loans, and the termination of the commitments with respect to such DIP Facilities, has occurred.

| | |
|---|---|
| **Interest Rates; Certain Fees:** | As set forth on <u>Schedule B</u> to this <u>Exhibit A</u>. |
| **Prepayments:** | The DIP Documents will permit the Borrower to: (a) prepay the DIP ABL Revolving Loans at any time and from time to time (without any reduction to the commitments related thereto), without premium or penalty, and reborrow amounts thereunder; (b) permanently terminate all or any portion of the commitments in respect of the DIP ABL Revolver, without premium or penalty; (c) prepay a portion or all of the DIP Term Loans, subject to the prior prepayment in full of the DIP ABL Revolver (and termination of all commitments thereunder) without premium or penalty. Amounts terminated or prepaid under the foregoing clauses (b) and (c) may not be reborrowed. |

The DIP Documents will, subject to the Carve Out, require the Borrower to prepay the DIP Loans upon the occurrence of certain events or conditions with 100% of the net cash proceeds received, including upon (i) certain dispositions of the ABL Priority Collateral (as defined below), (ii) the disposition of any other unencumbered (or partly unencumbered) assets that are subject to a superpriority claim in favor of the DIP Agent and DIP Lenders (including, without limitation, the unencumbered 35% portion of the equity of Claire's Swiss Holdings LLC and Claire's Stores Canada Corp.), (iii) issuances or incurrences of debt-for-borrowed money not permitted by the DIP Documents, and (iv) casualty and condemnation events, in certain cases subject to a threshold and a limited reinvestment right; provided that such prepayments shall apply *first* to prepay in full the DIP ABL Revolver (and termination of all commitments thereunder) and *second* to prepay the DIP Term Loans.

| | |
|---|---|
| **Cash Dominion** | All cash of the Debtors shall be subject to the DIP Agent's cash dominion sweep (x) to the extent that at such time the Excess Availability (as defined below) is less than 12.5% of the DIP ABL Loan Cap or (y) upon any Event of Default. It is understood and agreed that once the Excess Availability exceeds 12.5% of the DIP ABL Loan Cap for 20 consecutive days the cash dominion shall cease to exist so long a no Event of Default was continuing during such period. |

"<u>Excess Availability</u>" means, at any time of determination by the DIP ABL Agent thereof, the result, if a positive number, of (a) the DIP ABL Loan Cap

as of such date, minus (b) the total amount of DIP ABL Revolving Loans and outstanding obligations with respect to the Letters of Credit (including the outstanding face amount of the undrawn Letters of Credit issued under the DIP ABL Revolver).

**Security and Priority:**  The obligations under the DIP Facilities will at all times, and subject in all respects to the Carve Out:

A. pursuant to Bankruptcy Code §364(d)(1), be secured by a perfected first priority priming security interest and lien on all prepetition and postpetition assets constituting the ABL Priority Collateral (as defined in that certain Intercreditor Agreement (the "ABL Intercreditor Agreement"), dated as September 20, 2016, among Credit Suisse AG, Cayman Islands Branch, as agent for lenders under the Prepetition ABL Revolver and agents under the Prepetition 1L Secured Facilities (as defined below), referred to herein as "ABL Priority Collateral"), of any Debtor (collectively, the "Priming Liens"; provided that the Priming Liens shall not prime, and shall be junior to, perfected, nonavoidable liens that are senior to the liens securing the Prepetition ABL Revolver as of the Petition Date or that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code);

B. subject to clause (A) above, pursuant to Bankruptcy Code § 364(c)(3), be secured by a perfected junior security interest and lien on all prepetition and postpetition assets constituting the Notes Priority Collateral (as defined in the ABL Intercreditor Agreement, and together with the ABL Priority Collateral, the "DIP Collateral") to the extent such DIP Collateral is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Bankruptcy Code §546(b), subject as to priority to such liens in favor of such third parties; and

C. pursuant to Bankruptcy Code §364(c)(1), be entitled to superpriority administrative expense claim status in the Cases (the "DIP Superpriority Claims"), which claims in respect of the DIP ABL Revolver and the DIP Term Loan Facility shall be pari passu and shall have full recourse against all assets of the Debtors (including the unencumbered 35% portion of the equity of Claire's Swiss Holdings LLC and Claire's Stores Canada Corp.) including, subject to the Final Order, proceeds of Avoidance Actions and subject, in each case, to any liens or claims that are senior to the liens and claims securing the DIP Facilities.

All of the liens described above will be effective and perfected as of the Petition Date upon entry of the Interim Order or the Final Order, as applicable, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

Subject to the terms of the ABL Intercreditor Agreement and subject to the Carve-Out in all respects, the DIP Term Loan Facility shall be documented as a last out facility under the DIP Facilities and the DIP Documents shall, subject to customary provisions with respect to application of proceeds, provide that (a) proceeds of all ABL Priority Collateral shall be applied *first* to the DIP ABL Revolver and *second* to the DIP Term Loan Facility, (b) proceeds of all Notes Priority Collateral (after the application pursuant to the ABL Intercreditor Agreement) the shall be applied *first* to the DIP Term Loan Facility and *second* to the DIP ABL Revolver, in each case after the application to any liens or claims that are senior to the liens and claims securing the DIP Facilities, as set forth in the DIP Orders and (c) proceeds of any other assets not constituting DIP Collateral (including the unencumbered 35% portion of the equity of Claire's Swiss Holdings LLC and Claire's Stores Canada Corp.) shall be applied on a ratable basis to the DIP Term Loan Facility and the DIP ABL Revolver.

The DIP Documents will include a payment waterfall providing that, among other things, prior to the repayment of any DIP Term Loans, the obligations (and commitments) relating to the DIP ABL Revolver shall have been repaid in full in cash (and terminated).

Notwithstanding the foregoing, (a) the Prepetition Letters of Credit that were not backstopped with a Letter of Credit (and any other letters of credit secured by the L/C Cash Collateral Amount) will be secured solely by the L/C Cash Collateral Amount; upon expiration, return or payment of all such Prepetition Letters of Credit, any remaining L/C Cash Collateral Amount will be available to repay other obligations under the DIP Facilities and (b) the DIP Collateral shall not include any Excluded Asset (as defined below).

"Excluded Assets" means (i) any leasehold interest of a Debtor, (ii) any escrow, fiduciary, or trust account, (iii) the Debtors' intellectual property, to the extent the assignment of the creation of a lien thereon would violate applicable non-bankruptcy law unless such violation is excused or permitted under applicable bankruptcy law, (iv) any amount in excess of 65% of the equity interest in (x) Claire's Swiss Holdings, LLC or (y) any non-US subsidiary of a Debtor, (v) the Professional Fees Account (including funds held in the Professional Fees Account), and (vi) any other assets of the Debtors' estates to the extent that a pledge or creation of a lien on such assets would violate applicable non-bankruptcy law unless such violation is excused or permitted under applicable bankruptcy law.

"Prepetition 1L Secured Facilities" means: (a) that certain Term Loan Credit Agreement, dated as of September 20, 2016 (the "Prepetition Term Loan Facility"), among the Borrower, the lenders party thereto from time to time, and Wilmington Trust, National Association, as administrative agent and collateral agent, as amended, supplemented or otherwise modified from time to time; (b) that certain Senior Secured First Lien Notes Indenture, dated as of February 28, 2012, between the Borrower (as successor to Claire's Escrow II Corporation) and The Bank of New York Mellon Trust Company, as trustee and collateral agent, as amended, supplemented or otherwise modified from time to time; and (c) that certain Senior Secured First Lien Notes Indenture,

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

dated as of March 15, 2013, between the Borrower and The Bank of New York Mellon Trust Company, as trustee and collateral agent, as amended, supplemented or otherwise modified from time to time. The holders of the obligations under the Prepetition 1L Secured Facilities, other than Holdings and its subsidiaries, are referred to herein as the "<u>Prepetition 1L Debtholders</u>", and together with the other secured parties referenced in the Prepetition 1L Secured Facilities and related loan documents, the "<u>Prepetition 1L Secured Parties</u>".

**Carve-Out:** "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (the "<u>Professional Fees</u>") incurred by persons or firms retained by the Loan Parties pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and any official committee of unsecured creditors (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice and without regards to whether such fees and expenses are provided for in the Approved Budget; and (iv) Professional Fees incurred after the first Business Day following delivery by the Agent of the Carve-Out Trigger Notice (including transaction fees or success fees earned or payable to a Professional Person), to the extent allowed at any time, whether by interim order, procedural order or otherwise in an aggregate amount not to exceed $4,000,000 with respect to Professionals Persons (the amount set forth in this clause (iv) being the "<u>Post-Carve-Out Trigger Notice Cap</u>"). For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Loan Parties, their lead restructuring counsel, the United States Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facilities, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

On the day on which a Carve-Out Trigger Notice is received by the Loan Parties, the Carve-Out Trigger Notice shall constitute a demand to the Loan Parties to utilize all cash on hand to transfer to the Professional Fees Account cash in an amount equal to all obligations benefitting from the Carve-Out.

The Interim Order shall provide that, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall deposit into the Professional Fees Account (as defined below) any cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) until the Professional Fees Account has been fully funded in an amount equal to all obligations

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

benefitting from the Carve-Out. Notwithstanding anything to the contrary in the DIP Documents or the Final Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Loan Parties until the Professional Fees Account has been fully funded in an amount equal to all obligations benefitting from the Carve-Out.

Further, notwithstanding anything to the contrary herein, (i) disbursements by the Loan Parties from the Professional Fees Account shall not constitute DIP Loans, (ii) the failure of the Professional Fees Account to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out and (iii) in no way shall the Carve-Out, Professional Fees Account, or an Approved Budget or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Loan Parties or that may be allowed by the Bankruptcy Court at any time (whether by interim order, final order, or otherwise). No portion of the Carve-Out, any cash collateral, any other DIP Collateral, or any proceeds of the DIP Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any committee appointed in the Cases, in connection with challenging the DIP Agent's or the DIP Lenders' liens or claims, preventing, hindering or delaying any of the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral, or initiating or prosecuting any claim or action against the DIP Agent or any DIP Lender, unless otherwise ordered by the Bankruptcy Court, other than with respect to seeking a determination that an Event of Default has not occurred or is not continuing.

Proceeds from the DIP Facilities not to exceed $125,000 in the aggregate (the "Investigation Budget Cap") may be used on account of Professional Fees incurred by Committee Professionals in connection with the investigation of Avoidance Actions (but not the prosecution of such actions) on account of the Prepetition 1L Secured Facilities and other Debtors' prepetition facilities (but not the DIP Facilities), which obligations will benefit from the Carve-Out in an amount not to exceed the Investigation Budget Cap to the extent unpaid as of delivery of a Carve-Out Trigger Notice.

For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities, any adequate protection liens, if any, and superpriority claims (whether granted to secure the DIP Facilities or as adequate protection), and any and all other liens or claims securing the DIP Facilities.

| | |
|---|---|
| **Professional Fees Account** | The Debtors shall (i) contemporaneously with the initial funding of the DIP Loans, transfer cash proceeds from the DIP Facilities in an amount equal to the total budgeted weekly Professional Fees for the first two weekly periods set forth in the Approved Budget and (ii) thereafter on a weekly basis transfer cash proceeds from the DIP Facilities or cash on hand in an amount equal to the total budgeted weekly Professional Fees for the next unfunded week set forth in the Approved Budget, in each case into a segregated account not subject to |

9

the control of the Agent, any Lender, or any Prepetition Secured Party (the "Professional Fees Account").

The Debtors shall be authorized to use funds held in the Professional Fees Account to pay Professional Fees as they become allowed and payable pursuant to any interim or final orders of the Bankruptcy Court or otherwise; provided that when all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Bankruptcy Court), any funds remaining in the Professional Fees Account shall revert to the Debtors for use in a manner not inconsistent with this Term Sheet; provided further that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Account.

Funds transferred to the Professional Fees Account shall be held in trust for the Professional Persons (as defined below), including with respect to obligations arising out of the Carve-Out. Funds transferred to the Professional Fees Account shall not be subject to any liens or claims granted to the Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute cash collateral; provided that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Account, if any, after all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Bankruptcy Court).

**Adequate Protection:**   A. Prepetition 1L Secured Parties.  Subject in all respect to the Carve-Out, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Prepetition 1L Secured Parties holding liens that are subordinated by the Priming Liens will receive as adequate protection:

(a)   payment, in cash of interest as and when due with respect to the obligations under the Prepetition 1L Secured Facilities at the applicable non-default rate thereunder; provided that the Debtors' or any party in interest's rights are fully reserved to seek a determination that such adequate protection payments should be recharacterized as payment on account of the secured portion of the Prepetition 1L Secured Parties' claims as of the Petition Date;

(b)   current cash payment of reasonable and documented fees and expenses (including reasonable legal fees and expenses) of agent under the Prepetition ABL Revolver, and agents and trustees under the Prepetition 1L Secured Facilities; provided that the Debtors' or any party in interest's rights are fully reserved to seek a determination that such adequate protection payments should be recharacterized as payment on account of the secured portion of the Prepetition 1L Secured Parties' claims as of the Petition Date;

(c)   replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facilities (in the same relative priority as among the Prepetition 1L Secured Facilities) but senior to the adequate protection liens granted to the

10

Prepetition 2L Secured Parties as described below, which, for the avoidance of doubt, shall be subject to and junior to the Carve-Out;

(d) superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are subject and junior to the DIP Superiority Claims, which, for the avoidance of doubt, shall be subject to and junior to the Carve-Out; and

(e) delivery of all reports and notices provided for in the DIP Documents, in each case when and as required under the DIP Documents;

provided, however, that the DIP Orders shall not provide for adequate protection payments set forth in clauses (a) and (b) above unless ordered otherwise by the Bankruptcy Court.

B. Prepetition 2L Secured Parties.  Subject in all respects to the Carve-Out, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the collateral agent and other secured parties (the "Prepetition 2L Secured Parties") under the Senior Secured Second Lien Notes Indenture, dated as of March 4, 2011 between the Borrower (as successor to Claire's Escrow Corporation) and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent, and the other note documents related thereto, whose liens will be primed as described above, and whose cash collateral will be authorized for use by the Loan Parties, will be entitled to receive, as adequate protection, to the extent the Prepetition 2L Secured Parties are determined by the Bankruptcy Court to have been secured as of the Petition Date, (a) replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facilities and the Prepetition 1L Secured Facilities and to the adequate protection liens granted to the Prepetition 1L Secured Parties as described above; and (b) delivery of all reports and notices provided for in the DIP Documents, in each case when and as required under the DIP Documents.  The rights of all parties with respect to the obligations and liens of the Prepetition 2L Secured Parties (including but not limited to validity, amount, security, perfection and priority) are reserved.

**Conditions to Initial Extension of Credit:**   Each DIP Lender's obligation to provide its share of the initial extension of credit on the Closing Date shall be subject to the satisfaction of the conditions set forth in the Commitment Letter and to the satisfaction (or waiver by Initial DIP Lenders who, when taken together, hold more than 50% of the total amount of commitments held by the Initial DIP Lenders to provide the DIP Loans (such Initial DIP Lenders, the "Required Initial DIP Lenders")) of the conditions precedent to be set forth in the DIP Documents and limited to:

A. The Debtors shall have provided the DIP Agent with copies of all "first day orders" to be entered by the Bankruptcy Court in connection with the commencement of the Cases, including without limitation a cash management order, at least three business days prior to the filing

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

of pleadings seeking entry of such orders, and such orders will be reasonably satisfactory in form and substance to the DIP Agent, it being acknowledged and agreed that the form of orders reviewed by the DIP Agent as of the date hereof are reasonably satisfactory;

B.  Negotiation, execution and delivery of a debtor-in-possession credit facility and other related definitive documentation consistent in all material respects with the terms set forth herein and in the Commitment Letter and the Fee Letter, and in all other respects reasonably satisfactory to the Borrower and the DIP Agent (the "DIP Documents"), and delivery of customary resolutions, corporate organizational and authorizing documents and certificates; it being understood and agreed that DIP Documents shall be substantially similar to the Prepetition ABL Revolver and the Prepetition Term Loan Facility with such changes as may be necessary and customary for debtor-in-possession credit facilities;

C.  The Bankruptcy Court shall have entered an order materially consistent with this term sheet and otherwise in form and substance acceptable to the DIP Agent and the Debtors (such acceptance not to be unreasonably withheld), which order shall include provisions that are reasonably acceptable to the DIP Agent and are customarily included in interim orders approving debtor-in-possession facilities of this type, authorizing and approving (i) the DIP Facilities and the extensions of credit thereunder and (ii) the granting of liens and claims in favor of the DIP Agent and DIP Lenders (the "Interim Order"), which Interim Order has not been vacated, reversed, modified, amended or stayed;

D.  The Interim Order shall, among other things: (i) modify the automatic stay to permit the creation and perfection of the DIP Agent's and the DIP Lenders' liens on the DIP Collateral; (ii) provide for the automatic vacation of such stay to permit the enforcement of the DIP Agent's and/or the DIP Lenders' remedies under the DIP Facilities; provided that the Debtors shall be permitted to contest whether an Event of Default has occurred under the DIP Facilities; (iii) subject to entry of the Final Order, prohibit the assertion of claims arising under Section 506(c) of the Bankruptcy Code against any or all of the DIP Agent and the DIP Lenders; (iv) prohibit the commencement of other actions materially adverse to the respective interests, right, and remedies of the DIP Agent and the DIP Lenders under the DIP Facilities or the Interim DIP Order or Final DIP Order; (v) without limiting the Carve Out, prohibit the incurrence of debt or granting of liens with priority equal to or greater than the DIP Agent's and DIP Lenders' liens under the DIP Facilities, subject to customary baskets and thresholds to be mutually agreed and, solely with respect to Notes Priority Collateral, subject to any adequate protection liens or claims granted in favor of prepetition claims secured by the Notes Priority Collateral on a senior basis to the Prepetition ABL Revolver; (vi) authorize the payment by the Debtors of all the fees provided for herein and in the Fee Letter as administrative expense claims under Section 503(b)(1) of the

Bankruptcy Code, including with respect to any indemnification obligations (which fees and indemnification obligations shall, subject to the Carve Out in all respects, be secured by all of the priorities and liens granted pursuant to Section 364(c) and (d) of the Bankruptcy Code with respect to any and all other indebtedness under the DIP Facilities); (vii) find that the DIP Lenders are extending credit to the Debtors in good faith within the meaning of Section 364(e) of the Bankruptcy Code and (viii) find that (A) the DIP Documents (as they relate to the DIP ABL Revolver) are Permitted Refinancing Agreements under the ABL Intercreditor Agreement (as defined below), (B) the DIP ABL Revolver constitutes a Permitted Refinancing of the Prepetition ABL Revolver under the ABL Intercreditor Agreement, (C) the DIP ABL Revolver constitutes ABL Obligations secured by liens on the ABL Priority Collateral (each as defined in the ABL Intercreditor Agreement) that are senior to the liens securing the Notes Obligations (as defined in the ABL Intercreditor Agreement) and secured by liens on the Notes Priority Collateral that are junior to the liens securing the Notes Obligations, in each case to the extent provided in the ABL Intercreditor Agreement, (D) the DIP ABL Revolver and the DIP Term Loans constitute ABL DIP Financing (as defined in the ABL Intercreditor Agreement) that satisfies all of the relevant provisions of Section 6.01(a) of the Intercreditor Agreement and as a result the Note Claimholders are deemed to have consented to such ABL DIP Financing and the terms and conditions governing same, (E) the superpriority administrative claims granted to the DIP Agent and DIP Lenders in respect of the Debtors' unencumbered assets (including, without limitation, the unencumbered 35% portion of the equity of Claire's Swiss Holdings LLC and Claire's Stores Canada Corp.) are senior to any interests and claims of the Note Claimholders (as defined in the ABL Intercreditor Agreement) with respect to such assets, and (F) the DIP ABL Revolver and the DIP Term Loans and the DIP Agent and the DIP Lenders are entitled to the rights, benefits, protections, and priorities as set forth in the ABL Intercreditor Agreement;[1]

E. No trustee or examiner shall have been appointed with respect to the Debtors or their property;

F. All fees, costs and expenses that are due and payable prior to or on the Closing Date, as set forth in the Commitment Letter, Fee Letter and DIP Documents and to the extent invoiced prior to such date, shall have been paid or reimbursed;

G. The Initial DIP Lenders shall have received, and the DIP Agent shall be reasonably satisfied with, a 13-week cash flow forecast of the Loan Parties (a "Initial Budget") for the 13-week period commencing as of the Petition Date; it being acknowledged and agreed that the budget set forth on Schedule C to this Exhibit A is in form and substance

---

[1] The Interim DIP Order will include similar findings and determinations with respect to the Second Lien Intercreditor Agreement.

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

acceptable to the Agent as an "<u>Approved Budget</u>" (as the same may be modified or superseded by a Proposed Budget (as defined below)); and

H.  Since January 28, 2017, there shall not have occurred a material adverse effect on the business, property, operations or condition of the Borrower and its subsidiaries, taken as a whole, or the validity or enforceability of any of the material DIP Documents or the rights and remedies of the DIP Agent and the DIP Lenders thereunder (other than any events leading up to, related to or resulting from the Cases or the Cases themselves).

The date on which each of the Conditions to Initial Extension of Credit have been satisfied (or waived by the DIP Agent) shall be referred to herein as the "<u>Closing Date</u>".

**Conditions to all Extensions of Credit:**  The DIP Lenders' obligation to provide any extensions of credit on and after the Closing Date shall be subject to the satisfaction (or waiver by the DIP Agent) of the conditions set forth in the DIP Documents and limited to:

A.  After giving effect to any extension of credit under the DIP ABL Revolver, the Borrower shall be in compliance with the Borrowing Base;

B.  Not later than the first business day that is at least forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance materially consistent with this term sheet and otherwise acceptable to the DIP Agent and the Debtors (such acceptance not to be unreasonably withheld), which order shall include provisions that are reasonably acceptable to the DIP Agent and are customarily included in final orders approving debtor-in-possession facilities of this type, (i) authorizing and approving on a final basis (x) the DIP Facilities and all provisions thereof and the extensions of credit thereunder and (y) the granting and priority of liens and claims in favor of the DIP Agent and DIP Lenders and (ii) containing, among other things, the provisions described in Section D under the heading "Conditions to Initial Extension of Credit" (the "<u>Final Order</u>" and, together with Interim Order, the "<u>DIP Orders</u>"), which Final Order has not been vacated, reversed, modified, amended or stayed; provided that, for the avoidance of doubt, the Final DIP Order shall be in substantially the same form as the Interim DIP Order, with the inclusion of the additional provisions of the Interim DIP Order that are subject to the entry of a Final DIP Order;

C.  No trustee or examiner shall have been appointed with respect to the Debtors or their property;

D.  All representations and warranties made in the DIP Documents shall be true and correct in all material respects (or in all respects to the extent that any representation or warranty is qualified by materiality); and

14

E.  No default or Events of Default shall have occurred and be continuing under the DIP Documents.

**Documentation Principles:**

The loan documentation entered into in connection with the DIP Facilities will be based upon the Prepetition ABL Revolver with such changes thereto as are appropriate to reflect terms applicable to customary asset-based lending facilities and the debtor-in-possession nature of the DIP Facilities (including the last-out nature of the DIP Term Loan Facility) and the terms and conditions and other provisions set forth in this Term Sheet (the "<u>Documentation Principles</u>").

**Representations and Warranties:**

The DIP Documents will contain representations and warranties substantially similar to those set forth in the Prepetition ABL Revolver and the Prepetition Term Loan Facility, as applicable, and otherwise customary for debtor-in-possession credit facilities of this size, type and purpose (in certain cases, subject to limited exceptions, qualifications and carve outs) including representations in respect of the accuracy of the Borrowing Base, compliance with PATRIOT Act, OFAC, FCPA, anti-money laundering, anti-terrorism, and other anti-corruption laws.

**Covenants:**

The DIP Documents will contain affirmative and negative covenants substantially similar to those set forth in the Prepetition ABL Revolver and the Prepetition Term Loan Facility, as applicable, and otherwise customary for debtor-in-possession credit facilities of this size, type and purpose, including limitations on the incurrence or existence of certain indebtedness, liens, investments, restricted payments (including dividends and junior debt payments of junior lien, subordinated or unsecured debt), dispositions, acquisitions, mergers, transactions with affiliates, repayment of obligations created prior to the Petition Date, and including:

A.  Periodic reporting (including delivery of (i) monthly, quarterly and annual financial statements; it being understood and agreed that monthly reporting of financial statements shall be deemed satisfied by the filing of a Monthly Operating Report required by the Bankruptcy Court and (ii) the Proposed Budget and the Variance Report as set forth in section Budget; Variance Reporting);

B.  Collateral reporting (including, in the case of the DIP ABL Revolver, delivery of (i) monthly, or to the extent at such time the Excess Availability is less than 15% of the DIP ABL Loan Cap or during the continuance of any Event of Default, weekly Borrowing Base certificates and (ii) one field examination and one inventory appraisal per fiscal year, prepared by an appraiser reasonably acceptable to the DIP ABL Agent (it being understood and agreed that Hilco Valuation Services is acceptable to the DIP Agent) plus one additional field examination and one inventory appraisal if at such time the Excess Availability is less than 15% of the DIP ABL Loan Cap or during the continuance of any Event of Default or, upon reasonable request of the DIP Agent additional field examinations and inventory appraisals to the extent any Event of Default then exists);

15

C. Loan Parties using commercially reasonable efforts to complete inventory appraisal prepared by Hilco Valuation Services by the time of entry of the Final Order;

D. The Debtors using commercially reasonable efforts to provide to the DIP Agent copies of all pleadings material to the DIP Agent at least three business days in advance of filing such pleadings with the Bankruptcy Court;

E. The DIP Agent being included as a notice party in connection with all pleadings filed with the Bankruptcy Court;

F. In any event so long as no Event of Default is continuing, provisions permitting:

    a. the Loan Parties to repay existing intercompany loans owing to Claire's (Gibraltar) Holdings Limited ("CGHL") and/or Claire's (Gibraltar) Intermediate Holdings Limited on or after the Petition Date in an amount not to exceed an amount to be agreed; and/or

    b. to the extent that the aggregate amount of cash on hand of the Borrower and its domestic subsidiaries would exceed $30 million for a period of 30 consecutive days, permit the Borrower and/or any domestic subsidiary to transfer cash in an amount equal to $1 more than the amount of such cash in excess of $30 million to a subsidiary of the Borrower that is not a domestic subsidiary so long as such non-domestic subsidiary returns the relevant transferred amount to the Borrower and/or the transferring domestic subsidiary within two business days following the date of transfer.

**Budget; Variance Reporting; Variance**

On the first business day that is at least four (4) full weeks after the Petition Date, and on the Thursday of each fourth week thereafter, the Borrower shall deliver to the DIP Agent an updated "rolling" budget covering at least the subsequent 13-week period, or more frequently as the Debtors may elect (each, a "Proposed Budget").

A Proposed Budget shall be deemed an Approved Budget (and shall modify and supersede any prior Approved Budget) for all purposes unless the DIP Agent, acting in its reasonable discretion, objects by written notice delivered to the Borrower on or within three (3) business days after receipt of such Proposed Budget by the DIP Agent.

If the DIP Agent objects to a Proposed Budget within such three (3) business day period, the then-current Approved Budget shall remain the Approved Budget unless otherwise agreed by the DIP Agent and the Borrower in their reasonable discretion.

Commencing on the first Thursday that is at least four weeks after the Petition Date, and continuing every four weeks thereafter, the Borrower shall deliver to

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

the DIP Agent a report (each, a "Variance Report") describing in reasonable detail the Debtors' aggregate cash receipts and aggregate cash disbursements (without regard to Professional Fees incurred or paid by the Loan Parties) from the period from the Petition Date through the end of the immediately preceding week compared to projected, aggregate cash receipts and disbursements provided by the then-current Approved Budget (such difference, a "Variance").

"Permitted Variance" means a Variance from the then-current Approved Budget on a cumulative basis from the Petition Date through and including the last day of the relevant four-week period (the "Testing Period") that (i) does not exceed the total aggregate amount in such Approved Budget of disbursements (exclusive of (x) Professional Fees and restructuring charges arising on account of the Cases (including U.S. Trustee fees and professional fees and expenses incurred by the DIP Agent and/or the DIP Lenders) and (y) disbursements made on account of prepetition claims pursuant to any order of the Bankruptcy Court) for the Testing Period by more than 20% or (ii) is not less than the total aggregate amount in such Approved Budget of cash receipts for the Testing Period by more than 20%; provided that that the first such Variance will be tested at as of the end of the fourth week after the Petition Date and that the Permitted Variance for such first test only shall be 25% and not 20%.

For the avoidance of doubt, the Loan Parties' compliance with the Approved Budget (including any Permitted Variances) shall be tested without regard to Professional Fees incurred or paid by the Credit Parties.  The Borrower hereby agrees that during any Testing Period the Variance from the then-current Approved Budget shall not exceed the Permitted Variance.

| | |
|---|---|
| **Financial Covenants:** | In the case of the DIP ABL Revolver, minimum Excess Availability of at least $9.375 million, at any time. |
| | In the case of the DIP Term Loan Facility, minimum trailing 12 month Consolidated EBITDA (to be defined in the DIP Documents) of CGHL to be not less than $45 million; tested on a monthly basis. |
| **Events of Default:** | The DIP Documents will contain events of default (the "Events of Default") customary for facilities of this size, type and purpose and limited to (with qualifications and exceptions, where applicable, substantially identical to those set forth in the Prepetition ABL Revolver and/or the Prepetition Term Loan Facility, as applicable): |

A.  Failure to pay principal, interest, or any other amount when due (subject to a 5 business day grace period except with respect to the payment of principal);

B.  Representations and warranties incorrect in any material respect when made or deemed made;

C.  Failure to comply with affirmative and negative covenants (subject to

17

a 30 day grace period in the case of certain affirmative covenants);

D. Cross-default to payment defaults on other post-petition or unstayed indebtedness in excess of $15 million of the Loan Parties and their subsidiaries, or cross-acceleration to any such indebtedness;

E. Post-petition judgments in excess of $15 million;

F. Any Loans Party shall assert per a pleading filed with the Bankruptcy Court that any DIP Document is invalid, or that any lien or claim in respect of the DIP Facilities does not have the priorities required by the DIP Documents, or any order shall be entered by the Bankruptcy Court determining any of the foregoing;

G. Certain bankruptcy events, including: (i) dismissal of any of the Cases or conversion of any of the Cases to cases under chapter 7 of the Bankruptcy Code; (ii) appointment of a trustee, responsible officer or an examiner having expanded powers; (iii) the DIP Orders (as applicable) shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated, or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of the DIP Agent; (iv) entry of an order or filing authorizing, approving, granting, or seeking (a) additional postpetition financing not otherwise permitted or any liens on the DIP Collateral not otherwise permitted or (b) any other superpriority claim senior to or pari passu with the superpriority claims of the DIP Agent and the DIP Lenders, in each case other than a Carve-Out; (v) the payment by any Debtor of any prepetition claim in excess of $200,000 in the aggregate without the prior written consent of the DIP Agent other than as permitted by the Approved Budget  (including the Permitted Variance); (vi) relief from the automatic stay for the benefit of any other secured creditor with respect to any material DIP Collateral; (vii) allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against any or all of the DIP Agent, the DIP Lenders, and the DIP Collateral; (viii) any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code; and (ix) bankruptcy of any foreign subsidiary of a Debtor.

H. The entry of the Interim Order has not occurred prior to or on the first business day that is at least 5 calendar days after the Petition Date, or entry of the Final Order has not occurred prior to or on the first business day that is at least 45 calendar days after the Petition Date;

I. Unless otherwise agreed to in writing by the DIP Agent, the Debtors have failed to comply with the following milestones:

    a. On or before 90 days after the Petition Date, the Debtors have filed a motion requesting, and within 145 days after the Petition Date shall have obtained, an order of the Bankruptcy Court extending the lease assumption/rejection period such

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

that the lease assumption/rejection period shall be 210 days;

b. On or before the date that is 180 days after the Petition Date, the Debtors shall have filed a disclosure statement and related Acceptable Plan, have obtained an order of the Bankruptcy Court approving such disclosure statement and related solicitation procedures, and have begun solicitation of an Acceptable Plan;

c. On or before the date that is 60 days following the entry of an order approving the disclosure statement, the Debtors shall have obtained an order of the Bankruptcy Court confirming the Acceptable Plan (the "Confirmation Order"); and

d. On or before the date that is 30 days after the entry of the Confirmation Order, the Acceptable Plan shall have become effective in all respects.

J. The Debtors' deadline to assume or reject nonresidential real property leases under section 364(d)(4) of the Bankruptcy Code shall have expired prior to the date that is 210 days after the Petition Date;

K. Noncompliance by any Debtor or any of its subsidiaries with the terms of the DIP Orders (as applicable), after giving effect to any materiality threshholds or cure periods set forth therein; or

L. Any Loan Party seeks to obtain Bankruptcy Court approval of a disclosure statement or plan of reorganization other than an Acceptable Plan (as defined below), or one or more orders approving the sale of all or substantially all of the Loan Parties' assets under Bankruptcy Code §363 (through one or a series of transactions), in each case unless the proceeds therefrom will pay in full in cash the obligations under the DIP Facilities or such disclosure statement or plan of reorganization provides for any other treatment of the obligations under the DIP Facilities acceptable to the DIP Agent and the DIP Lenders, or any of the Loan Parties or their affiliates file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

"Acceptable Plan" shall mean a plan of reorganization for each of the Cases that provides for the termination of the unused commitments under the DIP Facilities and the payment in full in cash of the obligations under the DIP Facilities at emergence.

**Remedies:**   Upon the occurrence of an Event of Default, the DIP Agent, on behalf of the DIP Lenders and at the direction of the Required Initial DIP Lenders, will, unless ordered otherwise by the Bankruptcy Court, be permitted to exercise all rights and remedies provided for in the DIP Documents, including to (i) declare the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) declare all obligations under the DIP Facilities to be immediately due and payable, or (iii) terminate the DIP

19

Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders; provided that, with respect to the enforcement of the liens or exercise of any other rights or remedies with respect to the DIP Collateral (including rights to set off or apply any amounts in any bank accounts that are a part of the DIP Collateral), the DIP Agent will provide the Borrower with at least five (5) business days' prior written notice thereof; provided further that, upon the occurrence and during the continuance of any payment Event of Default, the Borrower, (a) upon the request of the DIP Agent, shall be obligated to sell, pursuant to Section 363 of the Bankruptcy Code and pursuant to sale procedures reasonably acceptable to the DIP Agent and the Required DIP Lenders and on terms and conditions reasonably acceptable to the DIP Agent and the Required DIP Lenders, the unencumbered 35% portion of the equity of Claire's Swiss Holdings LLC and Claire's Stores Canada Corp. and (b) subject to the consent of the Applicable Collateral Agent (as defined in the First Lien Intercreditor Agreement dated as of March 2, 2012), shall be obligated to sell all of the equity of Claire's Swiss Holdings LLC and Claire's Stores Canada Corp. pursuant to Section 363 of the Bankruptcy Code and pursuant to sale procedures reasonably acceptable to the DIP Agent and the Required DIP Lenders and on terms and conditions reasonably acceptable to the DIP Agent and the Required DIP Lenders, in each case, with a related mandatory prepayment with respect to the proceeds of the unencumbered 35% portion of such equity.

| | |
|---|---|
| **Expenses and Indemnification:** | The DIP Documents will contain expense reimbursement and indemnification provisions customary for facilities of this size, type and purpose and consistent with the Commitment Letter and shall apply whether or not the DIP Orders (as applicable) are entered or all or any portion of the DIP Facilities are funded. |
| **Assignments and Participations:** | Each DIP Lender may assign or participate all or a portion of its rights and obligations under (i) DIP Term Loan Facility without the Borrower's consent and (ii) DIP ABL Revolver subject to the Borrower's consent (not to be unreasonably withheld or delayed), unless an Event of Default then exists and, in each case, subject to certain limitations to be set forth in the DIP Documents; provided, however, that the Borrower shall have consent rights at all times to any assignments and participation to any customers or operating competitors (or their respective affiliates except for bona fide debt funds) of any Loan Party. |
| **Amendments:** | Subject to the consent of the Required Initial DIP Lenders, with certain customary amendments subject to the consent of all DIP Lenders. |
| **Governing Law and Jurisdiction:** | Laws of the State of New York (and, to the extent applicable, the Bankruptcy Code). The Loans Parties shall submit to the exclusive jurisdiction of the Bankruptcy Court. |
| **Counsel to DIP Lenders:** | Latham & Watkins LLP |

20

<div align="right">
<strong>Schedule A to Exhibit A</strong><br>
<strong>of Commitment Letter</strong>
</div>

<div align="center"><strong>Commitments</strong></div>

| Initial DIP Lender | DIP ABL Revolving Commitments |
|---|---|
| Citibank, N.A. | $75,000,000 |
| **Total** | **$75,000,000** |

| Initial DIP Lender | DIP Term Loans Commitment |
|---|---|
| Citibank, N.A. | $60,000,000 |
| **Total** | **$60,000,000** |

WEIL:\96471509\13\36182.0003
US-DOCS\99496119.9

**Interest rates and fees**

| | |
|---|---|
| **Interest Rates:** | DIP Loans and advances under the Intercompany Facility will bear interest, at the option of the Borrower, at one of the following rates: |

(i) the Applicable Margin (as defined below) <u>plus</u> the Base Rate, payable monthly in arrears; or

(ii) the Applicable Margin <u>plus</u> the current LIBOR Rate as quoted by the DIP Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one, two, three or six months (the "<u>LIBOR Rate</u>"), payable monthly; <u>provided</u> that in no event shall the LIBOR Rate in respect of DIP Loans be less than 0% (the "<u>LIBOR Floor</u>").

"<u>Applicable Margin</u>" means, (a) with respect to DIP Term Loans, (1) 5.50% *per annum*, in the case of DIP Term Loans that are Base Rate Loans and (2) 6.50% *per annum*, in the case of DIP Term Loans that are LIBOR Rate Loans; and (b) with respect to DIP ABL Revolving Loans, (1) 1.50% *per annum*, in the case of DIP ABL Revolving Loans that are Base Rate Loans and (2) 2.50% *per annum*, in the case of DIP ABL Revolving Loans that are LIBOR Rate Loans.

"<u>Base Rate</u>" means the highest of (i) the DIP Agent's prime rate, (ii) the Federal Funds Effective Rate <u>plus</u> 1/2 of 1% and (iii) the LIBOR Rate for an interest period of one month (giving effect to the LIBOR Floor) <u>plus</u> 1.00%.

Interest and fees shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of interest with respect to Base Rate Loans based on the DIP Agent's prime rate).

| | |
|---|---|
| **Default Interest:** | During the continuance of an Event of Default, at the request of the Required Initial DIP Lenders any overdue amounts under the DIP Documents (including unreimbursed amounts on account of drawn Letters of Credit) will bear interest at an additional 2.0% *per annum*. |
| **Extension Fee:** | 0.25% with respect to the DIP ABL Revolving Commitments and the DIP Term Loans outstanding at such time. |
| **Unused Commitment Fees:** | From and after the Closing Date, a non-refundable unused commitment fee at the rate of 0.375% *per annum* will accrue as a percentage of the daily average undrawn portion of the commitments under the DIP ABL Revolver, payable monthly in arrears. |

<div align="right">

**Schedule C to Exhibit A**
**of Letter**

</div>

**Initial Budget**[2]

---

[2] Subject to the Initial Budget.

WEIL:\96471509\5\36182.0003
US-DOCS\99496119.9

**Exhibit B**

**Transfer Agreement**

## PROVISION FOR TRANSFER AGREEMENT

The undersigned ("Transferee") (a) hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ 2018 (the "Agreement"),[1] by and among the Company, the Sponsor, and each of the Consenting Creditors party thereto, (b) desires to acquire the Claims described below (the "Transferred Claims") from one of the Consenting Creditors (the "Transferor") and (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent Transferor was thereby bound with respect to the Transferred Claims, and shall be deemed a Consenting Creditor for all purposes under the Agreement.

The Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the Agreement, to the same extent applicable to the Transferred Claims, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Transferred Claims, except as otherwise provided in the Agreement and (iii) that each of the Parties shall be an express third-party beneficiary of this Provision for Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor with respect to the Transferred Claims.

**TRANSFEREE**

_____

By:
Name:
Title:

Principal amount of First Lien Term Loan $_____
Principal amount of Claire's 2019 1L Notes $_____
Principal amount of Claire's 2020 1L Notes $_____
Principal amount of Second Lien Notes $_____
Principal amount of Senior Unsecured Notes $_____
Principal amount of other Claims against the Company (describe below):  $_____

Notice Address:

_____


_____

Attn:

_____

Fax:

_____

Email:

_____

_____

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Agreement.

**<u>Exhibit C</u>**

**Joinder**

## JOINDER

The undersigned ("<u>Joining Party</u>") (a) hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ 2018 (the "<u>Agreement</u>"),[1] by and among the Company, the Sponsor, and each of the Consenting Creditors party thereto, and (b) desires to join and hereby irrevocably agrees to be bound by the terms and conditions of the Agreement in all respects, and shall be deemed a Consenting Creditor for all purposes under the Agreement.

## JOINING PARTY

_____

By:
Name:
Title:

Principal amount of First Lien Term Loan $_____
Principal amount of Claire's 2019 1L Notes $_____
Principal amount of Claire's 2020 1L Notes $_____
Principal amount of Second Lien Notes $_____
Principal amount of Unsecured Notes Claims $_____
Principal amount of other Claims against the Company (describe below): $_____

Notice Address:

_____

_____

Attn:

_____

Fax:

_____

Email:

_____

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Agreement.

**Schedule I**[1]

| **Backstop Party** | **Allocation** |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| **Total:** | 100% |

---

[1] Schedule I to be redacted when filed.

## Exhibit B

## Corporate Organizational Chart

Prepetition ABL
Obligor on 1st Lien ABL (Feb. 19)
Prepetition Revolving Credit Facility
Obligor on 1st Lien Revolving Credit Facility (Feb. 19)
First Lien Term Loan
Obligor on 1st Lien Term Loan (Sept. 21)
First Lien 9.00% Notes
Obligor on 9.000% Sr. Sec. 1st Lien Notes (Mar. 19)
First Lien 6.125% Notes
Obligor on 6.125% Sr. Sec. 1st Lien Notes (Mar. 20)
Second Lien 8.875% Notes
Obligor on 8.875% Sr. Sec. 2nd Lien Notes (Mar. 19)
Unsecured 7.750% Notes
Obligor on 7.750% Sr. Unsec. Notes (June 20)
CLSIP Term Loan
Obligor on CLSIP Sr. Sec. Term Loan (Sept. 21)
Gibraltar 2019 Unsecured Term Loan
Obligor on Gibraltar Unsec. Term Loan (Feb. 19)
Gibraltar 2021 Unsecured Term Loan
Obligor on Gibraltar Unsec. Term Loan (Sept. 21)
Gibraltar Secured Term Loan
Obligor on Gibraltar Int. Sec. Term Loan (Jan. 19)
Claire's Inc. (Delaware)
Claire's Stores, Inc. (Florida)
56%
44%
Claire's Puerto Rico Corp.(Delaware)
CBI Distributing Corp. (Delaware)
Claire's Boutiques, Inc. (Colorado)
Claire's Canada Corp. (Delaware)
Claire's Swiss Holdings LLC (Delaware)
CLSIP Holdings LLC (Delaware)
BMS Distributing Corp. (Delaware)
Claire's Stores Canada Corp. (Canada)
CSI Canada LLC (Delaware)
Claire's (Gibraltar) Holdings Limited (Gibraltar)
CLSIP LLC (Delaware)
Claire's (Gibraltar) Intermediate Holdings Limited (Gibraltar)
Claire's Holdings S.a.r.l. (Luxembourg)
Claire's Holding GmbH (Switzerland)
Claire's Luxembourg S.a.r.l. (Luxembourg)
Claire's European Services Limited (United Kingdom)
Claire's Hungary Kft. (Hungary)
Claire's Stores Hong Kong Li mited (Hong Kong)
CSI Luxembourg S.a.r.l. (Luxembourg)
BMS Fashion Corp. (Cayman Islands)
WhiteClaire's Acessorios Portugal, Unipessoal LDA (Portugal)
Claire's Netherlands B.V. (Netherlands)
Claire's Germany GmbH (Germany)
Claire's Switzerland GmbH (Switzerland)
Claire's Accessories UK Ltd (United Kingdom)
Claire's Austria GmbH (Austria)
CSI Luxembourg S.a.r.l. Swiss Branch (Switzerland)
Claire's China Services (China)
Claire's Fashion Property Corp. (Cayman Islands)
RSI International Limited (Hong Kong)
Claire's Accessories UK, Ltd. Irish Branch (Ireland)
Claire's Accessories UK, Ltd. French Branch (France)
Claire's France S.A.S. (France)
Claire's Accessories Spain, S.L. (Spain)
Claire's Italy S.R.L. (Italy)
Claire's Belgium B.V.B.A. (Belgium)
99%
90%
Claire's Poland Sp. z.o.o. (Poland)*
Claire's Czech Republic s.r.o. (Czech Republic)*
Claire's European Distribution Limited (United Kingdom)
* Minority interests in Claire's Poland and Claire's Czech Republic are held by Claire's Holdings S.a.r.l

