# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
----------------------------------------------------------- x
                                                            :
In re                                                       :     Chapter 11
                                                            :
CLAIRE'S STORES, INC., et al.,                              :     Case No. 18– _____
                                                            :
                              Debtors.¹                     :     (Joint Administration Requested)
                                                            :
----------------------------------------------------------- x
```

## MOTION OF DEBTORS FOR
### ENTRY OF ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION NON-ABL SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

By this motion (the "**Motion**"), Claire's Stores, Inc. ("**Claire's**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**"), respectfully request entry of an interim order in the form attached hereto as **Exhibit A** (the "**Interim Order**"), and a final order (the "**Final Order**," and together with the Interim Order, collectively, the "**DIP Orders**"): (i) authorizing the Debtors to (a) enter into that certain *Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement*, a form of which is attached hereto as **Exhibit B** (the "**DIP Credit**

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Claire's Inc. (6919); Claire's Stores, Inc. (0416); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Puerto Rico Corp. (6113); and CSI Canada LLC (7936).

**Agreement**,"[2] and, together with the any and all other Loan Documents (as defined in the DIP Credit Agreement), the "**DIP Documents**") to incur DIP Financing (as defined below), including with respect to an interim borrowing of up to $105 million, and (b) use the Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code); (ii) granting adequate protection as provided herein; (iii) scheduling a hearing to consider the relief requested herein on a final basis (the "**Final Hearing**"); and (iv) granting related relief.

In support of the Motion, the Debtors submit: (i) the declaration of Tyler Cowan, Managing Director at Lazard Frères & Co. LLC ("**Lazard**"), the Debtors' proposed investment banker, attached hereto as **Exhibit C** (the "**Cowan Declaration**") and (ii) the first day declaration of Scott E. Huckins, filed contemporaneously herewith and incorporated herein by reference (the "**First Day Declaration**"). The Debtors' Approved Budget with respect to the DIP Facilities is attached hereto as **Exhibit D** (the "**Budget**").

### Preliminary Statement

1.      By this Motion, the Debtors seek approval of their entry into (i) a superpriority senior secured multiple-draw asset-based revolving credit facility in an aggregate principal amount of up to $75 million (the "**DIP ABL Revolver**" and the loans thereunder, the "**DIP ABL Revolving Loans**") and (ii) a superpriority senior secured dual-draw "last-out" term loan facility in an aggregate principal amount of up to $60 million (the "**DIP Term Loan Facility**"[3] and the loans thereunder, the "**DIP Term Loans**"), agented by Citibank, N.A.

---

[2] The form of DIP Credit Agreement attached as **Exhibit B** is presented for informational purposes only and remains subject to ongoing review and material revision consistent with that certain Commitment Letter, dated March 11, 2018, by and among Citigroup Global Markets Inc. and Claire's. The Debtors intend to file their DIP Credit Agreement in substantially final form prior to the Court's hearing to consider the relief requested by the Motion on an interim basis.

[3] The DIP ABL Revolver and the DIP Term Loan Facility shall collectively be referred to herein as the "**DIP Facilities**." The DIP ABL Revolving Loans and the DIP Term Loans shall collectively be referred to herein as the "**DIP Loans**").

("**Citibank**" or the "**DIP Agent**"), following a competitive marketing process undertaken by the Debtors, with the assistance of Lazard, and results from vigorous negotiations to develop the best financing reasonably available to these chapter 11 estates.

2. As described herein, and as fully reflected in the DIP Credit Agreement, the DIP Facilities provide the Debtors with (i) attractive pricing, (ii) substantial net liquidity versus available alternatives, (iii) highly favorable budget covenants, and (iv) limited case milestones or case controls. In addition, the Debtors' proposed DIP Financing will not cause the Debtors to incur priming liens on all or substantially all the Debtors' assets. Rather, the senior liens proposed to be granted pursuant to the DIP Facilities will only encumber assets that constitute "ABL Priority Collateral" on a senior basis. This provision, together with the Debtors' proposed refinancing of their Prepetition ABL Facility with proceeds of their DIP ABL Revolver, permit the Debtors to incur their proposed financing,[4] and use Cash Collateral on a consensual basis with respect to their prepetition secured creditors by virtue of the series of consents and agreements granted by their prepetition secured creditors through their respective intercreditor agreements.

3. In particular, the DIP Facilities constitutes a "Permitted Refinancing" and "Permitted Refinancing Agreement" under the Debtors' ABL ICA (as defined below), thereby causing the balance of the Debtors' prepetition lenders to have consented to the relief requested here. This structure provides substantial benefits to these chapter 11 estates by (i) reducing the need for contested motion practice with respect to the incurrence of DIP Financing or use of cash collateral, and (ii) has also permitted the Debtors to obtain financing on highly favorable terms

---

[4] Additionally, and as detailed below, holders of approximately 72% of the Debtors' "**First Lien Claims**" (as defined in that certain *Restructuring Support Agreement*, dated March 19, 2018 (the "**RSA**")) have stipulated that the Debtors' proposed DIP Financing constitutes a "Permitted Refinancing Agreement" under the terms of the relevant intercreditor agreement.

by, among other things, allowing the Debtors to incur such financing without also needing to pay adequate protection to the balance of their prepetition secured creditors in the form of cash-pay interest.

4.      With access to DIP Financing, the Debtors will enter chapter 11 by sending a strong message to their vendors, landlords, customers, and employees that their balance sheet restructuring is well-capitalized and positioned for success.   In addition to foregoing reasons, several compelling reasons justify the relief requested herein:

- **The Debtors' Estates Will Suffer
  <u>Immediate And Irreparable Harm If The Requested Relief Is Not Granted</u>:**

  - The Debtors are entering chapter 11 with limited cash on hand.  Access to DIP Financing is thus critical to ensure the Debtors' smooth entry into chapter 11 and their ability to prudently operate their business during the pendency of these chapter 11 cases.

  - The Debtors believe the commencement of these chapter 11 cases will place increased demands on liquidity due to, among other things, the costs of administering these chapter 11 cases and the acceleration or elimination of trade terms.

  - The Debtors therefore submit that the requested relief is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the vital liquidity that would be provided through their proposed interim borrowings.

- **The Proposed DIP Financing Is
  <u>Highly Attractive And Results From A Competitive Marketing Process</u>:**

  - The Debtors, with assistance from experienced financial and legal advisors, ran a highly competitive process to obtain DIP Financing on the best terms reasonably available for these estates.

  - Negotiations with potential and interested financing parties were conducted at arm's length, iterative, and rigorous.

  - The competitive and, ultimately, successful nature of this process is demonstrated by the terms of the DIP Facilities.  Indeed, the DIP Facilities provide for significant liquidity with limited budget-based restrictions and case milestones, all at reasonable rates and for market fees.

- **<u>The Proposed DIP Financing Will Send A Strong And Vital Message To The Market</u>**:

  o The Debtors expect that vendors, customers, and their employees – both domestic and abroad – will be highly focused on whether these chapter 11 cases are appropriately capitalized to maximize the greatest possibility of success.

  o Access to DIP Financing will provide a strong message to the Debtors' customers, vendors, landlords, and competitors that these chapter 11 cases are well-funded and the capital markets stand strongly behind the Debtors' restructuring efforts.

  o And, by virtue of limited case milestones, the Debtors' can confidently communicate their ongoing flexibility in, and control over these, chapter 11 cases to the market.

- **The Debtors' Proposed Refinancing of the <u>Prepetition ABL Facility Will Benefit All Stakeholders</u>**:

  o The repayment of the approximately $71 million outstanding under the Debtors' Prepetition ABL Facility is a critical term of the proposed DIP Financing.

  o On the one hand, this condition was required by the DIP Lenders as a condition for the manifest benefits provided by that financing, including up to $30 million of additional liquidity that will be available to these chapter 11 estates as a result of the interim relief requested here.

  o On the other hand, the Debtors respectfully submit that all parties in interest will benefit from that repayment.

    ▪ As set forth in the First Day Declaration, the Debtors believe that obligations outstanding under the Prepetition ABL Facility are oversecured by a substantial margin, with respect to, among other things, cash, inventory, and receivables with a value well in excess of outstanding borrowings.

      • In other words, refinancing this debt will not unduly improve the position of this prepetition debt.

    ▪ Repayment of the Prepetition ABL Facility as provided herein will permit the Debtors to utilize Cash Collateral and incur their financing on a consensual basis in light of consents already obtained through applicable intercreditor agreements.

    ▪ Nor is any prepetition lender seeking to unduly advance its prepetition collateral position through this proposed refinancing given that the Debtors' DIP Financing is being provided through a fully underwritten commitment from Citibank—a third party financial institution.

- **<u>The Proposed DIP Lenders Have Proceeded In Good Faith</u>**:

  o Each DIP Financing proposal was reviewed and analyzed by both the Debtors and their experienced professionals.

RLF1 19027854V.1

o Ultimately, the Debtors leveraged alternative proposals in order to obtain DIP Financing that provided substantial operational flexibility, limited milestones, and reduced the likelihood of litigation at the outset of these chapter 11 cases.

o As further detailed in the Cowan Declaration, the Debtors' negotiations with the DIP Lenders[5] were vigorously negotiated at arm's length by the Debtors, with the assistance of their advisors, and prospective lenders.

### Jurisdiction

5.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

6.      By this Motion, the Debtors request the following relief as provided in the DIP Orders:

- **The DIP Financing:** authority to enter into the DIP Credit Agreement and related documents providing for  (i) a $75 million DIP ABL Revolver and (ii) a $60 million DIP Term Loan that will be drawn up to $30 million on an interim basis and up to an additional $30 million on a final basis that, together, will:

  o upon entry of the Interim Order, be used, to (a) refinance the approximately $71 million outstanding under the Debtors' Prepetition ABL Facility (as defined below) and (b) cash collateralize outstanding letters of credit under the Prepetition ABL Facility totaling approximately $4 million, with the ability to issue additional letters of credit up to an aggregate cap of $10 million; and

---

[5] "**DIP Lenders**" means the lenders party to the DIP Credit Agreement.

- o provide the liquidity needed to ensure the Debtors are able to continue operating their business without disruption during the pendency of these chapter 11 cases.

- **DIP Interest and Fees:** authority to pay:

  - o an interest rate of, at Claire's discretion, (i) Base Rate plus 5.50% *per annum* for DIP Term Loans or Base Rate plus 1.5% *per annum* for DIP ABL Revolving Loans or (ii) LIBOR Rate plus 6.50% *per annum* for DIP Term Loans or LIBOR Rate plus 2.5% *per annum* for DIP ABL Revolving Loans;

  - o default interest at 2.0% *per annum*; and

  - o certain additional fees and expenses, including underwriting, upfront, and administration fees, respectively, as described in that certain *Fee Letter* by and among Claire's Stores Inc. and the parties thereto, dated as of March 11, 2018, (the "**Fee Letter**").[6]

- **DIP Liens and Claims:** authority to grant, in each case subject to the Carve-Out (as defined in the Interim Order):

  - o first priority priming security interest and lien on all prepetition and postpetition assets constituting ABL Priority Collateral (as defined herein) of any Debtor;

  - o junior security interest and lien on all prepetition and postpetition assets constituting the Notes Priority Collateral (as defined below, and, together with the ABL Priority Collateral, the "**DIP Collateral**");[7] and

  - o a superiority administrative expense claim, which claims in respect of the DIP ABL Revolver and the DIP Term Loan Facility shall be *pari passu* and shall have full recourse against all assets of the Debtors' estates, including the Unencumbered Foreign Equity.[8]

- **Cash Collateral:** authority to use Cash Collateral within the meaning of section 363(a) and 363(c) of the Bankruptcy Code.

- **Permitted Refinancing:** finding that the DIP Documents constitute Permitted Refinancing Agreements (as defined in the ABL ICA (as defined below));

- **Adequate Protection:** approval of the form and manner of adequate protection to be provided to the Prepetition Non-ABL Secured Parties (as defined below), including:

  - o with respect to the Prepetition 1L Secured Parties (as defined below):

---

[6] The Fee Letter will be provided to the Court, the U.S. Trustee, and any professionals retained by an official committee appointed in these chapter 11 cases, subject to the confidentiality provisions set forth therein.

[7] For the avoidance of doubt, the DIP Collateral excludes Avoidance Actions (as defined below) or the proceeds thereof; provided that, subject to entry of the Final Order, the DIP Superpriority Claim shall have recourse to the proceeds of Avoidance Actions.

[8] "**Unencumbered Foreign Equity**" means the 35% of the respective equity of Claire's Swiss Holdings LLC ("**Claire's Swiss**") and Claire's Stores Canada Corp. "**Claire's Canada**").

- ▪ replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facilities (in the same relative priority as among the Prepetition 1L Secured Facilities) but senior to the 2L Adequate Protection Liens (as defined below) (such replacement or new liens, the "**1L Adequate Protection Liens**");

- ▪ superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are subject and junior to the DIP Superpriority Claims (as defined in the Interim Order, the "**DIP Superpriority Claims**"); and

- ▪ delivery of all reports and notices provided for in the DIP Documents; and,

- o with respect to the Prepetition 2L Secured Parties (as defined below):

- ▪ replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facilities and the Prepetition 1L Secured Facilities and to the 1L Adequate Protection Liens (such replacement or new liens, the "**2L Adequate Protection Liens**").

- **Modification of the Automatic Stay**: modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, with actions against the DIP Collateral requiring at least five business days' notice to the Debtors, the U.S. Trustee, and any official committee.

- **Immediate Effectiveness**: waiver of any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order.

- **Final Hearing**: scheduling a date for a hearing on the Motion to consider entry of the Final Order no later than thirty (30) days after entry of the Interim Order.

### Concise Statement Pursuant to Bankruptcy Rule 4001

7.     Pursuant to Bankruptcy Rules 4001(b), (c) and (d), the following is a concise statement and summary of the proposed material terms of the DIP Documents and Orders:[9]

---

[9] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

| | SUMMARY OF THE DIP FACILITIES[10] | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| **Borrower**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Claire's Stores, Inc. | Interim Order,<br>Introduction (i) |
| **Guarantors**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Each Debtor aside from Borrower. | Interim Order,<br>Introduction |
| **DIP Lenders**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | A syndicate of banks, financial institutions, and other entities, including Citibank, N.A., arranged by Citigroup Global Markets Inc. | Interim Order,<br>Introduction (i) |
| **DIP Agent**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Citibank, N.A. | Interim Order,<br>Introduction (i) |
| **Lead Arranger and Bookrunner**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Citigroup Global Markets Inc. | Interim Order,<br>Introduction (i) |
| **DIP Facilities**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | $135 million DIP Financing facility, comprised of (a) a senior secured multiple-draw asset-based revolving credit facility in an aggregate principal amount of up to $75 million and (b) a senior secured "last-out" term loan facility in an aggregate principal amount of up to $60 million, of which up to $30 million will be borrowed on an interim draw | Interim Order,<br>¶2(c) |
| **Borrowing Limits**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Initial draw on DIP Term Loan Facility: $30 million<br><br>Initial borrowings on DIP ABL Revolver:  Together with cash on hand, sufficient to refinance Prepetition ABL Facility and otherwise in accordance with DIP Documents. | Interim Order,<br>¶ 2(c) |
| **Budget**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Attached as **Exhibit D**.<br><br>The Debtors' compliance with the Budget shall be tested every four weeks commencing on the first Thursday that is at least four (4) full weeks after the Petition Date without regard to (x) Professional Fees and restructuring charges arising on account of these Chapter 11 Cases (including U.S. Trustee fees and professional fees and expenses incurred by the DIP Agent and/or the DIP Lenders) and (y) disbursements made on account of prepetition claims pursuant to any order of the Court.<br><br>On the first day that is at least four (4) full weeks after the Petition Date, and on the Thursday of each fourth week thereafter (each, a "**Testing Period**"), the Debtors shall deliver a Variance Report to the DIP Agent presenting the difference, if any, between the Debtors' (i) Actual Receipts and Actual Disbursements during the Testing Period to (ii) the Debtors' Budgeted Receipts and Disbursements.  A Permitted Variance | Interim Order<br>¶ 2(e), (h). |

---

[10] All capitalized terms listed in this table but not otherwise defined herein, shall have the meaning ascribed to such terms in the DIP Documents.

| SUMMARY OF THE DIP FACILITIES[10] | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | means (i) with respect to Budgeted Disbursements, a Variance where Actual Disbursements are not more than 120% of Budgeted Disbursements as of the end of the applicable Testing Period, except with respect to the first Testing Period, which shall be 125%, and (ii) with respect to Budgeted Receipts, a Variance where Actual Receipts are not less than 80% of the Projected Aggregate Receipts as of the end of the Applicable Testing Period, except with respect to the first Testing Period, which shall be 75%. | |
| **Use of DIP Proceeds and Cash Collateral** Fed. R. Bankr. P. 4001(c)(1)(B)(ii);(c)(1)(B) | The proceeds from the DIP Facilities and the Cash Collateral will be used to: <br>• refinance and replace commitments under the Prepetition ABL Facility, including cash collateralization of Prepetition Letters of Credit, as well as pay the fees, costs, and expenses incurred in connection therewith; <br>• provide for general corporate working capital purposes; and <br>• fund the Professional Fees Account and other obligations arising from the Carve-Out. | DIP Credit Agreement §5.08. Interim Order ¶ G. |
| **Payments on Prepetition Debt;** Fed. R. Bankr. P. 4001(c)(B) | Subject to entry of Interim Order, the proposed DIP ABL Revolver shall be used to refinance the Prepetition ABL Facility. | Interim Order ¶ F(iv) |
| **Cross Collateralization** Fed. R. Bankr. P. 4001(c)(B) | Cross Collateralization <br>None, other than adequate protection | Interim Order, ¶¶ 3-4. |
| **Identity of Each Entity with Interest in Cash Collateral** Fed. R. Bankr. P. 4001(b)(1)(B)(i) | The following entities have interest in the Cash Collateral: <br>• Prepetition ABL Secured Parties <br>• 1L Secured Parties <br>• 2L Secured Parties | N/A |
| **Interest Rates** Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Loans will accrue interest, at the option of the Borrower, at one of the following interest rates: <br><br>(i) the Applicable Margin (as defined below) plus the Base Rate, payable monthly in arrears; or <br><br>(ii) the Applicable Margin plus the current LIBOR Rate as quoted by the DIP Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one, two, three or six months (the "**LIBOR Rate**"), payable monthly; provided that in no event shall the LIBOR Rate in respect of DIP Loans be less than 0% (the "**LIBOR Floor**"). <br><br>"**Applicable Margin**" means, (a) with respect to DIP Term Loans, (1) 5.50% per annum, in the case of DIP Term Loans that are Base Rate Loans and (2) 6.50% per annum, in the case of DIP Term Loans that are LIBOR Rate Loans; and (b) with respect to DIP ABL Revolving Loans, (1) 1.50% per annum, in the case of DIP ABL Revolving Loans that are Base Rate Loans and (2) 2.50% per annum, in the case of DIP ABL Revolving Loans that | |

| SUMMARY OF THE DIP FACILITIES[10] | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | are LIBOR Rate Loans.<br><br>"**Base Rate**" means the highest of (i) the DIP Agent's prime rate, (ii) the Federal Funds Effective Rate plus 1/2 of 1% and (iii) the LIBOR Rate for an interest period of one month (giving effect to the LIBOR Floor) plus 1.00%. Interest and fees shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of interest with respect to Base Rate Loans based on the DIP Agent's prime rate). | |
| **Maturity Date**<br>Fed. R. Bankr. P. 4001(c)(1)(B); | One-year anniversary of the Closing Date, unless extended pursuant to certain conditions set forth in the DIP Credit Agreement (the "**Scheduled Maturity Date**") | *See* DIP Credit Agreement, § 1.01 |
| **Termination Date**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The "**Termination Date**" means the earliest to occur of:<br>• the Scheduled Maturity Date<br>• the first business day that is at least 5 calendar days after the Petition Date unless, on or prior to such date, the Interim Order shall have been entered,<br>• the first business day that is at least 45 calendar days after the Petition Date unless, on or prior to such date, the Final Order shall have been entered,<br>• the date on which any of the Debtors' chapter 11 cases are converted to a case under chapter 7 of the Bankruptcy Code,<br>• the date on which a chapter 11 trustee or an examiner with expanded powers is appointed in any of the Cases without the consent of the Administrative Agent,<br>• the date on which substantial consummation (as defined in Bankruptcy Code §1101), of a plan of reorganization filed in any of the Cases that is confirmed pursuant to an order of the Bankruptcy Court has occurred (which for purposes hereof will be no later than the "effective date"),<br>• the date on which consummation of a sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code, or otherwise has occurred; and<br>• the date on which the termination of the commitments with respect to such DIP Facilities has occurred in accordance with the provisions of the DIP Credit Agreement. | DIP Credit Agreement, § 1.01 |
| **Financial Covenants**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | <u>Cash Dominion</u><br>Subject to the Carve-Out in all respects, from and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same deposit and/or concentration accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition ABL Loan Documents (collectively, the "**Cash Collection Accounts**"), which accounts shall be subject to the sole dominion and control of the DIP Agent to the extent provided in the DIP Documents (and the funds in such accounts may be used by the Debtors to the extent provided in this Interim Order and the DIP Documents). All cash | Interim Order ¶ 12(a) |

| SUMMARY OF THE DIP FACILITIES[10] | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | of the Debtors shall be subject to the DIP Agent's cash dominion sweep (x) to the extent that at such time the Excess Availability (as defined in the DIP Credit Agreement) is less than 12.5% of the DIP ABL Loan Cap (each as defined in the DIP Credit Agreement) or (y) upon any Event of Default (as defined in the DIP Credit Agreement).  To the extent the Excess Availability exceeds 12.5% of the DIP ABL Loan cap for 20 consecutive days, the cash dominion shall cease to exist, provided that no Event of Default was continuing during such period. | |
| | Minimum Excess Availability <br> In the case of the DIP ABL Revolver, minimum Excess Availability of the lesser of (x) 12.5% of the DIP ABL Loan CAP (as defined in the DIP Credit Agreement) and (y) $8.0 million, at any time. | |
| | EBITDA <br> In the case of the DIP Term Loan Facility, minimum trailing 12 month Consolidated EBITDA (to be defined in the DIP Documents) of CGHL to be not less than $45 million; tested on a monthly basis. | |
| **Collateral and Priority** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(i); | "**DIP Collateral**" refers to all property of the Debtors, now existing or hereinafter acquired, including, as applicable, all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, securities and other investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, real property, fixtures, permits, franchise rights, capital stock and other equity interests of subsidiaries and in other entities, tax and other refunds, insurance proceeds, commercial tort claims, all other Collateral (as defined in the DIP Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located that constitutes ABL Priority Collateral or Notes Priority Collateral, in each case, under the ABL ICA.  For the avoidance of doubt, the DIP Collateral does not include Avoidance Actions or the proceeds thereof. | Interim Order ¶ 2(k). |
| | The DIP Liens and DIP Lenders' claims shall have the following priority: <br><br> • first priority priming security interest and lien on all prepetition and postpetition assets constituting ABL Priority Collateral of any Debtor; | Interim Order ¶ 2(m)-(l). |

| SUMMARY OF THE DIP FACILITIES[10] | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | • junior security interest and lien on all prepetition and postpetition assets constituting the Notes Priority Collateral<br><br>• a superiority administrative expense claim, which claims in respect of the DIP ABL Revolver and the DIP Term Loan Facility shall be *pari passu* and shall have full recourse against all assets of the Debtors' estates, including the Unencumbered Foreign Equity. | |
| **Adequate Protection**<br>Fed. R. Bankr. P. 4001(b)(1)(B)(iv), (c)(1)(B)(ii) | With respect to the Prepetition 1L Secured Parties (as define below):<br>• replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facilities (in the same relative priority as among the Prepetition 1L Secured Facilities) but senior to the 2L Adequate Protection Liens (as defined below) (such replacement or new liens, the "**1L Adequate Protection Liens**");<br>• superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are subject and junior to the DIP Superpriority Claims (as defined in the Interim Order, the "**DIP Superpriority Claims**"); and<br>• delivery of all reports and notices provided for in the DIP Documents.<br>With respect to the Prepetition 2L Secured Parties (as defined below):<br>• replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facilities and the Prepetition 1L Secured Facilities and to the 1L Adequate Protection Liens (such replacement or new liens, the "**2L Adequate Protection Liens**" and, together with the 1L Adequate Protection Liens, the "**Adequate Protection Liens**").<br>The Adequate Protection Liens are subject to the Challenge Period in favor of parties-in-interest, as detailed in ¶ 6 of the Interim Order | Interim Order, ¶¶ 3-4. |
| **Debtors' Stipulations**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii), (viii) | The Debtors stipulate to the following:<br>• the Debtors' entry into the Prepetition ABL Facility, the aggregate principal amount outstanding thereunder and that the Prepetition ABL Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the ABL Priority Collateral; (ii) valid, binding, perfected, enforceable, second priority liens and security interests in the Notes Priority Collateral; and (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law and (iv) as of the Petition Date, with respect to Prepetition Collateral that is Notes Priority Collateral, subject to and subordinate to the Prepetition 1L Liens; | Interim Order ¶¶ D, E |

| | SUMMARY OF THE DIP FACILITIES[10] | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | • the Debtors' entry into the Prepetition LC Facility and the amount of letters of credit issued thereunder, and that the liens securing the Prepetition LC Obligations are (i) valid, binding, perfected, enforceable, first priority liens and security interest in the Collateral Account, and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law;<br><br>• the Debtors' entry into the Prepetition 1L Secured Facilities, and the Prepetition 2L Secured Facility, and the principal amount outstanding with respect to each of those facilities;<br><br>• the Term Loan Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Prepetition Collateral (as defined below); and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law.<br><br>• the 9.00% Notes Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Prepetition Collateral (as defined below); and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law.<br><br>• the 6.125% Notes Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Prepetition Collateral (as defined below); and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law. | |
| **Material Conditions to Closing**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The material conditions to closing are reasonable and customary for facilities of this size, type, and purpose, and include, among others:<br>• the Debtors shall have provided the DIP Agent with all copies of "first day orders;"<br>• the DIP Credit Agreement shall have been duly executed by each of the Loan Parties;<br>• the DIP Lenders shall have received the Initial Approved Budget, in form and substance acceptable to the DIP Agent;<br>• entry of Interim DIP Order in substantially the form approved by the DIP Agent; and<br>• since January 28, 2017, there shall not have been a material adverse effect on the business, property, operations, or condition of the Borrowers of its subsidiaries. | *See* DIP Credit Agreement, Art. 4. |
| **Indemnification**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | The Debtors shall pay on demand all fees, costs, indemnities, expenses (including reasonable and documented out-of-pocket legal and other professional fees and expenses of the DIP Agent) and other charges payable under the terms of the DIP Documents. | Interim Order ¶2(h) |

| SUMMARY OF THE DIP FACILITIES[10] | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | All such fees, costs, <u>indemnities</u>, expenses and disbursements, whether incurred, paid or required to be paid prepetition or post-petition and whether or not budgeted in the Approved Budget, are entitled to administrative expense priority under section 503(b)(1) of the Bankruptcy Code (in addition to being part of the DIP Superpriority Claim), in each case subject to the Carve-Out (as defined below), and are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Agent and/or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Documents, and, subject to provisions regarding the fees and expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any respect. | |
| **Events of Default**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Events of Default are reasonable and customary for facilities of this size, type, and purpose, and include, among others:<br><br>• failure to pay principal, interest, or any other amount when due;<br><br>• representations and warranties incorrect in any material respect when made or deemed made;<br><br>• cross-default to payment defaults on other post-petition or unstayed indebtedness in excess of $15 million of the Loan Parties and their subsidiaries, or cross-collateralization to any such indebtedness;<br><br>• any Loans Party shall assert per a pleading filed with the Bankruptcy Court that any DIP Document is invalid, or that any lien or claim in respect of the DIP Facilities does not have the priorities required by the DIP Documents, or any order shall be entered by the Bankruptcy Court determining any of the foregoing;<br><br>• certain bankruptcy events, including (i) dismissal of any of the chapter 11 cases or conversion of any of the cases to chapter 7 of the Bankruptcy Code; (ii) appointment of a trustee, responsible officer, or an examiner having expanded powers; (iii) the DIP Orders ceasing to be in full force and effect; (iv) entry of an order filing, authorizing, approving, granting, or seeking (a) additional postpetition financing not otherwise permitted or any liens on DIP Collateral not otherwise permitted or (b) any other superiority claims senior to or *pari passu* with the superpriority claims of the DIP Agent and the DIP Lenders; (v) the payment by any Debtor of any prepetition claim in excess of $200,000 in the aggregate without the prior written consent of the DIP Agent other that as permitted by the Approved Budget; (vi) relief from the automatic stay for the benefit of any other secured creditor with respect to any material DIP Collateral; (vii) allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against any or all of the DIP Agent, the DIP Lenders, and the DIP Collateral; (viii) any | Interim Order, Introduction ¶ 14(g) |

| SUMMARY OF THE DIP FACILITIES[10] | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code; and (ix) bankruptcy of any foreign subsidiary of a Debtor;<br><br>• failure to comply with affirmative and negative covenants in the DIP Credit Agreement;<br><br>• post-petition judgments in excess of $15 million;<br><br>• failure to obtain entry of the Interim Order or the Final DIP Order in a form and substance acceptable to the DIP Agent on or before the dates set forth in the Interim Order; and<br><br>• failure to comply with any of the Milestones (defined below). | |
| **Milestones**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi) | The Milestones are annexed to the Interim Order as **Exhibit A** and include the following:<br><br>• On or before 90 days after the Petition Date, the Debtors have filed a motion requesting, and within 145 days after the Petition Date shall have obtained, an order of the Bankruptcy Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall be 210 days;<br><br>• On or before the date that is 180 days after the Petition Date, the Debtors shall have filed a disclosure statement and related Acceptable Plan, have obtained an order of the Bankruptcy Court approving such disclosure statement and related solicitation procedures, and have begun solicitation of an Acceptable Plan;<br><br>• On or before the date that is 60 days following the entry of an order approving the disclosure statement, the Debtors shall have obtained an order of the Bankruptcy Court confirming the Acceptable Plan (the "**Confirmation Order**"); and<br><br>• On or before the date that is 30 days after the entry of the Confirmation Order, the Acceptable Plan shall have become effective in all respects.[11] | Interim Order, Exhibit A |
| **Liens on Avoidance Actions**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(xi) | None. | Interim Order, ¶ 3(i), ¶ 4(i) |
| **Waiver or Modification of the Automatic Stay**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | Modification of the automatic stay to the extent necessary to implement and effectuate the terms of the DIP Documents | Interim Order, Introduction (v) |
| | Modification of the automatic stay to the extent necessary to permit the DIP Secured Parties exercise their rights under the Interim DIP Order, under the DIP Documents, and/or applicable non-bankruptcy law | Interim Order, ¶ 15(a)-(b) |

---

[11] "**Acceptable Plan**" shall mean a plan of reorganization for each of the Debtors' chapter 11 cases that provides for the termination of unused commitments under the DIP Facilities and the payment in full in cash of the obligations under the DIP Facilities on the effective date of such plan of reorganization.

| SUMMARY OF THE DIP FACILITIES[10] | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | The Debtors expect that all of the DIP Liens shall be effective and perfected upon entry of the Interim Order and without the necessity of the execution of mortgages or similar undertakings | Interim Order, ¶ 15(g) |
| **Section 506(c) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B)(x) | 506(c) waiver upon entry of Final Order with respect to DIP Liens | Interim Order, ¶ 8 |
| **Section 522(b) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B) | None, other than with respect to the Adequate Protection Liens. | Interim Order, Introduction (iii) |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The Debtors' Stipulations shall be binding upon all other parties in interest subject to the Challenge Period described in ¶ 6 of the Interim Order. Specifically, any party in interest with standing to challenge the Debtors' Stipulations must commence, <u>by the earlier of (i)</u> with respect to any Committee, sixty (60) calendar days after the formation of any Committee, and (ii) with respect to other parties in interest with requisite standing other than the Debtors or any Committee, seventy-five (75) calendar days following the date of entry of the Interim Order. | Interim Order, ¶ 6 |

## **Highlighted Provisions Pursuant to Local Rule 4001-2**

8.      Pursuant to Local Rule 4001-2, the terms of the DIP Facilities contain the following provisions:

| HIGHLIGHTED PROVISIONS | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| **Local Rule 4001-2(a)(ii)** Summary of essential terms | See table above. | |
| **Local Rule 4001-2(a)(i)(A)** Cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition | None, other than with respect to the Adequate Protection Liens. | |

| | secured creditors | | |
|---|---|---|

| | secured creditors | |
|---|---|---|
| **Local Rule 4001-2(a)(i)(B)** Findings of fact that bind the state to the validity, perfection, or amount of the secured creditors' prepetition lien or waiver of claims against the secured creditor | The Debtors stipulate to the following:<br><br>• the Debtors' entry into the Prepetition ABL Facility, the aggregate principal amount outstanding thereunder and that the Prepetition ABL Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the ABL Priority Collateral; (ii) valid, binding, perfected, enforceable, second priority liens and security interests in the Notes Priority Collateral; and (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law and (iv) as of the Petition Date, with respect to Prepetition Collateral that is Notes Priority Collateral, subject to and subordinate to the Prepetition 1L Liens;<br><br>• the Debtors' entry into the Prepetition LC Facility and the amount of letters of credit issued thereunder, and that the liens securing the Prepetition LC Obligations are (i) valid, binding, perfected, enforceable, first priority liens and security interest in the Collateral Account, and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law;<br><br>• the Term Loan Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Prepetition Collateral (as defined below); and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law.<br><br>• the 9.00% Notes Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Prepetition Collateral (as defined below); and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law.<br><br>• the 6.125% Notes Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Prepetition Collateral (as defined below); and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law. | Interim Order ¶¶ D, E |
| **Local Rule 4001-2(a)(i)(C)** Waiver of estate rights with respect to section 506(c) | The Interim Order provides for a waiver of section 506(c) upon entry of Final Order with respect to DIP Liens | Interim Order, ¶ ¶ 3(iii), 4(iii) |
| **Local Rule 4001-2(a)(i)(D)** Liens on Debtors' causes of action | None. | Interim Order, ¶¶ 3(i), 4(i) |
| **Local Rule 4001-2(a)(i)(E)** Provisions which | The proceeds from the DIP Facilities and the Cash Collateral will be used to refinance and replace commitments under the Prepetition ABL Facility, including cash collateralization of Prepetition Letters of Credit, as well as | DIP Credit Agreement §5.08. |

| | | |
|---|---|---|
| deem prepetition secured debt to be postpetition debt or which use post-petition loans from a prepetition secured creditor to pay part or all of that secured creditors' prepetition debt | pay the fees, costs, and expenses incurred in connection therewith. | Interim Order ¶ G. |
| **Local Rule 4001-2(a)(i)(F)** Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; | Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition 1L Liens, the 1L Adequate Protection Liens, the Prepetition 2L Liens, the 2L Adequate Protection Liens, and the 1L Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out. "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Loan Parties pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and any official committee of unsecured creditors (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice and without regards to whether such fees and expenses are provided for in the Approved Budget; and (iv) Professional Fees incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice (including transaction fees or success fees earned or payable to a Professional Person), to the extent allowed at any time, whether by interim order, procedural order or otherwise in an aggregate amount not to exceed $4,000,000 with respect to Professionals Persons (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**"). | Interim Order, ¶ 7 |
| **Local Rule 4001-2(a)(i)(G)** Nonconsensual priming | The Debtors do not expect the Interim Order to provide for any non-consensual priming of any lien other than with respect to the Carve-Out. | |
| **Local Rule 4001-2(a)(i)(H)** Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. §552 | None, other than with respect to the Adequate Protection Liens. | Interim Order, Introduction (iii) |

**Prepetition Capital Structure**

9.     The Debtors' prepetition capital structure includes approximately $1.9 billion in total funded debt as of the date of commencement of these chapter 11 cases (the "**Petition Date**"), consisting of: (i) the Prepetition ABL Facility; (ii) the Prepetition Revolving Credit Facility; (iii) two series of First Lien Notes; (iv) a Prepetition Term Loan; (v) one series of Second Lien Notes; and (vi) one series of Unsecured Notes.  Additionally, certain of the Debtors' non-debtor affiliates are obligors with respect to:  (i) the CLSIP Term Loan; and (ii) the Gibraltar Loans, comprised of three separate terms loans (collectively, the "**Non-Debtor Obligations**").  The Non-Debtor Obligations are also detailed below.

10.     The Debtors' prepetition indebtedness is also subject to three different intercreditor agreements, generally referred to as (i) the ABL ICA;[12] (ii) the 1L ICA;[13] and (iii) the 2L ICA[14] (each as defined and discussed in more detail below).  The ABL ICA governs the relative contractual rights of lenders under the Prepetition ABL Facility and the Prepetition RCF on the one hand, and lenders under the Prepetition Term Loan and holders of First Lien Notes, on the other hand.  The 1L ICA governs the relative rights as between lenders under the Prepetition Term Loan and holders of First Lien Notes.  The 2L ICA governs the relative rights of holders of the Debtors' first priority indebtedness and holders of Second Lien Notes.

---

[12] "**ABL ICA**" means that certain *Intercreditor Agreement*, dated as of September 20, 2016, as more fully described below, and annexed hereto as **Exhibit E.**

[13] "**1L ICA**" means that certain *Intercreditor Agreement*, dated as of March 2, 2012, as more fully described below, and annexed hereto as **Exhibit F.**

[14] "**2L ICA**" means that certain *Intercreditor Agreement*, dated as of March 4, 2011, as more fully described below, and annexed hereto as **Exhibit G.**

RLF1 19027854V.1

## I.    Prepetition Indebtedness

11.    The Debtors' prepetition indebtedness can be summarized as follows:

| As of Petition Date:<br>Debt Instrument (Aggregate Principal) | | Funded Debt<br>($ millions) |
|---|---|---|
| Prepetition ABL Facility | $ | 71 |
| Prepetition Revolving Credit Facility | | — |
| Prepetition LC Facility | | 1.3 |
| Prepetition Term Loan | | 32.3 |
| 9.00% Notes | | 1,125.0 |
| 6.125% Notes | | 210.0 |
| **Total First Lien Debt** | | $1,439.6 |
| Second Lien Notes | | 222.3 |
| Unsecured Notes | | 216.7 |
| **Total Funded Debt** | $ | **1,878.7** |

These obligations are discussed below.

### A.    Prepetition ABL Facility

12.    On August 12, 2016, certain of the Debtors entered into that certain *ABL Credit Agreement,* effective as of September 20, 2016 (the "**Prepetition ABL Credit Agreement**"), by and among Claire's, as borrower, Claire's Inc. ("**Holdings**"), the other guarantors party thereto (the "**Subsidiary Guarantors**" and, together, with Claire's and Holdings, the "**ABL Obligors**"),[15] Credit Suisse AG, Cayman Islands Branch ("**Credit Suisse**"), as administrative agent (in such capacity, the "**Prepetition ABL Agent**"), and the lenders party thereto (collectively, the "**Prepetition ABL Lenders**"), pursuant to which the Prepetition ABL Lenders agreed to provide Claire's with revolving credit loans, subject to borrowing base availability, in an amount up to $75 million (the "**Prepetition ABL Facility**") less any amounts

---

[15] The "**Subsidiary Guarantors**" are Claire's Puerto Rico Corp., CBI Distributing Corp., Claire's Boutiques, Inc., BMS Distributing Corp., Claire's Canada Corp., CSI Canada LLC, and Claire's Stores Corp.  Each of the Debtors other than Claire's and Holdings is a Subsidiary Guarantor.

outstanding under the Prepetition Revolving Credit Facility (as defined below) and any letters of credit issued and outstanding.

13.     All obligations under the Prepetition ABL Facility are unconditionally guaranteed by Holdings and the Subsidiary Guarantors (collectively, the "**Prepetition Guarantors**").  All obligations under the Prepetition ABL Facility, and the guarantees of those obligations, are secured, subject to certain exceptions and permitted liens, by (i) a first-priority security interest in the ABL Priority Collateral (as defined in the ABL ICA), which includes, among other things, deposit accounts, accounts receivable, inventory, and chattel paper and (ii) a second-priority security interest versus obligations outstanding under the Prepetition Term Loan (defined below), the Prepetition Revolving Credit Facility (defined below), and the First Lien Notes (defined below) on account of Notes Priority Collateral (as defined in the ABL ICA), which generally consists of all collateral other than ABL Priority Collateral, including all real estate, equipment, intellectual property, and equity interests in subsidiaries.  In particular, Notes Priority Collateral includes a pledge on 65% of the Debtors' voting interests in (i) Claire's Canada, the Debtors' non-Debtor Canadian subsidiary and (ii) Claire's Swiss, a non-Debtor. Claire's Swiss is the indirect parent of all of the Debtors' international subsidiaries other than Claire's Canada.

14.     The Prepetition ABL Facility matures in February 2019.  As of the Petition Date, an aggregate balance of approximately $71 million in principal amount remains outstanding, in addition to letters of credit issued and outstanding with a face value of approximately $4 million.

**B.     Prepetition Revolving Credit Facility**

15.     On August 12, 2016, certain of the Debtors entered into that certain *Second Amended and Restated Credit Agreement* (as may be amended, restated, modified, or

supplemented from time to time, the "**Prepetition RCF Credit Agreement**"), effective as of September 20, 2016, by and among Claire's, as borrower, Holdings, as holdings, the Subsidiary Guarantors, as guarantors, Credit Suisse, as administrative agent (in such capacity, the "**Prepetition RCF Agent**"), and the lenders party thereto (collectively, the "**Prepetition RCF Lenders**"), pursuant to which the Prepetition RCF Lenders agreed to provide Claire's with a revolving credit loans in an amount up to $75 million less any amounts outstanding under the Prepetition ABL Facility, including letters of credit issued and outstanding (the "**Prepetition Revolving Credit Facility**").

16.     Claire's obligations under the Prepetition Revolving Credit Facility are unconditionally guaranteed by the Prepetition Guarantors.  All obligations under the Prepetition Revolving Credit Facility, and the guarantees of those obligations, are secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Prepetition Term Loan (as defined below) and the First Lien Notes (as defined below) by (i) a first-priority lien on the Notes Priority Collateral and (ii) a second-priority lien on the ABL Priority Collateral versus obligations outstanding under the Prepetition ABL Facility.

17.     The Prepetition Revolving Credit Facility matures in February 2019 and, as of the Petition Date, has an aggregate balance of approximately $0 million in principal amount outstanding.

### C.     Prepetition Letter of Credit Facility

18.     On February 12, 2018, certain of the Debtors entered into that certain Letter of Credit Reimbursement and Security Agreement (as may be amended, restated, modified, or supplemented from time to time, the "**Prepetition LC Agreement**"), by and among Claire's, as applicant, Holdings, as holdings, and Credit Suisse, as issuer and collateral agent (in

such capacity, the "**Prepetition LC Issuer**"), pursuant to which the Prepetition LC Issuer agreed to issue letters of credit in an aggregate maximum amount of up to $1,253,446.45 (the "**Prepetition LC Facility**").  All obligations under the Prepetition LC Facility are secured by a first priority security interest in amounts on deposit in a cash collateral account (the "**Collateral Account**").  The Prepetition LC Agreement requires Claire's to maintain a balance in the Collateral Account of at least 105% of the aggregate amount of letters of credit issued thereunder.  The Prepetition LC Facility matures in February 2019 and, as of the Petition Date, one letter of credit with a face amount of $1,253,446.45 has been issued thereunder.

### D. First Lien Notes

19.    Claire's, successor to Claire's Escrow II Corporation ("**Claire's Escrow II**")[16] as issuer, the Subsidiary Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A. ("**Bank of New York**"), as indenture trustee and collateral agent, (in such capacity, the "**9.00% Indenture Trustee**") are parties to that certain indenture, dated as of February 28, 2012 (as may be amended, modified, or supplemented from time to time, the "**9.00% Notes Indenture**") governing the 9.000% senior secured first lien notes (the "**9.00% Notes**").  Interest is payable on the 9.00% Notes on March 15 and September 15 of each year prior to their maturity.

20.    The 9.00% Notes are unconditionally guaranteed, jointly and severally, by the Subsidiary Guarantors and are secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Prepetition Revolving Credit Facility, the Prepetition Term Loan (as defined below), and the 6.125% Notes (as defined below) by (i) a first-priority lien on the Notes

---

[16] On March 2, 2012, Claire's Escrow II merged with Claire's, with Claire's as the surviving entity in the merger.  In accordance with the 9.00% Notes Indenture and pursuant to that certain supplemental indenture, dated as of March 2, 2012, Claire's assumed Claire's Escrow II's obligations with respect to the 9.00% Notes.

Priority Collateral and (ii) a second-priority lien on the ABL Priority Collateral versus obligations outstanding under the Prepetition ABL Facility.  The 9.00% Notes mature in March 2019 and, as of the Petition Date, approximately $1,125 million in principal amount remain issued and outstanding.

21.     Claire's, as issuer, the Subsidiary Guarantors, as guarantors, and Bank of New York, as indenture trustee and collateral agent, (in such capacity, the "**6.125% Indenture Trustee**") are parties to that certain indenture, dated as of March 15, 2013 (as may be amended, modified, or supplemented from time to time, the "**6.125% Notes Indenture**") governing the 6.125% senior secured first lien notes (the "**6.125% Notes**" and, together with the 9.00% Notes, the "**First Lien Notes**").  Interest is payable on the 6.125% Notes on March 15 and September 15 of each year prior to their maturity.

22.     The 6.125% Notes are unconditionally guaranteed, jointly and severally, by the Subsidiary Guarantors and are secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Prepetition Revolving Credit Facility, the Prepetition Term Loan (as defined below), and the 9.00% Notes by (i) a first-priority lien on the Notes Priority Collateral and (ii) a second-priority lien on the ABL Priority Collateral versus obligations outstanding under the Prepetition ABL Facility.  The 6.125% Notes mature in March 2020 and, as of the Petition Date, approximately $210 million in principal amount remains issued and outstanding.

E.     **Prepetition Term Loan**

23.     Claire's, as borrower, the Subsidiary Guarantors, as guarantors, Wilmington Trust, N.A. ("**Wilmington Trust**"), as administrative and collateral agent (in such capacity, the "**Prepetition Term Loan Agent**"), and the lenders party thereto (collectively, the "**Prepetition Term Loan Lenders**"), entered into that certain *Term Loan Credit Agreement*,

dated as of September 20, 2016 (as may be amended, modified, or supplemented from time to time, the "**Prepetition Term Loan Agreement**"), pursuant to which Claire's, as borrower, was deemed to have borrowed an aggregate principal amount of $30.9 million in term loans, including $10.5 million in aggregate principal amount of pay-in-kind interest (collectively, the "**Prepetition Term Loan**" and, together with the Prepetition Revolving Credit Facility, the Prepetition Revolving Credit Facility, and the First Lien Notes, the "**Prepetition 1L Secured Facilities**").[17]

24.    The Prepetition Term Loan is secured on a *pari passu* basis with the Prepetition Revolving Credit Facility and the First Lien Notes by (i) a first-priority interest in the Notes Priority Collateral and (ii) a second-priority interest in the ABL Priority Collateral in accordance with that certain *Joinder*, dated September 20, 2016, pursuant to which the Prepetition Term Agent, on behalf of itself and holders of obligations under the Prepetition Term Loan, became party to the 1L ICA.  The Prepetition Term Loan matures in September 2021 and, as of the Petition Date, approximately $32.3 million in aggregate principal amount remains outstanding.[18]  As of the Petition Date, (i) approximately $9 million of Prepetition Term Loans are held by funds affiliated with Apollo Global Management, LLC ("**Apollo**") and (ii) approximately $3 million of Prepetition Term Loans are held by Holdings.

---

[17] All obligations under the Prepetition 1L Secured Facilities shall collectively be referred to herein as the "**Prepetition 1L Obligations.**" All lenders under the Prepetition 1L Secured Facilities shall collectively be referred to herein as the "**Prepetition 1L Secured Parties.**"

[18] The Debtors' obligations under the Prepetition Term Loan arose in connection with the "**Exchange**" (as defined in the First Day Declaration), through which the Debtors were deemed to have borrowed under the Prepetition Term Loan in exchange for Second Lien Notes, Unsecured Notes, and 10.500% Senior Subordinated Notes (which are no longer outstanding) tendered by participating creditors.

F.      **Second Lien Notes**

25.      Claire's, as successor to Escrow Corporation ("**Claire's Escrow**"),[19] as issuer, the Subsidiary Guarantors, as guarantors, and Bank of New York, as indenture trustee and collateral agent (in such capacity, the "**2L Indenture Trustee**") are parties to that certain indenture, dated as of March 4, 2011 (as may be amended, modified, or supplemented from time to time, the "**8.875% Notes Indenture**") governing the 8.875% senior secured notes (the "**8.875% Notes**" or the "**Second Lien Notes**").[20]   Interest is payable on the Second Lien Notes on March 15 and September 15 of each year prior to their maturity.

26.      The 8.875% Notes are irrevocably and unconditionally guaranteed, jointly and severally by the Subsidiary Guarantors and are secured, subject to certain exceptions and permitted liens by substantially the same collateral securing the Prepetition 1L Obligations. Moreover, as discussed more fully below, such liens are subordinated to liens securing the Prepetition 1L Obligations pursuant to the 2L ICA (as defined below).   The 8.875% Notes mature in March 2019 and, as of the Petition Date, approximately $222.3 million in principal amount remain issued and outstanding.

G.      **Unsecured Notes**

27.      Claire's, as issuer, the Subsidiary Guarantors, as guarantors, and Bank of New York, as indenture trustee and collateral agent, (in such capacity, the "**Unsecured Notes Indenture Trustee**") are parties to that certain indenture, dated as of March 14, 2013 (as may be

---

[19] On May 2, 2012, Claire's Escrow merged with Claire's, with Claire's as the surviving entity in the merger.   In accordance with section 13.20 of the 8.875% Notes Indenture and pursuant to that certain *Senior Secured Second Lien Notes Supplemental Indenture*, dated as of March 4, 2011, Claire's assumed Claire's Escrow II's obligations with respect to the 9.00% Notes

[20] All obligations under the 8.875% Notes shall collectively be referred to herein as the "**Prepetition 2L Obligations**."   The lenders with respect to the Prepetition 2L Obligations shall collectively be referred to herein as the "**Prepetition 2L Secured Parties**."   The Prepetition 1L Secured Parties and the Prepetition 2L Secured Parties shall collectively be referred to herein a the "**Prepetition Secured Parties**."

amended, modified, or supplemented from time to time, the "**Unsecured Notes Indenture**") governing the 7.750% senior unsecured notes (the "**Unsecured Notes**" and together with the First Lien Notes and the Second Lien Notes, the "**Notes**").  Interest is payable on the Unsecured Notes on June 1 and December 1 of each year prior to their maturity.  The Unsecured Notes mature in June 2020 and, as of the Petition Date, approximately $216.7 million in principal amount remain issued and outstanding.

## II.  Indebtedness of Non-Debtor Affiliates

28.     Certain of the Debtors' non-Debtor subsidiaries are party to certain secured and unsecured debt obligations (as described more fully below, the "**Non-Debtor Obligations**").  Although the Debtors are not obligated on the Non-Debtor Obligations, in certain instances, provisions in those debt instruments may, from time to time, impose indirect restrictions on the Debtors' liquidity.  The Non-Debtor Obligations are described below.

### A.  CLSIP Term Loan

29.     CLSIP LLC ("**CLSIP**", as borrower, CLSIP Holdings LLC ("**CLSIP Holdings**"), as holdings, Wilmington Trust, as administrative and collateral agent (in such capacity, the "**CLSIP Loan Agent**"), and the lenders party thereto (collectively, the "**CLSIP Term Loan Lenders**"), entered into that certain *Term Loan Credit Agreement*, dated as of September 20, 2016 (as may be amended, restated, or supplemented from time to time, the "**CLSIP Term Loan Agreement**"), pursuant to which CLSIP was deemed to have borrowed an aggregate principal amount of $100.5 million in term loans, including $34.2 million in

aggregate principal amount of pay-in-kind interest (the "**CLSIP Term Loan**"), from the CLSIP

Term Loan Lenders.[21]

30.    The CLSIP Term Loan is guaranteed by CLSIP Holdings and is secured

by a first-priority lien on (i) substantially all assets of CLSIP, which consist of, among other

things, CLSIP's rights in certain intellectual property rights used by Claire's and its subsidiaries

in the conduct of their business, which were transferred to CLSIP immediately prior to the

completion of the Exchange (as defined in the First Day Declaration) (the "**Transferred IP**")[22]

and CLSIP's rights under the Transferred IP Agreement[23] and (ii) substantially all assets of

CLSIP Holdings, including all equity interests of CLSIP held by CLSIP Holdings (together with

the Transferred IP, the "**CLSIP Collateral**").  Due to CLISP LLC's location within the Debtors'

organizational structure, the CLSIP Term Loan is structurally senior to the Prepetition ABL

Facility, the Prepetition Revolving Credit Facility, and the Notes with respect to CLSIP and

---

[21] CLSIP's and CLSIP Holdings' obligations under the CLSIP Term Loan arose in connection with the Exchange, through which the Debtors were deemed to have borrowed under the CLSIP Term Loan in exchange for Second Lien Notes, Unsecured Notes, and 10.500% Senior Subordinated Notes tendered by participating creditors.

[22] The Transferred IP consists of (i) an undivided 17.5% interest (the "**US Claire's Marks Ownership Interest**") in all (a) trademark registrations and applications for trademark registration issued by or filed with any federal government authority in the United States related to the Claire's® brand, (b) common law trademark rights in and to the Claire's® brand in the United States, and (c) the associated goodwill of the assets described in clauses (a) and (b); in each case, whether in existence or later adopted, filed, or acquired (collectively, the "**US Claire's Marks**"); (ii) all (a) trademark registrations and applications for trademark registration issued by or filed with any federal government authority in the United States related to the Icing® brand, (b) common law trademark rights in and to the Icing® brand in the United States, and (c) the associated goodwill of the assets described in clauses (a) and (b); in each case, whether in existence or later adopted, filed, or acquired (collectively, the "**US Icing Marks**"); (iii) certain internet domain names that incorporate, correspond with or are otherwise related to the Claire's® and Icing® brands (the "**Domain Names**"); and (iv) a mobile application agreement pursuant to which the Claire's® mobile application is licensed from a third party (the "**Mobile Application Agreement**").

[23] In connection with entry into the CLSIP Term Loan, CLSIP entered into that certain *Intellectual Property Agreement*, dated as of September 20, 2016 (the "**Transferred IP Agreement**") with Claire's, CBI Distributing Corp. ("**CBI**"), and certain other of Claire's domestic subsidiaries, pursuant to which Claire's and certain of its domestic subsidiaries agreed to pay CLSIP an annual fee of $12 million in exchange for (i) the exclusive right to use and exploit the US Icing Marks, the Domain Names and the Mobile Application Agreement, (ii) the exclusive right to use, exploit, register, enforce and defend the US Claire's Marks, and (iii) CLSIP's acknowledgement that it will not exercise any rights in or to the US Claire's Marks, either directly or indirectly, during the term of the Transferred IP Agreement without CBI's prior written consent; in each case, solely during the term of the Transferred IP Agreement and subject to the terms contained therein.

CLSIP Holdings.  The CLSIP Term Loan matures in September 2021 and, as of the Petition Date, approximately $105 million in aggregate principal amount remains outstanding.  As of the Petition Date, (a) approximately $26 million of CLSIP Term Loans are held by funds affiliated with Apollo and (b) approximately $9 million of CLSIP Term Loans are held by Holdings.

### B.    Gibraltar 2021 Unsecured Term Loan

31.    Non-Debtor affiliate Claire's (Gibraltar) Holdings Limited ("**Claire's Gibraltar**"), as borrower, and Wilmington Trust, as administrative agent (in such capacity, the "**Gibraltar 2021 Unsecured Term Loan Agent**"), and the lenders party thereto (the "**Gibraltar 2021 Unsecured Term Loan Lenders**"), entered into that certain *Term Loan Credit Agreement*, dated as of September 20, 2016 (as may be amended, restated, or supplemented from time to time, the "**Gibraltar 2021 Unsecured Term Loan Agreement**"), pursuant to which Claire's Gibraltar, as borrower, was deemed to have borrowed $46.4 million in aggregate principal amount of term loans, including $15.8 million in aggregate principal amount of pay-in-kind interest (collectively, the "**Gibraltar 2021 Unsecured Term Loan**"), from the Gibraltar 2021 Unsecured Term Loan Lenders.  The Gibraltar 2021 Unsecured Term Loan matures in September 2021.  As of the Petition Date, the aggregate principal amount outstanding under the Gibraltar 2021 Unsecured Term Loan is approximately $48.5 million. None of the Debtors are obligated on the Gibraltar 2021 Unsecured Term Loan.

### C.    Gibraltar 2019 Unsecured Term Loan

32.    Claire's Gibraltar, as borrower, Credit Suisse, as administrative agent, and the lenders[24] party thereto (the "**Gibraltar 2019 Unsecured Term Loan Lenders**"), entered into

---

[24] Claire's Gibraltar's obligations under the Gibraltar 2019 Unsecured Term Loan arose in connection with the Exchange, through which the Debtors were deemed to have borrowed under the Gibraltar 2019 Unsecured Term Loan in exchange for Second Lien Notes, Unsecured Notes, and 10.500% Senior Subordinated Notes tendered by participating creditors.

that certain *Credit Agreement*, dated as of August 12, 2016, effective as of September 20, 2016 (as may be amended, restated or supplemented from time to time, the "**Gibraltar 2019 Unsecured Term Loan Agreement**"), pursuant to which Claire's Gibraltar, as borrower, was deemed to have borrowed an aggregate principal amount of $40 million from the Gibraltar 2019 Unsecured Term Loan Lenders (collectively, the "**Gibraltar 2019 Unsecured Term Loan**") for the purpose of paying down outstanding indebtedness under the Prepetition Revolving Credit Facility in connection with the Exchange. As of the Petition Date, the aggregate principal amount outstanding under the Gibraltar 2019 Unsecured Term Loan is approximately $40 million.

33. None of the Debtors are obligated on the Gibraltar 2019 Unsecured Term Loan; however, the Gibraltar 2019 Unsecured Term Loan Agreement contains a cash sweep provision that requires that aggregate cash on hand at domestic entities, including the Debtors, in excess of $30 million for thirty (30) consecutive days be transferred to Claire's Gibraltar (the "**Gibraltar Cash Sweep Provision**"). Failure to comply with the Gibraltar Cash Sweep Provision triggers an event of default under the Gibraltar 2019 Unsecured Term Loan.

### D. CGHI Secured Term Loan

34. Claire's (Gibraltar) Intermediate Holdings Limited ("**CGIH**") and Claire's Germany GmbH ("**Claire's Germany**"), as borrowers, the guarantors party thereto, Botticelli LLC, as administrative agent, Cortland Capital Markets Services LLC, as collateral agent, and the lenders party thereto (collectively, the "**CGIH Secured Term Loan Lenders**"), entered into that certain *Credit Agreement*, dated as of January 5, 2017 (as may be amended, restated, or supplemented from time to time, the "**CGIH Agreement**"), pursuant to which the CGIH Secured Term Loan Lenders agreed to provide CGIH and Claire's Germany with a secured term loan in the aggregate principal amount of $50 million for the purposes of, among other things,

31

(i) repaying outstanding indebtedness arising under the Prepetition Revolving Credit Facility and (ii) general corporate purposes (collectively, the "**CGIH Secured Term Loan**" and, together with the Gibraltar 2021 Unsecured Term Loan and the Gibraltar 2019 Unsecured Term Loan, the "**Gibraltar Loans**"). As of the Petition Date, the aggregate principal amount outstanding under the CGIH Secured Term Loan is approximately $51.5 million.

35. Obligations under the CGIH Secured Term Loan are guaranteed by certain of CGIH's direct and indirect wholly-owned subsidiaries (collectively, the "**CGIH Guarantors**") and are secured by liens on the assets of CGIH, Claire's Germany, and the CGIH Guarantors. None of the Debtors are obligated on the CGIH Secured Term Loan; however, a provision in the CGIH Secured Term Loan restricts cash transfers from certain of the Company's international entities to the Company's domestic entities if an event of default exists with respect to more than $25 million of indebtedness outstanding with respect to the Debtors (the "**Cash Transfer Restriction**". Prior to the Petition Date, the Company and the CGIH Secured Term Loan Lenders entered into that certain *Amendment Commitment Letter*, dated March 11, 2018 (the "**Amendment Commitment Letter**"), pursuant to which the CGIH Secured Term Loan Lenders committed to provide CGIH and Claire's Germany with a right, but not an obligation, to amend the CGIH Secured Term Loan 2018 to waive the Cash Transfer Restriction and permit postpetition cash transfers from certain of the Company's international entities to the Company's domestic entities, subject to certain restrictions therein.

## III. Intercreditor Agreements

### A. ABL ICA

36. The relative contractual rights of the lenders under the Prepetition ABL Facility, on one hand, and the lenders under the Prepetition 1L Obligations, on the other hand, are governed by that certain *Intercreditor Agreement*, dated as of September 20, 2016 (as may be

amended, modified, or supplemented from time to time, the "**ABL ICA**").  The ABL ICA binds (i) the Prepetition ABL Agent, as the authorized representative of the Prepetition ABL Lenders and (ii) the Prepetition RCF Agent, the 9.00% Indenture Trustee, the 6.125% Indenture Trustee, and the Prepetition Term Loan Agent, as the authorized representatives of the lenders under each of their respective Prepetition 1L Obligations (each, a "**First Lien Agent**") with respect to, among other things, DIP Financing and use of Cash Collateral.

37.    The ABL ICA prohibits holders of obligations outstanding under the Prepetition 1L Secured Facilities from objecting to the Debtors' use of Cash Collateral constituting ABL Priority Collateral or DIP Financing secured by a senior lien on ABL Priority Collateral in each case where the Prepetition ABL Agent has consented to the use of such Collateral or the incurrence of such debt, so long as: (i) the First Lien Agents and holders of Prepetition 1L Obligations retain their liens on the Collateral (as defined in the ABL ICA), as applicable, and, with respect to the liens on Notes Priority Collateral, with the same priority as existed prior to the Petition Date; (ii) if the Prepetition ABL Agent is granted adequate protection in the form of a lien, each First Lien Agent is permitted to seek a lien (without objection from the Prepetition ABL Agent or the Prepetition ABL Lenders) on Collateral arising after the Petition Date (so long as, with respect to the ABL Priority Collateral, such lien is junior to the lien securing the applicable DIP Financing or any other lien benefiting the Prepetition ABL Agent); (iii) the terms of the use of Cash Collateral or the proposed DIP Financing require any lien on the Note Priority Collateral securing the DIP Financing to be subordinate to any lien of each First Lien Agent securing the Prepetition 1L Obligations with respect to the Notes Priority Collateral; and (iv) the terms of the DIP Financing or use of Cash Collateral do not require any Debtor obligated on the Prepetition 1L Obligations or any ABL Obligor to seek confirmation of a plan of reorganization that is inconsistent with the terms of the ABL ICA.

**B.    1L ICA**

38.    The relative contractual rights of the lenders under the Prepetition 1L Obligations *vís a vís* one another, are governed by that certain *Intercreditor Agreement*, dated as of March 2, 2012 (as may be amended, modified, or supplemented from time to time, the "**1L ICA**").  The 1L ICA binds (i) the Prepetition RCF Agent, as the authorized representative of the lenders under the Prepetition Revolving Credit Facility, and (ii) the 9.00% Indenture Trustee, the 6.125% Indenture Trustee, and the Prepetition Term Loan Agent, as the authorized representatives of the lenders under their respective Prepetition 1L Obligations (excluding the Prepetition Revolving Credit Facility) (such obligations, the "**Non-RCF Prepetition 1L Obligations**" and each authorized representative, a "**Non-RCF First Lien Agent**") with respect to DIP Financing and the use of Cash Collateral.

39.    The 1L ICA, among other things, prohibits any of the holders of each series of Prepetition 1L Obligations from objecting to DIP Financing encumbering the Collateral or the use of Cash Collateral where such financing is not opposed or objected to by the Prepetition RCF Agent (as the "**Applicable Collateral Agent**" under the 1L ICA[25] so long as: (i) the holders of each series of Prepetition 1L Obligations retain the benefit of their existing liens on any Collateral pledged to secure such DIP Financing, including liens on the proceeds of such Collateral arising after the Petition Date, with the same priority as existed prior to the Petition Date; (ii) the lenders under or holders of each series of Prepetition 1L Obligations are granted liens on any additional collateral pledged to lender under or holder of Prepetition 1L Obligations as adequate protection in connection with the use of the Cash Collateral or DIP Financing with

---

[25] Upon Discharge (as such term is defined in the 1L ICA) of the obligations under the Prepetition Revolving Credit Facility, the 9.00% Notes Trustee/Collateral Agent will succeed to the position of "Applicable Collateral Agent" under the 1L ICA.

the same priority *vís a vís* the lenders under or holders of Prepetition 1L Obligations as provided in the 1L ICA; (iii) if any of the DIP Financing or Cash Collateral is applied to repay any of the Prepetition 1L Obligations, such repayments are made in accordance with the priority scheme set forth in Section 2.01 of the 1L ICA; and (iv) if any of the lenders under or holders of the Prepetition 1L Obligations are granted adequate protection with respect to the Prepetition 1L Obligations, including in the form of periodic payments, in connection with the DIP Financing or use of Cash Collateral, the proceeds of such adequate protection are applied in accordance with the priority scheme set forth in Section 2.01 of the 1L ICA, which provides for, among other things, ratable distribution on account of the Prepetition 1L Obligations.

### C.     2L ICA

40.     The relative contractual rights of the lenders under or holders of the Prepetition 1L Obligations, on the one hand, and the lenders under the Second Lien Notes, on the other hand, are governed by that certain *Intercreditor Agreement*, dated as of March 4, 2011 (as may be amended, modified, or supplemented from time to time, the "**2L ICA**" and, together with the ABL ICA and the 1L ICA, the "**ICAs**").  The 2L ICA binds (i) the Prepetition RCF Agent, the 9.00% Indenture Trustee, the 6.125% Indenture Trustee, and the Prepetition Term Loan Agent, as the authorized representatives of the lenders under their respective Prepetition 1L Obligations and (ii) the 2L Indenture Trustee, as the authorized representative of the Second Lien Notes, with respect to, among other things, the DIP financing and the use of Cash Collateral.

41.     Pursuant to the 2L ICA, the 2L Indenture Trustee may not object to DIP Financing or the use of Cash Collateral, and may not request adequate protection in connection therewith, where *any* First Lien Agent desires to permit DIP Financing or the use of Cash Collateral, so long as: (i) to the extent any of the lenders under the Prepetition 1L Obligations (or any portion thereof) are granted adequate protection in the form of additional collateral in

connection with the DIP Financing or use of Cash Collateral, the 2L Indenture Trustee may seek or request adequate protection for the Second Lien Notes on such additional collateral in the form of a replacement lien on such additional collateral, which lien shall be subordinated to the liens securing the Prepetition 1L Obligations and such DIP Financing (and all obligations related thereto), on the same basis as the other liens securing the Second Lien Obligations and that the 2L Indenture Trustee will not seek, request, or accept adequate protection in any other form and (ii) in the event the 2L Indenture Trustee seeks or requests adequate protection and such adequate protection is granted in the form of additional collateral, then the 2L Indenture Trustee agrees that the lenders under the Prepetition 1L Obligations shall be granted a senior lien on such additional collateral as security with respect to the Prepetition 1L Obligations.

## Debtors' Liquidity Needs and Marketing Efforts

**I.    The Debtors Have an Immediate Need to Use Cash Collateral and Obtain DIP Financing**

42.    The Debtors are entering chapter 11 with limited cash on hand and require access to the DIP Financing and authority to use the Cash Collateral to ensure they have sufficient liquidity to operate their business and administer their estates during these chapter 11 cases.  The DIP Facilities will provide the Debtors with the liquidity needed to, among other things, make payroll and satisfy their other working capital and general corporate purposes, including essential payments to vendors, both domestic and abroad, many of which are unfamiliar with the chapter 11 process.

43.    Absent authority to enter into and access the DIP Facilities, even for a limited period of time, Claire's will be unable to continue operating its businesses, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates.  Accordingly, immediate access to the DIP Facilities is essential so the Debtors can assure their employees,

customers, and vendors that the Debtors have sufficient capital to continue operating "business as usual" during the pendency of these chapter 11 cases.

## II.   Marketing and Negotiation of the DIP Financing

44.   In the weeks leading up to Petition Date, the Debtors and their advisors engaged in an exhaustive marketing process to obtain DIP Financing.  The Debtors' marketing efforts were led by their proposed investment banker, Lazard, who described the process as robust, competitive, and highly successful.  Indeed, the DIP Facilities' highly favorable terms evidence the success of the marketing and negotiation process.

45.   The Debtors' primary strategic consideration when marketing the DIP Financing opportunity was the identification of an economical and reliable source of financing that could (i) support the Debtors' need for a sizeable loan to provide for general working capital; (ii) provide the Debtors with financing for the duration of their chapter 11 cases on terms that would afford them adequate time and flexibility to develop and pursue a restructuring strategy around their core business, all in the best interests of their estates; and (iii) minimize the possibility of litigation at the outset of these chapter 11 cases (i.e., reduce the risk of a priming fight).

46.   Given the anticipated difficulty in non-consensually priming the prepetition liens of the First Lien creditors, as well as the cost and risks of such litigation, together with the value of the Debtors' unencumbered assets, the Debtors ultimately determined to focus their third-party financing process on potential interest in (i) refinancing the Debtors' prepetition asset-based revolving loan facility and (ii) an incremental term loan collateralized by (a) a last-out position with respect to the ABL Priority Collateral, (b) a first lien on the Debtors' unencumbered assets and (c) a junior lien on the Notes Priority Collateral.

47.    In February 2018, Lazard and the Debtors' other advisors launched a DIP Financing marketing process by reaching out to certain of the Debtors' incumbent lenders, as well as nine third party lenders, to ascertain their interest in extending DIP Financing to the Debtors on the terms above.  In addition to receiving interest from the incumbent lenders contacted, the Debtors received additional interest from the capital markets.  Nine of the third party lenders contacted by Lazard were sent non-disclosure agreements and, of those nine, all but two executed such agreements.

48.    The Debtors ultimately received five (5) term sheet proposals with respect to possible DIP Financing from potential sources of DIP Financing.  Over a period of almost three weeks, the Debtors and their advisors engaged in an intense parallel-track negotiation process with each of the bidders to obtain the highest and best financing terms each bidder was willing to offer.  These negotiations were conducted at arm's length and involved hard bargaining by all interested parties.  Indeed, one of the potentially interested parties was forced to withdraw from the process after acknowledging that they would be unable to match or improve upon the terms of the other bidders' proposals, namely the DIP Lenders' proposal.

49.    In evaluating the final proposals, the Debtors considered, among other things, each prospective lender's proposed economics, financing structure, perceived deal risk, flexibility, and ability to work collaboratively with the Debtors.  Ultimately, the Debtors determined that the commitment submitted by the DIP Lenders met each of their DIP Financing requirements and was the best overall proposal available to the Debtors.  The DIP Lenders' proposal not only provided the most favorable economic terms received by the Debtors, but also offered the least most flexible covenants, the most incremental liquidity benefit, and highly limited "case controls."

50.     Specifically, the DIP Lenders' proposal provided, among other things, (i) a reasonable rate, (ii) modest fees, (iii) highly favorable budget covenants, including a monthly rolling budget requirement and only monthly variance testing; (iv) limited case milestones, with the primary milestone being the requirement that the Debtors commence court-approved solicitation with respect to an Acceptable Plan no later than 180 days after the Petition Date; and (v) the most incremental net liquidity benefit (after repayment of the Prepetition ABL Facility) when compared to the other proposals.  In addition to foregoing reasons, the Citibank proposal was also highly attractive to the Debtors because its structure fit squarely within the DIP-related provisions of the ICAs and, accordingly, would facilitate the Debtors' smooth entry into chapter 11 by reducing the risk of litigation at the outset of these chapter 11 cases.

## Basis for Relief Requested

**I.     The Debtors Should Be Authorized to Obtain Secured, Superpriority DIP Financing**

> **A.     Entry into the DIP Facilities is an Exercise of the Debtors' Sound Business Judgment**

51.     Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  *See, e.g.*, *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does

not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

52.    In determining whether the Debtors have exercised sound business judgment in selecting the DIP Financing, the Court should consider the economic terms of the proposed financing in light of current market conditions.  *See* Hr'g Tr. at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past).  Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed DIP Financing facility.

53.    Here, the Debtors' determination to secure DIP Financing was a business decision guided by the Debtors' financial and restructuring needs.  Specifically, the Debtors and their advisors determined that the Debtors will require additional liquidity to continue operating "business as usual" while complete their restructuring process.

54.    Bankruptcy courts will not generally second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513 (Bankr. D. Utah 1981) (footnote omitted).  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

55.     The Debtors, with the assistance of their advisors, carefully reviewed each of their options with respect to DIP Financing.  The Debtors, together with their restructuring professionals, carefully weighed the advantages and disadvantages of the proposals and ultimately selected the DIP Lenders' proposal only after determining it was the best option reasonably available.

56.     Accordingly, the Debtors submit that entry into the DIP Financing is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

**B.      The Debtors Should be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis**

57.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

58.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n*

RLF1 19027854V.1

(*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).   When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."   *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

59.     Despite their efforts and a competitive DIP Financing process with several potential financing sources, the Debtors were unable to obtain DIP Financing on an unsecured administrative expense basis.    In this process, Lazard contacted a number of financial institutions, as well as certain of the Debtors' incumbent lenders, in an effort to procure DIP Financing.   After evaluating each of the proposals, the Debtors determined the DIP Lenders' proposal was the best available option to the Debtors in terms of economics.   In addition, given that its structure satisfied the related provisions of the ICAs, the Debtors also determined that the DIP Lenders' proposal had the added advantages of (i) reducing the likelihood of litigation with respect to DIP Financing at the outside of these chapter 11 cases and (ii) obviating the need for adequate protection payments to the Prepetition Secured Parties.

60.     Accordingly, for the foregoing reasons, the Court should authorize the Debtors to provide the DIP Agent and the DIP Lenders (i) with respect to DIP Collateral that

constitutes ABL Priority Collateral, superpriority liens and a superpriority administrative expense claim for any obligations arising under the DIP Facilities, (ii) with respect to DIP Collateral which constitutes Notes Priority Collateral, a junior lien with respect to those assets, and (c) a lien on certain of the Debtors' few unencumbered assets, namely the Unencumbered Foreign Assets.

### C.   The DIP Facilities Provide for Consensual Priming and Cash Collateral Use: The DIP ABL Revolver is a Permitted Refinancing

61.   In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.   *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

62.   When determining whether to authorize a debtor to obtain credit secured by senior liens as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.   Courts consider a number of factors, including:

RLF1 19027854V.1

- whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids, or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10. The DIP Financing satisfies these factors.

### 1. Primed Parties Have Consented to the DIP Facilities Through Their ICAs

63.     Where the Prepetition 1L Secured Parties' interests in the ABL Priority Collateral are being primed, the Prepetition 1L Secured Parties are deemed to have consented pursuant to section 6.01(a) of the ABL ICA and those parties' intercreditor obligations.  Pursuant to the ABL ICA, the Prepetition ABL Agent's consent with respect to (i) the incurrence of DIP Financing secured by a senior lien on ABL Priority Collateral and (ii) the use of Cash Collateral causes each of the Debtors' remaining secured creditors to provide a similar consent.  The ABL ICA, in turn, defines "ABL Agent" to include any successor agent where the Prepetition ABL Facility have been refinanced through a "Permitted Refinancing Agreement."  The ABL ICA, in turn, defines Permitted Refinancing Agreement as:

> [W]ith respect to the ABL Credit Agreement, the notes, or any Additional First Lien Agreement, as applicable, any credit agreement, loan agreement, note agreement, promissory note, indenture, or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to increase, replace (whether upon or after termination or otherwise), whether or not such increase, replacement, refinancing, or refunding occurs (i) with the original parties thereto, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination or repayment of the ABL Credit Agreement, the Notes or any Additional First Lien Agreement or any other agreement or instrument referred to in this clause, unless such agreement or instrument expressly provides that it is not intended to be and is not a Permitted Refinancing Agreement, as such financing documentation may be amended, restated, supplemented, or otherwise modified from time to time and that would not be prohibited by Section 5.03(c) or Section 5.03(d), as applicable.

ABL ICA p.15 (defining "Permitted Refinancing Agreement").

64.     The DIP Credit Agreement, together with the Debtors' proposed refinancing of the Prepetition ABL Facility, is a Permitted Refinancing Agreement.  Subject to the Court's approval, the Debtors will use proceeds from the DIP ABL Revolver, together with cash on hand, to refinance the Prepetition ABL Facility.  That use of proceeds therefore causes the DIP ABL Revolver to constitute a "Refinancing" [26] of the Prepetition ABL Facility as that term is defined in the ABL ICA.  The DIP Documents, including the Interim Order, further provide that they shall be modified automatically and without any action from any party to conform to any limitations otherwise arising or imposed by the Debtors' existing prepetition debt instruments, including any limitations that might otherwise arise under sections 5.03(c) or (d) of the ABL ICA.  Additionally, pursuant to the RSA, approximately 72% of holders of the Debtors' the First Claims have stipulated and agreed that the Debtors' proposed DIP Financing constitutes

---

[26] Pursuant to Section 1.01 of  the ABL ICA, the term "**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement restructure, replace, refund, or repay, or to issue other indebtedness, in exchange or replace for such Indebtedness, in any case in whole or in part, and the  terms "**Refinanced**" and "**Refinancing**" have correlative meanings.  The term "**Permitted Refinancing**" means any Refinancing the governing documentation of which constitutes Permitted Refinancing Agreements.

a "Permitted Refinancing Agreement" accordance with the ABL ICA pursuant to restructuring support agreements entered-into with those parties prior to the Petition Date.

65. The Debtors therefore submit that their proposed entry into the DIP ABL Revolver, including the refinancing of the Prepetition ABL Facility, constitutes a Permitted Refinancing Agreement and, therefore, the DIP Agent holds authority to consent to both (i) the Debtors' use of Cash Collateral and (ii) incurrence of the Debtors' proposed DIP Financing under section 6.01(a) of the ABL ICA.

66. And, under 6.01(a) of the ABL ICA, the balance of the Prepetition 1L Secured Parties are deemed to have consented to the Debtors' proposed use of cash collateral so long as certain additional conditions have been met:  (i) those Prepetition 1L Secured Parties retain a lien with respect to Notes Priority Collateral on the same terms as they held on a prepetition basis, (ii) those parties receive adequate protection in similar form and manner as the Prepetition ABL Agent, (iii) liens granted under the DIP Facilities are junior to those parties liens with respect to Notes Priority Collateral, and (iv) the terms of DIP Facilities do not compel the Debtors to prosecute a plan in derogation of the ABL ICA.  And, as set forth above, these conditions are clearly satisfied here.

67. The Prepetition 2L Secured Parties have similarly consented to the incurrence of the DIP Facilities and the Debtors' proposed use of Cash Collateral by virtue of the First Lien Agent's consent.

### 2. The Liens Granted Under the DIP Facilities Further Reflect a Sound Exercise of the Debtors' Business Judgment

68. <u>First</u>, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders offered the best option for obtaining the DIP Financing that the Debtors require.  The Debtors believe, after rigorous

negotiations with the DIP Lenders, that the DIP Documents reflect the most favorable terms on which the DIP Lenders were willing to offer DIP financing.  The Debtors have not been able to obtain financing on equal or better terms from the DIP Lenders, or any other source, without granting first priority liens in the ABL Priority Collateral.[27]

69.     <u>Second</u>, the Debtors are entering chapter 11 with limited access to liquidity.  The commencement of these chapter 11 cases will only increase demands on that liquidity due to, among other things, the costs of administering these chapter 11 cases and the acceleration or elimination of trade terms.   Access to the DIP Facilities is thus critically necessary to ensure a smooth transition into chapter 11 and enable the Debtors to prudently operate their business and, in turn, maximize value for all parties in interest, during the pendency of these chapter 11 cases.  Particularly given the recent, well-publicized challenges facing other retailers operating in chapter 11, it is absolutely essential that the Debtors send a clear message to the market, immediately, that these chapter 11 cases are well-capitalized.  To this end, approval of the DIP Facilities will enable the Debtors to send precisely that "business as usual" message to their customers, vendors, and business partners.

70.     <u>Third</u>, as described in greater detail above and in the Cowan Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arms' length, and the Debtors' entry into the DIP Documents represents a sound exercise of their business judgment.  The other proposed lenders submitted less favorable proposals that consisted of more restrictive milestones and covenants, higher interest rates, and/or higher fees.   The Debtors believe the DIP Lender's proposal is the Debtors' most logical choice.

---

[27] Although the Debtors received a junior DIP Financing proposal from certain of their incumbent lenders, this proposal was determined by the Debtors to be inferior to the DIP Lenders' proposal due to, among other reasons, its more restrictive financial covenants and higher all-in fees and costs.  Moreover, the structure of the junior DIP Financing proposal did not fit with the DIP Financing provisions of the ICAs.

RLF1 19027854V.1

### D.     The Prepetition Secured Parties Are Adequately Protected

71.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if "the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

72.     As an initial matter, the relative rights of the Prepetition Secured Parties with respect to adequate protection, including in the context of DIP Financing, are set forth in the ICAs, and those parties have consented to the adequacy of protection provided here. Section 6.03(c) of the ABL ICA restricts the Prepetition 1L Secured Parties from seeking or being granted adequate protection with respect to their interests in the ABL Priority Collateral, or proceeds thereof, except with respect to the granting of replacement liens.  As noted above, the Prepetition 1L Secured Parties' interests in the Notes Priority Collateral, and any proceeds thereof, are not being primed by the DIP Liens and, therefore, the Prepetition 1L Secured Parties are not entitled to adequate protection with respect to such interests.  Accordingly, the proposed DIP Lenders and the Debtors propose granting  to the Prepetition 1L Secured Parties adequate protection in accordance with the following, subject to the Carve-Out:

48

- replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facilities (in the same relative priority as among the Prepetition 1L Secured Facilities) but senior to the 2L Adequate Protection Liens;

- superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are subject and junior to the DIP Superpriority Claims; and

- delivery of all reports and notices provided for in the DIP Documents.

73.     Section 6.3 of the 2L ICA similarly precludes the Prepetition 2L Secured Parties from seeking or being granted adequate protection except, to the extent any of the lenders under the Prepetition 1L Obligations (or any portion thereof) are granted adequate protection in the form of additional collateral in connection with DIP Financing or use of Cash Collateral, the 2L Indenture Trustee may seek or request adequate protection for the Second Lien Notes on such additional collateral in the form of a replacement lien on such additional collateral, which lien shall be subordinated to the liens securing the Prepetition 1L Obligations and such DIP Financing (and all obligations related thereto), on the same basis as the other liens securing the Prepetition 2L Obligations.  Accordingly, the DIP Lenders and the Debtors propose granting to the Prepetition 2L Secured Parties adequate protection in the form of the following, subject to the Carve-Out:

- replacement or, if applicable, new liens on the DIP Collateral that are junior to the liens securing the DIP Facilities and the Prepetition 1L Secured Facilities and to the 1L Adequate Protection Liens; and

- delivery of all reports and notices provided for in the DIP Documents.

74.     The Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is fair and reasonable, is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code, and, in any event, is permitted by virtue of the ICAs.

49

## II.     The Debtors Should be Authorized to Use Postpetition Collateral, Including Cash Collateral

75.     Section 363 of the Bankruptcy Code places certain restrictions on a debtor's use of Cash Collateral.  Specifically, section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

76.     The Debtors submit that the requirements of sections 363(c)(2) and (e) are met here, and the Debtors should be authorized to use the Cash Collateral.  As noted above, the Prepetition Secured Parites have consented to the use of Cash Collateral through the consents granted pursuant to their applicable ICAs.  As the Debtors are providing the Prepetition Secured Parties with adequate protection, which (i) is fair and reasonable in light of the Prepetition Secured Parties' contractually limited rights to seek or be granted adequate protection under the ICAs and (ii) adequately protects the Prepetition Secured Parties' interests in the Debtors' interests in the Prepetition Collateral securing the respective Prepetition 1L Obligations and the Prepetition 2L Obligations.

77.     Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### III.     The DIP Fees Are Reasonable and Should be Approved

78.     As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders (collectively, the "**DIP Fees**") in exchange for their providing, agenting, and/or arranging the DIP Facilities, as applicable.   Specifically, the DIP Fees accrue interest at an interest rate of, at Claire's discretion, (i) Base Rate plus 5.50% *per annum* for DIP Term Loans or Base Rate plus 1.5% *per annum* for DIP ABL Revolving Loans or (ii) LIBOR Rate plus 6.50% *per annum* for DIP Term Loans or LIBOR Rate plus 2.5% *per annum* for DIP ABL Revolving Loans.  As described in the Cowan Declaration, the DIP Fees are reasonable and in line with DIP Financing of this kind.   As described above, the DIP Fees, together with the other provisions of the DIP Documents, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facilities available.  The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient DIP Financing necessary to continue their operations and prosecute their chapter 11 cases.   The Debtors believe paying the DIP Fees in order to obtain such DIP Financing is in the best interests of the Debtors' estates, creditors and other parties in interest.

79.     Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

### IV.     The DIP Lenders Should be Deemed Good Faith Lenders

80.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not

> affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

81.     Here, the Debtors believe the DIP Documents embody the most favorable terms on which the Debtors could obtain DIP Financing.   All negotiations regarding the provision of the DIP Facilities were conducted in good faith and on an arm's length basis.   The terms and conditions of the DIP Facilities are fair and reasonable, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facilities other than as disclosed herein.   Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## V.     Scope of Carve-Out Is Appropriate

82.     The DIP Liens are subject to the Carve-Out. Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted. *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").   The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.   Additionally, the Carve-Out ensures that assets will be available for the payment of fees of the Clerk of the Bankruptcy Court or the Office of the United States Trustee for the District of Delaware and professional fees of the

Debtors and an unsecured creditors committee, if one is appointed.  Accordingly, the Carve-Out is necessary and appropriate, and should be approved.

## VI.    Automatic Stay Should Be Modified on a Limited Basis

83.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the DIP Liens.  Specifically, the DIP Facilities contemplate modifying the automatic stay so as to (i) permit the creation and perfection of the DIP Liens and (ii) provide for the automatic vacation of such stay to permit the DIP Agents to enforce its rights with respect to the DIP Collateral in the event of an Event of Default under the DIP Facilities, subject to 5 business day's written notice.

84.    Stay modifications of this kind are ordinary and standard features for DIP Financing, and in the Debtors' business judgment, are reasonable and fair under the present circumstances.  *See, e.g.*, *In American Apparel, Inc.*, Case No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015) (authorizing stay modifications in order to permit DIP lenders to exercise remedies upon an event of default); *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. July 24, 2015) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Coldwater Creek, Inc.,* Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014) (modifying stay to authorize exercise of remedies upon default); *In re Broadway 401 LLC,* Case No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (modifying the stay to the extent necessary to effectuate the order); *In re Dacco Transmission Parts (NY)*, Inc., No. 16-13245 (MKV) (Bankr. S.D.N.Y. December 23, 2016); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB) (Bankr. S.D.N.Y. August 19, 2016); *In re Aeropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 13, 2016); *In re Fairway Group Holdings Corp.*, No. 16-11241 (MEW) (Bankr. S.D.N.Y. May 31, 2016); *In re Chassix Holdings, Inc.*, No. 15-10578 (MEW) (Bankr. S.D.N.Y. April 10, 2015).

85.     The relief requested herein further contemplates a modification of the automatic stay to (i) in the event of a draw on the letters of credit outstanding under the Prepetition LC Facility, permit the Prepetition LC Issuer to apply cash collateral to satisfy the obligations outstanding under the Prepetition LC Agreement in accordance with the terms thereof, and (ii) in the event of a draw on the letters of credit outstanding under the Prepetition ABL Facility, permit the Prepetition ABL Agent to apply cash collateral to satisfy the obligations outstanding under the Prepetition ABL Credit Agreement in accordance with the terms thereof.  In the Debtors' business judgment, such relief is reasonable and fair under the present circumstances.

### Immediate Relief Is Required to Avoid Immediate and Irreparable Harm

86.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2); 6003(b).  The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to incur the interim borrowings under the DIP Documents, is not granted promptly after the Petition Date.

87.     The Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their liquidity as a result of, among other things, the costs of administering these chapter 11 cases, implementing critical restructuring initiatives, and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases.  Indeed, the Debtors have already begun to experience trade contraction as the result of certain recent news reporting on the Debtors' anticipated chapter 11 filing.

88.     Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important relationships with customers and landlords, meet payroll, procure goods and services from vendors and suppliers, and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.  For all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

### Request for a Final Hearing

89.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no later than thirty (30) days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and approval of the relief requested in this Motion on a final basis..

90.     The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

### Notice

91.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to the DIP Agent; (iv) the Prepetition ABL Agent; (v) the Prepetition RCF Agent; (vi) the Prepetition Term Loan Agent; (vii) the 9.00% Indenture Trustee; (viii) the 6.125% Indenture Trustee; (ix) the 2L Indenture

Trustee; (x) the Unsecured Notes Trustee; (xi) the Internal Revenue Service; (xii) the United States Attorney's Office for the District of Delaware; (xiv) the Securities and Exchange Commission; (xv) any party that has requested notice pursuant to Bankruptcy Rule 2002; (xvi) the Cash Management Banks;[28] and (xvii) any parties known after reasonable inquiry to have asserted a lien against the Debtors' assets (collectively, the "**Notice Parties**").

92.    As this Motion is seeking "first day" relief, the Debtors will serve copies of this Motion and any order entered in respect of the Motion as required by Local Rule 9013-1(m).  The Debtors respectfully submit that no further notice is required.  No previous request for the relief sought herein has been made by the Debtors to this or any other court.

---

[28] The term "Cash Management Banks" shall have the meaning ascribed to such term in the *Motion of Debtors for Authority to (A) Continue Participating in Existing Cash Management System, and Using Bank Accounts and Business Forms, and (B) Continue Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims and (III) Granting Related Relief*, filed contemporaneously herewith.

56

WHEREFORE the Debtors respectfully request entry of the DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: March 19, 2018
      Wilmington, Delaware

*/s/ Daniel J. DeFranceschi*
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
One Rodney Square
910 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Matthew S. Barr (*pro hac vice* admission pending)
Ryan Preston Dahl (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*