## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x
                                      :

In re                                :        **Chapter 11**
                                        :

**CLAIRE'S STORES, INC.,** *et al.*,     :        **Case No. 18–10584 (MFW)**
                                        :

                 **Debtors.**[1]    :       **Joint Administration Pending**
                                        :

------------------------------------------------------------ x    Re: Docket No. 8

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION NON-ABL SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

Upon the motion, dated March 19, 2018 (the "**DIP Motion**"), of Claire's Stores, Inc. (the "**Borrower**"), and the other debtors and debtors-in-possession (collectively with the Borrower, the "**Debtors**"), in the above-referenced chapter 11 cases (the "**Cases**"), seeking entry of an interim order (this "**Interim Order**") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(3), 364(d)(l), 364(e), 507, and 552 of chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), that, among other things:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Claire's Inc. (6919); Claire's Stores, Inc. (0416); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Puerto Rico Corp. (6113); and CSI Canada LLC (7936). The Debtors' corporate headquarters and service address is 2400 West Central Road, Hoffman Estates, Illinois 60192.

(i)        authorizes the Borrower to obtain post-petition financing (the "**DIP Financing**"), and for the other Debtors (collectively, the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**") to guaranty the Borrower's obligations in connection with the DIP Financing, consisting of, (a) a superpriority senior secured multiple-draw asset based revolving credit facility (the "**DIP ABL Revolver**" and the loans thereunder, the "**DIP ABL Revolving Loans**" and together with all interest thereon, and all fees costs, expenses and other amounts chargeable in respect thereof under the DIP Documents, collectively, the "**DIP ABL Revolving Loan Obligations**") in the aggregate principal amount of up to $75,000,000 (the "**DIP ABL Revolving Commitments**") with up to $10,000,000 of the DIP ABL Revolver available for the issuance of letters of credit, and (b) a superpriority senior secured dual-draw "last-out" term loan facility (the "**DIP Term Loan Facility**" and the loans thereunder, the "**DIP Term Loans**" and together with all interest thereon, and all fees costs, expenses and other amounts chargeable in respect thereof under the DIP Documents, collectively, the "**DIP Term Loan Obligations**") in the aggregate principal amount of $60,000,000, in each case subject to the terms and conditions set forth in (a) that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement, by and among the Borrower (as Debtor-in-Possession), the other Loan Parties thereto, Citibank, N.A., acting as administrative agent and collateral agent (in such capacities and together with any respective successor thereto, the "**DIP Agent**") and the lenders from time to time party to the DIP Credit Agreement (collectively, the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), to be arranged by Citigroup Global Markets Inc. (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"), (b) any and all other Loan Documents (as defined in the DIP Credit Agreement and together with the DIP Credit Agreement, the "**DIP Documents**"), and (c) this

2

Interim Order, and upon entry thereof, the Final Order (as defined below). The DIP ABL Revolver and the DIP Term Loan Facility shall collectively be referred to as the "**DIP Facilities**" and the DIP ABL Revolving Loans and the DIP Term Loans shall collectively be referred to as the "**DIP Loans**";

(ii)    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Documents and authorizes and directs the Debtors to perform such other and further acts as may be required in connection with the DIP Documents and this Interim Order;

(iii)    grants, subject to the Carve-Out in all respects, (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including, upon entry of the Final Order (as defined herein) any proceeds of Avoidance Actions;[2]

(iv)    authorizes the Debtors to continue to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which any of the Prepetition Non-ABL Secured Parties has an interest, and the granting of adequate protection to the Prepetition Non-ABL Secured Parties as provided herein, as applicable, with respect to, *inter alia*, such use of their Cash Collateral and all use and diminution in the value of such Cash Collateral and the Prepetition Collateral, as applicable;

---

[2] "**Avoidance Actions**" means claims or causes of action any claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code.

(v)        modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(vi)       schedules a final hearing on the DIP Motion (the "**Final Hearing**") within the timeframe contemplated by the DIP Documents to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis and which final order (the "**Final Order**") (i) shall be substantially the same as the Interim Order except that (x) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (y) where appropriate, references to this Interim Order shall be changed to references to the Final Order and (ii) with respect to any other modifications to the Interim Order, shall be consistent with the term sheet attached to the commitment letter dated as of March 11, 2018, by and among the Borrower and Citigroup Global Markets Inc. and shall otherwise be in form and substance acceptable to the DIP Agent and the debtors (in each case, which consent shall not be unreasonably withheld) and constitute provisions that are customarily included in final orders approving debtor-in-possession facilities similar to the DIP Facilities;

(vii)      waives, upon entry of the Final Order, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(viii)     provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the DIP Motion, the DIP Credit Agreement, the Declaration of Tyler W. Cowan in support of the DIP Motion (the "**Cowan Declaration**") and the Declaration of Scott E. Huckins (the "**First Day Declaration**," and together with the Cowan Declaration, the

"**DIP Motion Declarations**"), and the evidence submitted or proffered at the hearing on this Interim Order (the "**Interim Hearing**"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), and 4001(d) and 9014 and all applicable Local Rules, notice of the DIP Motion and the Interim Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); an Interim Hearing having been held and concluded on March 20, 2018; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' estates; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      **Petition Date**.  On March 19, 2018 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "**Court**").  The Debtors have

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent such committee is appointed, the "**Committee**"), trustee, or examiner has been appointed in the Cases.

B.    **Jurisdiction and Venue**.  This Court has core jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Rules.

C.    **Notice**.  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel to the DIP Agent; (iv) the Prepetition ABL Agent; (v) the Prepetition RCF Agent; (vi) the Prepetition Term Loan Agent; (vii) the 9.00% Indenture Trustee; (viii) the 6.125% Indenture Trustee; (ix) the 2L Indenture Trustee; (x) the Unsecured Notes Trustee; (xi) the Internal Revenue Service; (xii) the United States Attorney's Office for the District of Delaware; (xiii) the Ad Hoc First Lien Group (as defined below); (xiv) the Securities and Exchange Commission; (xv) any party that has requested notice pursuant to Bankruptcy Rule 2002; (xvi) the Cash Management Banks (as defined in the

DIP Motion); and (xvii) any parties known after reasonable inquiry to have asserted a lien against the Debtors' assets (collectively, the "**Notice Parties**").  Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules, and no other notice need be provided for entry of this Interim Order.

D.      **Debtors' Stipulations**.  Subject only to the rights of parties in interest that are specifically set forth in Paragraph 6 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (Paragraph D hereof shall be referred to herein collectively as the "**Debtors' Stipulations**") as follows:

(i)    **Prepetition ABL Facility**

a.      Borrower, Claire's Inc. ("**Holdings**"), the lenders from time to time party thereto (collectively, the "**Prepetition ABL Lenders**"), and Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent and collateral agent for such lenders (the "**Prepetition ABL Agent**" and, together with the Prepetition ABL Lenders, the "**Prepetition ABL Secured Parties**") are party to that certain ABL Credit Agreement, dated as of August 12, 2016 and effective as of September 20, 2016 (as amended by that certain Amendment No.1, dated as of November 1, 2016, and as further amended, restated, supplemented, or modified from time to time, the "**Prepetition ABL Credit Agreement**" and collectively with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" (as defined therein) each as may be amended, restated, supplemented, or modified from time to time, the "**Prepetition ABL Loan Documents**").  Pursuant to the Prepetition ABL Loan Documents, the Debtors (other than the Borrower) (collectively, the "**Prepetition Guarantors**") each unconditionally guaranteed, on a joint and several basis, the punctual and complete performance, payment, and satisfaction when due and at all times thereafter of all of the Prepetition ABL Indebtedness (as defined below).

b.      The principal amount of the loans and other obligations owed by Borrower to the Prepetition ABL Secured Parties under the Prepetition ABL Loan Documents, exclusive of accrued but unpaid interest, costs, fees, and expenses, was equal to $71,000,000 as of the Petition Date.  All loans and other obligations of the Debtors arising under or in connection with the Prepetition ABL Credit Agreement, including all issued and outstanding letters of credit in the aggregate face amount of $3,679,918 (the "**Prepetition Letters of Credit**") (including,

7

without limitation, the "Loan Document Obligations" as defined therein) or any other Prepetition ABL Loan Documents shall collectively be referred to herein as the "**Prepetition ABL Indebtedness**".

c.      Pursuant to the Prepetition ABL Credit Agreement and the other applicable Prepetition ABL Loan Documents, the Prepetition ABL Agent was granted, for its benefit and the benefit of the Prepetition ABL Lenders, liens, mortgages, and security interests against, on, and in the Collateral to the extent provided by the ABL Loan Documents (as defined in the Prepetition ABL Credit Agreement, the "**Prepetition ABL Collateral**") in each case to secure the Prepetition ABL Indebtedness. Such liens, mortgages, and security interests of the Prepetition ABL Agent are referred to herein as the "**Prepetition ABL Liens**."

d.      The Prepetition ABL Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the ABL Priority Collateral (as defined below); (ii) valid, binding, perfected, enforceable, second-priority liens and security interests in the Notes Priority Collateral (as defined below); (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition ABL Collateral that is Notes Priority Collateral, subject and subordinate to the Prepetition 1L Liens (as defined below).

(ii)    **Prepetition 1L Secured Facilities**

1.      *Prepetition Revolving Facility*

a.      Borrower, Holdings, the lenders from time to time party thereto (collectively, the "**Prepetition RCF Lenders**"), and Credit Suisse AG, in its capacity as administrative agent and collateral agent for such lenders (the "**Prepetition RCF Agent**" and, collectively with the Prepetition RCF Lenders, the "**Prepetition RCF Secured Parties**") are party to that certain Second Amended and Restated Credit Agreement, dated as of August 12, 2016 and effective as of September 20, 2016 (as amended by that certain Amendment No. 1, dated as of November 1, 2016, and as further amended, restated, supplemented, or modified from time to time, the "**Prepetition RCF Credit Agreement**" and collectively with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" (as defined therein) each as may be amended, restated, supplemented, or modified from time to time, the "**Prepetition RCF Loan Documents**"). Pursuant to the Prepetition RCF Loan Documents, the Prepetition Guarantors each unconditionally guaranteed, on a joint and several basis, the punctual and complete performance, payment, and satisfaction when due and at all times thereafter of all of the Prepetition RCF Obligations (as defined below).

b.      As of the Petition Date, no amounts are outstanding under the Prepetition RCF Loan Documents or otherwise due to the Prepetition RCF Secured Parties, and as a condition precedent to the closing of the DIP Facilities, the Debtors will terminate the Prepetition RCF Loan Documents and all commitments thereunder concurrently with the refinancing of the Prepetition ABL Indebtedness as set forth therein.  All loans and other obligations of the Debtors arising under or in connection with the Prepetition RCF Credit Agreement (including, without limitation, the "Loan Document Obligations" as defined therein) or any other Prepetition RCF Loan Documents shall collectively be referred to herein as the "**Prepetition RCF Obligations**").

c.      Pursuant to the Prepetition RCF Credit Agreement and the other applicable Prepetition RCF Loan Documents, the Prepetition RCF Agent was granted, for its benefit and the benefit of the Prepetition RCF Lenders, liens, mortgages, and security interests against, on, and in the Collateral to the extent provided by the Prepetition RCF Loan Documents (as defined in the Prepetition RCF Agreement, the "**Prepetition RCF Collateral**") to the extent provided by the Prepetition RCF Loan Documents, in each case to secure the Prepetition RCF Obligations.  Such liens, mortgages, and security interests of the Prepetition RCF Agent are referred to herein as the "**Prepetition RCF Liens**."

d.      The Prepetition RCF Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Notes Priority Collateral; (ii) valid,  binding, perfected, enforceable, second-priority liens and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition RCF Collateral that is ABL Priority Collateral, subject and subordinate to the Prepetition ABL Liens.

2.      *Prepetition Letter of Credit Facility*

a.      Borrower (as "**Applicant**"), Holdings, and Credit Suisse AG, in its capacity as Issuer and collateral agent (the "**Prepetition LC Issuer**") are party to that certain Letter of Credit Reimbursement and Security Agreement, dated as of February 12, 2018 (as amended by that certain Amendment to Letter of Credit Reimbursement and Security Agreement, dated as of March 14, 2018, the "**Prepetition LC Agreement**" and collectively with any other agreements and documents executed or delivered in connection therewith, the "**Prepetition LC Loan Documents**").

b.      The principal amount of letters of credit issued by the Prepetition LC Issuer under the Prepetition LC Agreement, exclusive of accrued but unpaid interest, costs, fees, and expenses, was equal to $1,253,446.45 as of the Petition Date.  All letters of credit, loans and other obligations of the Debtors arising under or in connection with the Prepetition LC Agreement or any other Prepetition LC

Loan Documents shall collectively be referred to herein as the "**Prepetition LC Obligations**").

c.      Pursuant to the Prepetition LC Credit Agreement and the other applicable Prepetition LC Loan Documents, the Prepetition LC Issuer was granted, for its benefit, a first priority security interest against, on, and in the Collateral Account (as defined in the Prepetition LC Agreement) (the "**Collateral Account**") to the extent provided by the Prepetition LC Agreement, to secure the Prepetition LC Obligations.  Such security interest of the Prepetition Issuer is referred to herein as the "**Prepetition LC Liens**."

d.      The Prepetition LC Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Collateral Account; and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law.

3.      *Prepetition Term Loan Facility*

a.      Borrower, the lenders from time to time party thereto (collectively, the "**Prepetition Term Loan Lenders**"), and Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent for such lenders (the "**Prepetition Term Loan Agent**") are party to that certain Term Loan Credit Agreement, dated as of September 20, 2016 (as amended, restated, supplemented, or modified from time to time, the "**Prepetition Term Loan Credit Agreement**" and collectively with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" (as defined therein) each as may be amended, restated, supplemented, or modified from time to time, the "**Prepetition Term Loan Documents**").  Pursuant to the Prepetition Term Loan Documents, the Prepetition Guarantors (other than Holdings) each unconditionally guaranteed, on a joint and several basis, the punctual and complete performance, payment, and satisfaction when due and at all times thereafter of all of the Prepetition Term Loan Obligations (as defined below).

b.      The principal amount of the loans and other obligations owed by Borrower to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders under the Prepetition Term Loan Documents, exclusive of accrued but unpaid interest, costs, fees, and expenses, was equal to $32,300,000 as of the Petition Date.  All loans and other obligations of the applicable Debtors arising under or in connection with the Prepetition Term Loan Credit Agreement (including, without limitation, the "Obligations" as defined therein) or any other Prepetition Term Loan Documents shall collectively be referred to herein as the "**Prepetition Term Loan Obligations**").

c.      Pursuant to the Prepetition Term Loan Credit Agreement and the other applicable Prepetition Term Loan Documents, the Prepetition Term Loan

Agent was granted, for its benefit and the benefit of the Prepetition Term Loan Lenders, liens, mortgages, and security interests against, on, and in the Collateral (as defined in the Prepetition Term Loan Credit Agreement, the "**Prepetition 1L TL Collateral**") to the extent provided by the Prepetition Term Loan Documents, in each case to secure the Prepetition Term Loan Obligations.  Such liens, mortgages, and security interests of the Prepetition Term Loan Agent are referred to herein as the "**Prepetition Term Loan Liens**."

        d.       The Term Loan Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Notes Priority Collateral; (ii) valid, binding, perfected, enforceable, second-priority liens and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition 1L TL Collateral that is ABL Priority Collateral, subject and subordinate to the Prepetition ABL Liens.

4.      *First Lien 9.00% Notes*

        a.       Borrower is the issuer of $1,125,000,000 aggregate principal amount of 9.00% Senior Secured First Lien Notes due 2019 (collectively, the "**9.00% Notes**" and the holders of such 9.00% Notes, the "**9.00% Noteholders**"). The 9.00% Notes are governed by that certain Senior Secured First Lien Notes Indenture, dated as of February 28, 2012, between Borrower and The Bank of New York Mellon Trust Company, as trustee and collateral agent (the "**9.00% Indenture Trustee**") (as amended, supplemented, or otherwise modified from time to time) (the "**9.00% Notes Indenture**" and, collectively with the security agreements, guaranties, mortgages, pledges and all other documentation executed in connection therewith, the "**Prepetition 9.00% Notes Indenture Documents**"). The Prepetition Guarantors (other than Holdings) each unconditionally guaranteed, on a joint and several basis, the punctual and complete performance, payment, and satisfaction when due and at all times thereafter of all of the 9.00% Notes Obligations (as defined below).

        b.       The principal amount of the obligations owed by Borrower to the 9.00% Noteholders under the 9.00% Notes Indenture, exclusive of accrued but unpaid interest, costs, fees, and expenses, was equal to $1,125,000,000 as of the Petition Date.  All obligations of the applicable Debtors arising under or in connection with the 9.00% Notes Indenture or the 9.00% Notes shall collectively be referred to herein as the "**9.00% Notes Obligations**").

        c.       Pursuant to the Prepetition 9.00% Notes Indenture Documents, the 9.00% Indenture Trustee was granted, for its benefit and the benefit of the 9.00% Noteholders, liens, mortgages, and security interests against, on, and in the Collateral (as defined in the 9.00% Notes Indenture, the "**Prepetition 9.00% Notes Collateral**"), to the extent provided by the Prepetition 9.00% Notes Indenture Documents, in each case to secure the 9.00% Notes Obligations.  Such

liens, mortgages, and security interests are referred to herein as the "**9.00% Notes Liens**").

d.        The 9.00% Notes Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Notes Priority Collateral; (ii) valid, binding, perfected, enforceable, second-priority liens and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition 9.00% Notes Collateral that is ABL Priority Collateral, subject and subordinate to the Prepetition ABL Liens.

5.        *First Lien 6.125% Notes*

a.        Borrower is the issuer of $210,000,000 aggregate principal amount of 6.125% Senior Secured First Lien Notes due 2020 (collectively, the "**6.125% Notes**" and the holders of such 6.125% Notes, the "**6.125% Noteholders**").  The 6.125% Notes are governed by that certain Senior Secured First Lien Notes Indenture, dated as of March 15, 2013, between Borrower and The Bank of New York Mellon Trust Company, as trustee and collateral agent (the "**6.125% Indenture Trustee**") (as amended, supplemented, or otherwise modified from time to time) (the "**6.125% Notes Indenture**" and, collectively with the security agreements, guaranties, mortgages, pledges and all other documentation executed in connection therewith, the "**Prepetition 6.125% Notes Indenture Documents**").   The Prepetition Guarantors (other than Holdings) each unconditionally guaranteed, on a joint and several basis, the punctual and complete performance, payment, and satisfaction when due and at all times thereafter of all of the 6.125% Notes Obligations (as defined below).

b.        The principal amount of the obligations owed by Borrower to the 6.125% Noteholders under 6.125% Notes Indenture, exclusive of accrued but unpaid interest, costs, fees, and expenses, was equal to $210,000,000 as of the Petition Date.   All obligations of the applicable Debtors arising under or in connection with the 6.125% Notes Indenture or the 6.125% Notes shall collectively be referred to herein as the "**6.125% Notes Obligations**").

c.        Pursuant to the 6.125% Notes Indenture and the 6.125% Notes, the 6.125% Indenture Trustee was granted, for its benefit and the benefit of the 6.125% Noteholders, liens, mortgages, and security interests against, on, and in the Collateral (as defined in the 6.125% Notes Indenture, the "**Prepetition 6.125% Notes Collateral**"; and, together with the Prepetition 1L TL Collateral, and the Prepetition 9.00% Notes Collateral, the "**Prepetition 1L Collateral**"), to the extent provided by the Prepetition 6.125% Notes Indenture Documents, in each case to secure the 6.125% Notes Obligations.   Such liens, mortgages, and security interests are referred to herein as the "**6.125% Notes Liens**").

d.     The 6.125% Notes Liens are (i) valid, binding, perfected, enforceable, first priority liens and security interests in the Notes Priority Collateral; (ii) valid, binding, perfected, enforceable, second-priority liens and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition 6.125% Notes Collateral that is ABL Priority Collateral, subject and subordinate to the Prepetition ABL Liens.

6.     *Prepetition 1L Secured Facilities*.  The Prepetition Term Loan Documents, the Prepetition 9.00% Notes Indenture Documents, the Prepetition 6.125% Notes Indenture Documents and the Prepetition RCF Loan Documents are collectively referred to herein as the "**Prepetition 1L Documents**".  The Prepetition Term Loan Obligations, the 9.00% Notes Obligations, the 6.125% Notes Obligations and the Prepetition RCF Obligations are collectively referred to herein as the "**Prepetition 1L Obligations**." The Prepetition Term Loan Liens, the 9.00% Notes Liens, the 6.125% Notes Liens and the Prepetition RCF Liens are collectively referred to herein as the "**Prepetition 1L Liens**."  The Prepetition Term Loan Facility, the First Lien 9.00% Notes, the First Lien 6.125% Notes and the revolving credit facility under the Prepetition RCF Loan Documents are collectively referred to herein as the "**Prepetition 1L Secured Facilities**."  The holders of the Prepetition 1L Obligations are collectively referred to herein as the "**Prepetition 1L Secured Parties**."  The Prepetition Term Loan Agent, the 9.00% Indenture Trustee, the 6.125% Indenture Trustee, and the Prepetition RCF Agent are collectively referred to herein as the "**Prepetition 1L Agents**").

(iii)  **Prepetition 2L Secured Facility**

1.     *Second Lien 8.875% Notes*

a.     Borrower is the issuer of $450,000,000 aggregate principal amount of 8.875% Senior Secured Second Lien Notes due 2019 (collectively, the "**8.875% Notes**" and the holders of such 8.875% Notes, the "**8.875% Noteholders**").  The 8.875% Notes are governed by that certain Senior Secured Second Lien Notes Indenture, dated as of March 4, 2011, between Borrower and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent (the "**2L Indenture Trustee**", and collectively with all other secured parties under the 8.875 Notes Indenture (as defined below), the "**Prepetition 2L Secured Parties**") (as amended, supplemented, or otherwise modified from time to time) (the "**8.875% Notes Indenture**" and, collectively with the security agreements, guaranties, mortgages, pledges and all other documentation executed in connection therewith, the "**Prepetition 2L Documents**").  The Prepetition Guarantors (other than Holdings) each unconditionally guaranteed, on a joint and several basis, the punctual and complete performance, payment, and satisfaction when due and at all times thereafter of all of the 8.875% Notes Obligations (as defined below).  The

Prepetition 2L Secured Parties and the Prepetition 1L Secured Parties are collectively referred to herein as the "**Prepetition Non-ABL Secured Parties**."

b.      The principal amount of the obligations owed by Borrower to the 8.875% Noteholders under 8.875% Notes Indenture, exclusive of accrued but unpaid interest, costs, fees, and expenses, was equal to $222,300,000 as of the Petition Date.  All obligations of the Debtors arising under or in connection with the 8.875% Notes Indenture or the 8.875% Notes shall collectively be referred to herein as the "**Prepetition 2L Obligations**").  The Prepetition 2L Liens are subject and subordinate to the Prepetition 1L Liens and the Prepetition ABL Liens.

c.      Pursuant to the 8.875% Notes Indenture and the 8.875% Notes, the 2L Indenture Trustee was granted, for its benefit and the benefit of the 8.875% Noteholders, junior liens, mortgages, and security interests against, on, and in the Collateral (as defined in that certain Collateral Agreement, dated as of March 14, 2011 (as amended, restated, amended and restated, supplemented and/or otherwise modified), *inter alios*, the Borrower, the Prepetition Guarantors (other than Holdings), and the 2L Indenture Trustee, the "**Prepetition 2L Collateral**", and together with the Prepetition 1L Collateral and the Prepetition ABL Collateral, the "**Prepetition Collateral**") in each case to secure the 8.875% Notes Obligations.  Such liens, mortgages, and security interests are referred to herein as the "**Prepetition 2L Liens**" and, together with the Prepetition 1L Liens, the "**Prepetition Liens**").

E.      <u>Reservation of Rights.</u>

Notwithstanding anything herein or in the DIP Documents to the contrary, (i) the Debtors make no stipulation, and reserve all rights, with respect to the validity, perfection, and priority of the liens securing or putatively securing the Prepetition 2L Obligations, and (ii) the Debtors' rights to seek a determination on the value of the Prepetition Collateral securing the Prepetition 1L Secured Facilities and/or the Prepetition 2L Obligations as of the Petition Date are fully preserved.

F.      <u>Ad Hoc First Lien Group's Stipulations</u>.  Each member of the Ad Hoc First Lien Group[4] has stipulated that the Debtors' entry into the DIP Facilities constitutes a

---

[4] "**Ad Hoc First Lien Group**" means those entities represented by Willkie Farr & Gallagher LLP that are parties to the Restructuring Support Agreement, dated March 19, 2018 and attached as <u>Exhibit A</u> to the First Day Declaration (as may be amended, modified, or supplemented from time to time)

Permitted Refinancing (as defined by the ABL ICA).

           G.            **Intercreditor Agreements/Lien Priorities**.

         (i)         **ABL ICA**.  On September 20, 2016, the Prepetition ABL Agent, the 9.00% Indenture Trustee, the 6.125% Indenture Trustee, and the Prepetition RCF Agent, as the initial additional first lien agent, entered into that certain Intercreditor Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "**ABL ICA**"), which was acknowledged by Borrower, Holdings, and the other Prepetition Guarantors and which governs, among other things, the relative priorities of the Prepetition ABL Liens and the Prepetition 1L Liens in the Prepetition 1L Collateral.  On September 20, 2016, the Prepetition Term Loan Agent entered into a Joinder to the ABL ICA in connection with the Prepetition Term Loan Credit Agreement.

         (ii)         **1L ICA**.  On March 2, 2012, Borrower, Holdings, the Prepetition Guarantors, the Prepetition RCF Agent, and the 9.00% Indenture Trustee entered into that certain First Lien Intercreditor Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "**1L ICA**"), which governs, among other things, the relative priorities of the Prepetition 1L Liens in the Prepetition 1L Collateral.  On March 15, 2013, the 6.125% Indenture Trustee entered into a Joinder Agreement to the 1L ICA in connection with the 6.125% Notes.  On September 20, 2016, the Prepetition Term Loan Agent entered into a Joinder to the 1L ICA in connection with the Prepetition Term Loan Credit Agreement.

         (iii)         **2L ICA**.  On March 4, 2011, Borrower, Holdings, the other Prepetition Guarantors, the Prepetition RCF Agent, and the 2L Indenture Trustee entered into that certain Intercreditor Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "**2L ICA**" and, together with the ABL ICA and the 1L ICA, the "**ICA**s").

On March 2, 2012, 9.00% Indenture Trustee entered into a Joinder Agreement to the 2L ICA in connection with the 9.00% Notes.  On March 15, 2013, the 6.125% Indenture Trustee entered into Joinder Agreement No. 2 to the 2L ICA in connection with the 6.125% Notes.  On September 20, 2016, the Prepetition Term Loan Agent entered into a Joinder to the 2L ICA. Agreement to the 2L ICA in connection with the Prepetition Term Loan Credit Agreement.  On September 20, 2016, the Prepetition ABL Agent entered into a Joinder Agreement to the 2L ICA in connection with the Prepetition ABL Credit Agreement.  The 2L ICA governs, among other things, the relative priorities of the Prepetition 1L Liens and the Prepetition 2L Liens in the Prepetition 1L Collateral.

(iv)    <u>Lien Priority</u>.  Subject to the terms and conditions set forth therein, the ICAs provide that: (i) with respect to the ABL Priority Collateral (as defined in the ABL ICA, the "**ABL Priority Collateral**"), (a) the Prepetition ABL Liens rank first in priority and are senior to the Prepetition 1L Liens and the Prepetition 2L Liens, (b) the Prepetition 1L Liens rank second in priority and are senior to the Prepetition 2L Liens and junior to the Prepetition ABL Liens, and (c) the Prepetition 2L Liens rank third in priority and are junior to the Prepetition ABL Liens and the Prepetition 1L Liens, and (ii) with respect to the Notes Priority Collateral (as defined in the ABL ICA, the "**Notes Priority Collateral**"), (a) the Prepetition 1L Liens rank first in priority and are senior to the Prepetition ABL Liens and the Prepetition 2L Liens, (b) the Prepetition ABL Liens rank second in priority and are senior to the Prepetition 2L Liens and junior to the Prepetition 1L Liens, and (c) the Prepetition 2L Liens rank third in priority and are junior to the Prepetition 1L Liens and the Prepetition ABL Liens.  No liens are being granted on the unencumbered assets of the Debtors (the "**Unencumbered Assets**"), including, without limitation, thirty five percent (35%) of the respective equity of Claire's Swiss Holdings LLC and

Claire's Stores Canada Corp. (the "**Unencumbered Foreign Equity**").

(v)     Pursuant to section 510 of the Bankruptcy Code, the ICAs between and/or among any Debtor or affiliate thereof, the Prepetition ABL Agent, the Prepetition 1L Agents, the 2L Indenture Trustee, any Prepetition Non-ABL Secured Party, and any Prepetition Secured Party shall remain in full force and effect.

(vi)     The Court hereby finds, that:

1.     On the Closing Date (as defined in the DIP Credit Agreement), (i) proceeds of the DIP ABL Revolver and cash from the Borrower will be used to refinance and/or repay in full all outstanding Prepetition ABL Indebtedness and to cash collateralize all outstanding but undrawn Prepetition Letters of Credit thereunder in accordance with the terms thereof, (ii) all the outstanding commitments under the Prepetition ABL Credit Agreement will be terminated and replaced in full with the DIP ABL Revolving Commitments and (iii) concurrently therewith, the Prepetition RCF Credit Agreement shall be terminated and all Prepetition RCF Obligations owing thereunder shall be paid in full (clauses (i) through (iii) being, collectively referred to as the "**Prepetition ABL Credit Agreement Refinancing**").

2.     The Prepetition Credit Agreement Refinancing will constitute a Permitted Refinancing (as defined in the ABL ICA) of the Prepetition ABL Credit Agreement, and the provisions of the DIP Documents applicable to the DIP ABL Revolver shall constitute a Permitted Refinancing Agreement (as defined in the ABL ICA) and an ABL Credit Agreement (as defined in the ABL ICA).

3.     Immediately upon the consummation of the Prepetition ABL Credit Agreement Refinancing, the DIP Agent shall become the ABL Agent (as defined

17

in the ABL ICA) for all purposes of the ABL ICA; provided, however, that the Prepetition ABL Secured Parties shall retain their respective rights against the Prepetition 1L Secured Parties and the Prepetition 2L Secured Parties under the applicable ICAs in the event any portion of the ABL Indebtedness is reinstated after giving effect to any Successful Challenge (as defined below) (but any such reinstated ABL Indebtedness shall remain junior in right of payment to the DIP Obligations); provided that the Debtors, the DIP Agent, and the Prepetition ABL Agent will work in good faith to negotiate, and the Final DIP Order shall provide, adequate protection in favor of the incumbent ABL Agent in the event of a Successful Challenge (as defined below) with respect to the liens securing the Prepetition ABL Facility; provided further that such adequate protection shall be junior in priority to the liens and claims securing the DIP Obligations with respect to the DIP Collateral that is ABL Priority Collateral, but shall be senior in priority with respect to all other adequate protection granted under this Interim Order with respect to the DIP Collateral that is ABL Priority Collateral.

4.       Notwithstanding anything to the contrary herein, until the initial funding of the DIP Term Loans (which will only occur after the Prepetition ABL Credit Agreement Refinancing has been consummated), the parties hereto agree that to the extent any modification of the terms or provisions of the Prepetition ABL Credit Agreement as reflected in the DIP Documents would not otherwise be permitted under the terms of any Prepetition 9.00% Note Indenture Document, Prepetition 6.125% Note Indenture Document or Prepetition 2L Document, and each Additional First Lien Agreement (as such terms are defined in the ABL ICA) as in effect on the date of the ABL ICA, then such term or provision shall be interpreted in a manner that would not

conflict with or violate the terms of such Prepetition 9.00% Note Indenture Document, Prepetition 6.125% Note Indenture Document, Prepetition 2L Document, or Additional First Lien Agreement (it being understood and agreed that this clause (4) shall not apply (and shall cease to be effective) after the initial funding of the DIP Term Loans).

5. The DIP ABL Revolver constitutes ABL Obligations (as defined in the ABL ICA) secured by liens on the ABL Priority Collateral that are senior to the liens securing the Notes Obligations (as defined in the ABL ICA) and secured by liens on the Notes Priority Collateral that are junior to the liens securing the Notes Obligations, in each case to the extent provided in the ABL ICA.

6. The DIP ABL Revolver Obligations, the DIP Term Loan Obligations, the DIP Agent, and the DIP Lenders are entitled to the rights, benefits, protections, and priorities set forth in the ABL ICA.

H. <u>Cash Collateral</u>. All of the Debtors' cash, including, without limitation, any cash held in that certain deposit account maintained with JPMorgan Chase Bank, N.A., account number ending 0742, constitutes Cash Collateral of the DIP Secured Parties and the Prepetition 1L Secured Parties; <u>provided</u>, <u>however</u>, that (x) any cash deposited in a segregated utilities account in accordance with the relief requested by the Utilities Motion[5] (a "**<u>Utilities Account</u>**") shall not constitute Cash Collateral; <u>provided</u> <u>further</u>, however, that the DIP Collateral shall include the Debtors' reversionary interest in any funds held in the Utilities Account; and (y) any cash held in the Collateral Account or in the Professional Fees Account

---

[5] "**<u>Utilities Motion</u>**" means *Motion of Debtors For Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service, (IV) Authorizing the Debtors to Honor Obligations to Payment Processors in the Ordinary Course of Business, and (V) Granting Related Relief*, filed contemporaneously with the DIP Motion.

shall not constitute Cash Collateral; provided further, however, that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Account.

I.        **Findings Regarding the DIP Facilities**.

(i)        Need for Postpetition Financing.  The Debtors have an immediate need to obtain the DIP Facilities and use Cash Collateral to, among other things, (i) in the case of the DIP ABL Revolving Loans, refinance all outstanding obligations and replace commitments under the Prepetition ABL Credit Agreement, (ii) pay  the fees, costs, and expenses incurred in connection with the transactions contemplated under the DIP Documents and other administration expenses incurred in connection with the Cases; (iii) provide funds for the Loan Parties' and their subsidiaries' working capital requirements and for general corporate purposes in accordance with the provisions governing the Approved Budget (including the Permitted Variance provisions) (each, as defined below); and (iv) fund the Professional Fees Account (as defined below) and obligations benefitting from the Carve-Out (without regard to whether such obligations are provided for in an Approved Budget), in each case in accordance with the terms of the DIP Documents.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facilities is vital to a successful reorganization and/or to otherwise preserve the enterprise value of the Debtors' estates. Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Documents.

(ii)        No Credit Available on More Favorable Terms.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Documents and this Interim Order.  The Debtors are

unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code on more favorable terms compared to the DIP Facilities. The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided pursuant to section 364 of the Bankruptcy Code, this Interim Order and the DIP Documents, including the DIP Liens and the DIP Superpriority Claims (as defined below) and (b) allowing the DIP Secured Parties to provide the loans, letters of credit, and other financial accommodations under the DIP Facilities on the terms set forth herein and in the DIP Documents (all of the foregoing described in clauses (a) and (b), collectively, the "**DIP Protections**").

J.       **Interim Financing**.  During the Interim Period (as defined below), the DIP Secured Parties are willing to provide financing to the Debtors and consent to the use of Cash Collateral by the Debtors subject to (i) the entry of this Interim Order, and (ii) the terms and conditions of the DIP Documents.

K.       **Adequate Protection for Prepetition Non-ABL Secured Parties**. Pursuant to the ICAs, the Prepetition Non-ABL Secured Parties are prohibited from objecting to the Debtors' use of the Prepetition Collateral (including Cash Collateral) consisting of ABL Priority Collateral (as defined in the ABL ICA), during the Interim Period, and to the priming of the Prepetition Non-ABL Secured Parties' Prepetition Liens on the ABL Priority Collateral by the DIP Liens.  The Prepetition Non-ABL Secured Parties are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court at the Interim Hearing, the terms of

the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facilities contemplated hereby are fair and reasonable, and reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties.

    L.  **Business Judgment and Good Faith Pursuant to Section 364(e)**.

    (i)  The DIP Secured Parties have committed to provide postpetition secured financing via the DIP Facilities to the Debtors in accordance with the DIP Documents and this Interim Order.

    (ii)  The terms and conditions of the DIP Facilities as set forth in the DIP Documents and this Interim Order, and the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Such terms and conditions are supported by reasonably equivalent value and fair consideration.

    (iii)  The DIP Secured Parties and the Debtors, with the assistance and counsel of their respective advisors, have acted in good faith and at arms' length in negotiating, consenting to, and/or agreeing to, the DIP Facilities, the Debtors' use of the DIP Collateral, the DIP Documents and the DIP Protections. The DIP Obligations (including all advances that are made at any time to the Debtors under the DIP Documents) and the Debtors' use of the DIP Collateral shall be deemed to have been extended and/or consented to by the DIP Secured Parties for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(e) of the Bankruptcy Code and this Interim Order, and, accordingly, the DIP Liens,

the DIP Superpriority Claims, and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Interim Order in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

M.      **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties and their ability to successfully reorganize or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facilities and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Documents is, therefore, in the best interests of the Debtors' estates and consistent with their fiduciary duties. Based on all of the foregoing, sufficient cause exists for immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors and the DIP Agent (on behalf of all of the DIP Secured Parties) to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.      **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Documents.  Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn,

waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

      2.     **<u>DIP Documents and DIP Protections</u>**.

      (a)    <u>Approval of DIP Documents</u>.  The Debtors are expressly and immediately authorized to establish the DIP Facilities, to execute, deliver, and perform under the DIP Documents and this Interim Order, to incur the DIP Obligations (as defined below) in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Documents as such become due pursuant to the DIP Documents and this Interim Order, including all closing fees, administrative fees, commitment fees, and reasonable and documented attorneys', financial advisors', and accountants' fees, indemnification obligations, and disbursements arising under the DIP Documents and this Interim Order, which amounts shall constitute administrative expense claims under section 503(b)(1) of the Bankruptcy Code (and DIP Superpriority Claims, as defined below) and shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect; <u>provided</u>, <u>however</u>, that the payment of the fees and expenses of the Lender Professionals (as defined below) shall be subject to the provisions of Paragraph 20(b).  Upon their execution and delivery, the DIP Documents shall represent the legal, valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance

with their terms.  Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)    DIP Obligations.  For purposes of this Interim Order, the term "**DIP Obligations**" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and other DIP Documents (including all "Obligations" as defined in the DIP Credit Agreement) and shall include the principal of, interest on, and fees, costs, expenses, and other charges owing in respect of, such amounts (including any reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Documents and/or this Interim Order), and any obligations in respect of indemnity claims, whether contingent or otherwise.

(c)    Authorization to Incur DIP Obligations and Use Cash Collateral.  The Borrower is hereby authorized (x) to use Cash Collateral and (y) to borrow and obtain letters of credit under the DIP Facilities; provided that (i) the aggregate outstanding amount for all such borrowings and letters of credit shall not exceed $75,000,000 under the DIP ABL Revolver (with up to $10,000,000 of the DIP ABL Revolver available for the issuance of standby letters of credit) and up to $30,000,000 under the DIP Term Loan Facility on an interim basis, and the timing of such borrowings and issuance of letters of credit shall be subject to the provisions of Paragraph 2(d); and (ii) any proposed use of the proceeds of DIP Loans or use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Documents, including the Approved Budget and the Budget Covenants (and including with respect to the Permitted Variance) as defined and contained in Paragraph 2(f) below; provided that, for the avoidance of doubt the use of DIP Proceeds or DIP Collateral (including Cash Collateral) to pay Professional

Fees  (as defined below), fund obligations benefitting from the Carve-Out, or comply with the adequate protection obligations hereunder shall not be subject in any way to the Approved Budget or the Budget Covenants.  Following the entry of the Final Order, the Borrowers' authority to incur further DIP Obligations, if any, and use further Cash Collateral will be governed by the terms of such Final Order and the DIP Documents.  Any amounts repaid under the DIP ABL Revolver (but not the DIP Term Loans) may be reborrowed, subject to the terms of the DIP Documents and this Interim Order. All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the Guarantors, as may be further provided in the DIP Documents.

(d)    <u>Termination of the Prepetition RCF Loan Documents; Refinancing of Prepetition ABL Indebtedness; and Timing of Initial Borrowings under DIP Facilities</u>.  The Debtors are hereby authorized and directed to terminate the Prepetition RCF Loan Documents and the commitments thereunder concurrently with the refinancing of the Prepetition ABL Indebtedness as set forth herein.  Upon the closing of the DIP Facilities, the Debtors shall make an initial borrowing under the DIP ABL Revolver in an amount sufficient to pay in full (or cash collateralize, in the case of outstanding Prepetition Letters of Credit issued thereunder, in an amount equal to 102% of the face amount of all such letters of credit (the "**Prepetition LC Cash Collateral**") all Prepetition ABL Indebtedness pursuant to a payoff letter, in form and substance satisfactory to the DIP Agent, the Debtors and the Prepetition ABL Agent (such payoff amount, the "**Prepetition ABL Payoff Amount**").  Upon the Prepetition ABL Agent's receipt of the Prepetition ABL Payoff Amount, all Prepetition ABL Indebtedness and all liens securing same shall be terminated and satisfied; <u>provided</u>, <u>however</u>, that in accordance with the provisions of the ABL ICA, the refinancing of the Prepetition ABL Indebtedness from the proceeds of the DIP

ABL Revolver shall not constitute a Discharge of ABL Obligations (as defined in the ABL ICA); provided, further, that the repayment of the Prepetition ABL Indebtedness shall remain subject to the provisions of Paragraph 6 hereof, and hence the payment of the Prepetition ABL Payoff Amount to the Prepetition ABL Secured Parties remains subject to disgorgement if this Court so determines pursuant to a Successful Challenge (as defined below).   At any time after the consummation of the refinancing of the Prepetition ABL Indebtedness, the Debtors may borrow up to $30,000,000 under the DIP Term Loan Facility, and no borrowings under the DIP Term Loan Facility shall constitute or be deemed to constitute part of the Refinancing (as defined in the ABL ICA) of the Prepetition ABL Indebtedness.

(e)     Budget.   Attached hereto as Exhibit B is the Initial Approved Budget, presenting (i) the Debtors' (A) projected cash receipts (such amount the "**Budgeted Receipts**"), labeled **"Total Receipts"** per the Initial Approved Budget Format, and (b) projected cash disbursements, labeled **"Operating Disbursements"** per the Initial Approved Budget (which, for the avoidance of doubt, shall be exclusive of (x) Professional Fees paid by the Debtors and restructuring charges arising on account of the Cases (including U.S. Trustee fees and professional fees and expenses incurred by the DIP Agent and/or the DIP Lenders) and (y) disbursements made on account of prepetition claims pursuant to any order of the Court) for the period from the Petition Date throughout the end of the immediately preceding week (such disbursements, the "**Budgeted Disbursements**").   For the avoidance of doubt, the Initial Approved Budget and each Approved Budget (as defined below) shall include a line item for Professional Fees to be paid by the Debtors for informational purposes only; provided, however, that such Professional Fees shall not be included in the calculation of any Variance for purposes of the Budget Covenants (each as defined below).   Commencing on the first Thursday that is at least four (4) full weeks after the

Petition Date and continuing on the Thursday of each fourth week thereafter (i.e., every four weeks), or more frequently as the Debtors may elect, the Debtors shall prepare and deliver simultaneously to the DIP Agent, the Ad Hoc First Lien Group (on a "Professional Eyes Only"), the Prepetition 1L Agents, the 2L Indenture Trustee, the Committee (on a "Professional Eyes Only" basis), and the U.S. Trustee: (i) an updated "rolling" 13-week budget in substantially the same form as the Initial Approved Budget, which, once approved in writing by the DIP Agent in its reasonable discretion, shall supplement and replace the Approved Budget or Supplemental Approved Budget (as defined below), as applicable, then in effect (each such updated budget that has been approved in writing by the DIP Agent, a "**Supplemental Approved Budget**") without further notice, motion, or application to, order of, or hearing before, this Court; provided, however, that the DIP Agent shall have three business days to approve each updated "rolling budget" (and if the DIP Agent fails to timely provide the Debtors written notice of any objection to such updated "rolling budget," it shall be deemed to have approved such updated "rolling budget"); provided, further, however, that unless and until the DIP Agent has approved (or has been deemed to have approved as provided above) such updated budget in its reasonable discretion, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect in accordance with this Interim Order, and the DIP Secured Parties shall have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto, as applicable. The Initial Approved Budget, as modified by all Supplemental Approved Budgets, shall constitute the "**Approved Budget**."  Notwithstanding anything to the contrary in this Interim Order, the (i) Professional Fees and obligations benefitting from the Carve-Out and (ii) the costs and expenses of the DIP Agent's advisors shall be due, payable and paid in accordance with the

terms of this Interim Order or any order of the Court allowing such Professional Fees, in each case notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget, and the Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget Covenants on account of any payment of such fees, costs or expenses. For the avoidance of doubt, nothing in this Interim Order or the DIP Documents shall be construed as a cap or limitation on the use of DIP Collateral (including Cash Collateral) to fund obligations benefitting from the Carve-Out.

(f)     _Testing Periods; Permitted Variances._  On the first business day that is at least four (4) full weeks after the Petition Date, and on the Thursday of each fourth week thereafter (each such period, a "**Testing Period**"), the Debtors shall deliver to the DIP Agent a report (each, a "**Variance Report**"), in a form reasonably acceptable to the DIP Agent, presenting, on a line item basis (for informational purposes only), the difference, if any, between Debtors' (A) (I) actual, aggregate cash receipts from the Petition Date through the end of the Testing Period (such amount the "**Actual Receipts**") and (II) actual, aggregate cash disbursements (which, for the avoidance of doubt, shall be exclusive of (x) Professional Fees paid by the Debtors and restructuring charges arising on account of the Cases (including U.S. Trustee fees and professional fees and expenses incurred by the DIP Agent and/or the DIP Lenders) and (y) disbursements made on account of prepetition claims pursuant to any order of the Court) from the Petition Date through the end of the Testing Period (such amount the "**Actual Disbursements**") to (B) (I) the Debtors' Budgeted Receipts from the Petition Date through the end of the Testing Period and (II) Budgeted Disbursements from the Petition Date through the end of the Testing Period, as applicable (each such difference, a "**Variance**"). A "**Permitted Variance**" means, (x) with respect to Budgeted Disbursements, a Variance where Actual

Disbursements are not more than 120% of Budgeted Disbursements as of the end of the applicable Testing Period; provided for the first testing period, the Permitted Variance shall be 125%, and (y) with respect to Budgeted Receipts, a Variance where Actual Receipts are not less than 80% of the Budgeted Receipts as of the end of the applicable Testing Period; provided for the first Testing Period, the Permitted Variance shall be 75%.

(g)     Use of DIP Obligations & Cash Collateral.  The Debtors are authorized to incur the DIP Obligations and expend Cash Collateral (i) to undertake the Prepetition ABL Credit Agreement Refinancing, (ii) to pay the fees, costs, and expenses incurred in connection with the transactions contemplated hereby, (iii) for the Debtors' and their subsidiaries' working capital requirements and for general corporate purposes in accordance with the provisions governing the Approved Budget (including any Permitted Variance), (iv) to fund obligations benefitting from the Carve-Out (without regard to whether such obligations are provided for in an Approved Budget), and (v) otherwise in accordance with the DIP Documents.

(h)     Interest, Fees, Costs, Indemnities and Expenses.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall pay on demand all fees, costs, indemnities, expenses (including reasonable and documented out-of-pocket legal and other professional fees and expenses of the DIP Agent) and other charges payable under the terms of the DIP Documents.  All such fees, costs, indemnities, expenses and disbursements, whether incurred, paid or required to be paid prepetition or post-petition and whether or not budgeted in the Approved Budget, are entitled to administrative expense priority under section 503(b)(1) of the Bankruptcy Code (in addition to being part of

the DIP Superpriority Claim), in each case subject to the Carve-Out (as defined below), and are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Agent and/or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Documents, and, subject to the provisions of Paragraph 20(b) with respect to the fees and expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any respect.

(i)      Use of DIP Facilities and Proceeds of DIP Collateral; Prepetition Letters of Credit.  Subject to Paragraph 2(g), the Borrowers shall apply the proceeds of all DIP Collateral solely in accordance with this Interim Order and the DIP Documents.  Without limiting the foregoing, the Debtors shall not be permitted to make any payments (from the DIP Collateral, the proceeds of DIP Loans or otherwise) on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except (a) as provided in any "first day orders" to be entered by the Court in connection with the commencement of the Cases (the "**First Day Orders**"), which First Day Orders shall be reasonably satisfactory in form and substance to the DIP Agent; (b) as expressly provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Agent prior to such motion, order, or request for such relief being filed; or (c) as otherwise expressly provided in the DIP Credit Agreement.  Further, the Debtors shall be authorized to reissue or transfer any Prepetition Letters of Credit outstanding under the Prepetition ABL Facility, and to cash collateralize such letters of credit, under the Prepetition Letter of Credit Facility, and to amend the Prepetition LC Agreement to implement such reissuances or transfers.

(j)    Conditions Precedent.  The DIP Secured Parties have no obligation to extend credit under the DIP Facilities or permit use of any DIP Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the Interim Period unless and until all conditions precedent to the extension of credit and/or use of DIP Collateral or proceeds thereof under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent in accordance with the DIP Documents and this Interim Order.

(k)    DIP Liens.  Subject in all respects to the Carve-Out, as security for the DIP Obligations, effective as of the Petition Date, and subject to the relative priorities as between the DIP ABL Revolver and the DIP Term Loan Facility as more fully set forth in this Interim Order and the DIP Documents, the following security interests and Liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Interim Order, are hereby granted by the Debtors to the DIP Agent, for itself and the other DIP Secured Parties (all such security interests and Liens granted to the DIP Agent for the benefit of all the DIP Secured Parties pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"), on all property of the Debtors, now existing or hereinafter acquired, including, as applicable, all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, securities and other investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, real property, fixtures, permits, franchise rights, capital stock and other equity interests of subsidiaries and in other

entities, tax and other refunds, insurance proceeds, commercial tort claims, all other Collateral

(as defined in the DIP Documents), and all other "property of the estate" (as defined in section

541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or

mixed, now existing or hereafter acquired or created, and all rents, products, substitutions,

accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each

case wherever located that constitutes ABL Priority Collateral or Notes Priority Collateral, in

each case, under the ABL ICA; provided, that the DIP Liens shall not include Liens on Excluded

Assets (as defined in the DIP Documents) and, for the avoidance of doubt, on the Prepetition LC

Cash Collateral or the Collateral Account (all of the foregoing collateral collectively referred to

as the "**DIP Collateral**"):

> (I)    subject to clause (II) below, pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable junior security interest and Lien upon all DIP Collateral constituting the Notes Priority Collateral that is subject solely to (A) the Prepetition Liens and the Adequate Protection Liens, (B) the valid, perfected, and unavoidable liens in favor of any third parties (other than the Prepetition Non-ABL Secured Parties) that were in existence immediately prior to the Petition Date or to valid and unavoidable Liens in favor of third parties (other than the Prepetition Non-ABL Secured Parties) that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code  (the Liens referenced in this clause (B), the "**Prepetition Prior Liens**") and (C) the Carve-Out; and

> (II)    pursuant to section 364(d)(1) of the Bankruptcy Code and the ICAs, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming security interest and Lien on all DIP Collateral constituting ABL Priority Collateral (including Cash Collateral proceeds thereof), which DIP Lien (x) shall be senior to the Adequate Protection Liens and senior and priming to (A) the Prepetition Liens and (B) any Liens that are junior to the Adequate Protection Liens or the Prepetition Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively, the "**Primed Liens**") and (y) shall be junior only to Prepetition Prior Liens and the Carve-Out.

For the avoidance of doubt, (i) the DIP Collateral shall not include, and the DIP Liens shall not

encumber, prepetition or postpetition assets that would not otherwise constitute ABL Priority

Collateral or Notes Priority Collateral or assets held in the Collateral Account (including, (x) the leasehold interests of any Debtor and (y) Avoidance Actions or the proceeds of Avoidance Actions) and (ii) the DIP Liens are junior in all respects to the Carve-Out with respect to the DIP Collateral.

(l)     Enforceable Obligations.  The DIP Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto (including any trustee or other estate representative in any Successor Case (as defined below)), and their creditors and other parties-in-interest, in accordance with their terms.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, surcharge, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(m)     Superpriority Administrative Claim Status.  Subject in all respect to the Carve-Out, in addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out in accordance with this Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate

Protection Superpriority Claims (as defined below)), priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment (the "**DIP Superpriority Claims**").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors (including, for the avoidance of doubt, the Unencumbered Assets) and all proceeds thereof, including, subject to the entry of the Final Order, proceeds of Avoidance Actions.  Other than as expressly provided in the DIP Credit Agreement and/or this Interim Order with respect to the Carve-Out, no costs or expenses of administration that have been or may be incurred in these Cases, or in any Successor Cases, and no priority claims are, or will be senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Documents and/or this Interim Order.  For the avoidance of doubt, the DIP Superpriority Claims shall not have recourse to funds held in the Professional Fees Account or the Prepetition LC Cash Collateral (in each case other than the Debtors' reversionary interest therein) and the DIP Superpriority Claims are junior to the Carve-Out in all respects.

(l)     <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  The DIP Liens and the DIP Superpriority Claims: (A) shall not be subject to sections 506, 510, 549, 550, or 551 of the

Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of any of the Cases, and (D) notwithstanding anything to the contrary in any First Day Orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Order; provided that the DIP Liens and the DIP Superpriority Claims are junior in all respects to the Carve-Out.  For avoidance of doubt, the DIP Superpriority Claims granted to the DIP Secured Parties in respect of the Unencumbered Assets (including the Unencumbered Foreign Equity) are senior to any interests and claims of the Note Claimholders with respect to such assets.

3.     **Adequate Protection for Prepetition 1L Secured Parties**.[6]  The Prepetition 1L Agents, for the benefit of the applicable Prepetition 1L Secured Parties, shall receive the following adequate protection (collectively referred to as the "**1L Adequate Protection**"):

(i)     1L Adequate Protection Liens.  Subject in all respects to the Carve-Out, to the extent there is a diminution in the Prepetition 1L Secured Parties' interests in the Debtors' interest in the Prepetition 1L Collateral securing the Prepetition 1L Obligations as of the Petition Date, resulting from the use, sale, or lease by the Debtors of the applicable Prepetition 1L Collateral (including Cash Collateral), the granting of DIP Superpriority Claims,

---

[6] The DIP Credit Agreement will provide for cash adequate protection in the form of cash interest and professional fees to the 1L, but only to the extent ordered by the Court or required by the Debtors.

the granting of the DIP Liens, the subordination of certain of the Prepetition 1L Liens thereto and to the Carve-Out, and/or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("**Diminution in 1L Prepetition Collateral Value**"), the Prepetition 1L Agents, for the benefit of all of the applicable Prepetition 1L Secured Parties, are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 362(d), 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral (such adequate protection replacement Liens, the "**1L Adequate Protection Liens**"), which 1L Adequate Protection Liens on such DIP Collateral shall be subject and subordinate to the Carve-Out, the Prepetition Prior Liens, and, with respect to the ABL Priority Collateral, to the DIP Liens and the Prepetition ABL Liens; provided that the 1L Adequate Protection Liens shall not encumber (x) the Professional Fees Account or (y) Avoidance Actions or the proceeds of Avoidance Actions in any way.

(ii)     1L Adequate Protection Superpriority Claims.   Subject in all respects to the Carve-Out, to the extent of Diminution in 1L Prepetition Collateral Value, the Prepetition 1L Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "**1L Adequate Protection Superpriority Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 8), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and the Carve-Out to

the extent provided herein and in the DIP Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all Avoidance Actions and the proceeds thereof); provided, however, that (x) the Prepetition 1L Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the 1L Adequate Protection Superpriority Claims unless and until all DIP Obligations have been Paid in Full (as defined below) and (y) the 1L Adequate Protection Superpriority Claims' recourse to proceeds of Avoidance Actions shall be subject to entry of the Final Order.  Subject to the relative priorities set forth above, the 1L Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.  Notwithstanding anything herein to the contrary, the 1L Adequate Protection Superpriority Claims shall not have recourse to the Professional Fee Account or funds held in the Professional Fees Account or to the Prepetition LC Cash Collateral (in each case other than the Debtors' reversionary interest therein).  For purposes of this Interim Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations, Prepetition 1L Obligations and/or Prepetition 2L Obligations, (i) the indefeasible payment in full in cash of such obligations, (ii) the termination or cash collateralization, in accordance with the DIP Documents, the Prepetition 1L Documents or the Prepetition 2L Documents, as applicable, of all undrawn letters of credit outstanding thereunder, and (iii) the termination of all commitments under the DIP Documents, the Prepetition 1L Documents and/or the Prepetition 2L Documents, as applicable; provided, however, that the 1L Adequate Protection Superpriority Claims granted to the Prepetition 1L Secured Parties and the 2L Adequate Protection Superpriority Claims granted to the Prepetition 2L Secured Parties may be impaired pursuant to any chapter 11 plan of

reorganization in the Cases with the vote of the applicable class of the holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code, in which case, Paid in Full (or any of the other variants of this phrase referenced above) would occur upon consummation of such plan.

(iii)     Priority of 1L Adequate Protection Liens and 1L Adequate Protection Superpriority Claims.  Subject in all respects to the Carve-Out, the 1L Adequate Protection Liens and the 1L Adequate Protection Superpriority Claim (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases, and (D) notwithstanding anything to the contrary in any First Day Orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Orders.

(iv)     Additional Adequate Protection; Reporting.  The Debtors shall concurrently deliver to the Prepetition 1L Secured Parties and the Ad Hoc First Lien Group, on a "Professional Eyes Only" basis, all information, reports, documents and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Documents, this Order, and the Final Order.

(v)      Additional Adequate Protection; Fees & Expenses.   The Debtors shall timely pay the reasonable and documented fees and expenses (but not success fees, transaction fees, or similar fees), including reasonable and documented professional fees and expenses, incurred by (i) the Ad Hoc First Lien Group and (ii) the Prepetition ABL Agent and the Prepetition 1L Agents (collectively, the "**First Lien Fees and Expenses**"); provided that the payment of all such fees and expenses shall be subject to the Debtors' or any party in interest's rights to seek a determination that such payments should be recharacterized as repayment on account of the secured portion of Prepetition Secured Facilities as of the Petition Date.

4.      **Adequate Protection for Prepetition 2L Secured Parties**.   The 2L Indenture Trustee, for the benefit of the applicable Prepetition 2L Secured Parties, shall receive the following adequate protection (collectively referred to as the "**2L Adequate Protection**"):

(i)      2L Adequate Protection Liens.   Subject in all respects to the Carve-Out, to the extent there is a diminution in the Prepetition 2L Secured Parties' interests in the Debtors' interest in the Prepetition 2L Collateral securing the Prepetition 2L Obligations as of the Petition Date, resulting from the use, sale, or lease by the Debtors of the applicable Prepetition 2L Collateral (including Cash Collateral), the granting of DIP Superpriority Claims, the granting of the DIP Liens, the subordination of certain of the Prepetition 2L Liens thereto and to the Carve-Out, and/or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (collectively, "**Diminution in 2L Prepetition Collateral Value**"), the 2L Indenture Trustee, for the benefit of all of the applicable Prepetition 2L Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral (such adequate protection replacement Liens, the "**2L Adequate Protection Liens**" and, together with

the 1L Adequate Protection Liens, the "**Adequate Protection Liens**"), which 2L Adequate

Protection Liens on such DIP Collateral shall be subject and subordinate only to the Prepetition

Prior Liens, the Prepetition 1L Liens, the 1L Adequate Protection Liens, and the Carve-Out and,

with respect to the ABL Priority Collateral, the DIP Liens and the Prepetition ABL Liens;

provided that the 2L Adequate Protection Liens shall not encumber (x) the Professional Fees

Account or (y) Avoidance Actions or the proceeds of Avoidance Actions in any way.

(ii)     2L Adequate Protection Superpriority Claims.   Subject in all respects to

the Carve-Out,  to the extent of Diminution in 2L Prepetition Collateral Value, the Prepetition 2L

Secured Parties are hereby further granted allowed superpriority administrative claims (such

adequate protection superpriority claims, the "**2L Adequate Protection Superpriority Claims**"

and together with the 1L Adequate Protection Superpriority Claims, the "**Adequate Protection**

**Superpriority Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over

all administrative expense claims and priority and other unsecured claims against the Debtors or

their estates, now existing or hereafter arising, of any kind or nature whatsoever, including

administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328,

330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in

Paragraph 8), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the

Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims, the Carve-Out and

the 1L Adequate Protection Superpriority Claims to the extent provided herein and in the DIP

Documents, and payable from and having recourse to all prepetition and postpetition property of

the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all

Avoidance Actions and the proceeds thereof); provided, however, that (x) the Prepetition 2L

Secured Parties shall not receive or retain any payments, property, or other amounts in respect of

the 2L Adequate Protection Superpriority Claims unless and until all DIP Obligations and all Prepetition 1L Obligations have been Paid in Full and (y) the 2L Adequate Protection Superpriority Claims' recourse to proceeds of Avoidance Actions shall be subject to entry of the Final Order.   Subject to the relative priorities set forth above, the 2L Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.   Notwithstanding anything herein to the contrary, the 2L Adequate Protection Superpriority Claims shall not have recourse to the Professional Fee Account or funds held in the Professional Fees Account and to the Prepetition LC Cash Collateral (in each case other than the Debtors' reversionary interest therein).

(ii)      The Debtors shall deliver to the Prepetition 2L Secured Parties all information, reports, documents and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Documents.

(iii)      Priority of 2L Adequate Protection Liens.   The 2L Adequate Protection Liens (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or pari passu with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases, and (D) notwithstanding anything to the contrary in any First Day Orders of this Court in any of the Cases, shall be senior to any

administrative claims arising under any such First Day Orders.  For the avoidance of doubt, the 2L Adequate Protection Liens shall be junior in all respects to the Carve-Out.

5.     **Automatic Postpetition Lien Perfection.**  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the Carve-Out, the DIP Liens, and the Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, (b) obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the DIP Agent shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts and commodities accounts within the meaning of such Uniform Commercial Code and other law) or (c) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition 1L Agents (solely with respect to the 1L Adequate Protection Liens), and the 2L Indenture Trustee (solely with respect to the 2L Adequate Protection Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date.  The applicable Debtors shall execute and deliver to the DIP Agent, the Prepetition 1L Agents, and/or the 2L Indenture Trustee, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated

validity, perfection and priority of the DIP Liens, the 1L Adequate Protection Liens, and the 2L Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, each of the DIP Agent, the Prepetition 1L Agents, and the 2L Indenture Trustee may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of this Interim Order.  Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any person or entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Documents and this Interim Order or in favor of the Prepetition Non-ABL Secured Parties in accordance with this Interim Order.

6.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.  Subject to the Debtors' reservation of rights as set forth at Paragraph E hereof, the Debtors' Stipulations shall be binding upon the Debtors and their estates in all circumstances upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon each other party in interest, including the Committee, except to the extent and only to the extent such

Committee or, solely as provided in clause (y) below, any other party in interest with standing (including any chapter 11 trustee) other than the Debtors (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), *first*, commences, by the earlier of (x) with respect to any Committee, sixty (60) calendar days after the formation of any Committee, and (y) with respect to other parties in interest with requisite standing other than the Debtors or any Committee, seventy-five (75) calendar days following the date of entry of the Interim Order (such time period established by the earlier of clauses (x) and (y), as the same may be extended in accordance with this Paragraph 6, shall be referred to as the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "**Challenge Period Termination Date**") a contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations (each, a "**Challenge**"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "**Successful Challenge**").  If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected. Except as otherwise expressly provided herein, from and after the Challenge Period Termination

Date and for all purposes in these Cases and any Successor Cases (and after the dismissal of these Cases or any Successor Cases), (i) any and all payments made to or for the benefit of the Prepetition ABL Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition ABL Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge. The Challenge Period may be extended only (i) with the written consent of the Debtors and, with respect to any challenge related to the Prepetition ABL Liens or the Prepetition ABL Indebtedness, with the written consent of the Debtors and the Prepetition ABL Agent or (ii) by order of the Court for good cause shown. Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates. The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the

Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 6 or to require or permit an extension of the Challenge Period Termination Date.

7.      **Carve-Out**.  Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition 1L Liens, the 1L Adequate Protection Liens, the Prepetition 2L Liens, the 2L Adequate Protection Liens, and the 1L Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out.

(a)      Carve-Out.  "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Loan Parties pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and any official committee of unsecured creditors (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below) and all reasonable and documented unpaid out of pocket expenses of the members of any Committee ("**Committee Members**") that are incurred at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the

Court prior to or after delivery of a Carve-Out Trigger Notice and without regard to whether such fees and expenses are provided for in the Approved Budget; provided, however, that this clause (iii) shall exclude any transaction fees or success fees of any Debtor Professionals; and (iv) Professional Fees and expenses of Committee Members incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (including transaction fees or success fees earned or payable to a Professional Person), to the extent allowed at any time, whether by interim order, procedural order or otherwise in an aggregate amount not to exceed $4,000,000 with respect to Professionals Persons (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Loan Parties, their lead restructuring counsel, the United States Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of a Termination Event and acceleration of the obligations under the DIP Facilities, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  No amounts set forth at clause (iv) of this subparagraph 7(a) with respect to the Post-Carve-Out Trigger Notice Cap may be modified without the prior written consent of the DIP Agent.  On the day on which a Carve-Out Trigger Notice is received by the Loan Parties, the Carve-Out Trigger Notice shall constitute a demand to the Loan Parties to utilize all cash on hand to transfer to the Professional Fees Account cash in an amount equal to all obligations benefitting from the Carve Out as provided herein.  Following delivery of a Carve-Out Trigger Notice, the DIP Agent shall deposit into the Professional Fees Account (as defined below) any cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) until the Professional Fees Account has been fully funded in an amount equal to all obligations benefitting

from the Carve-Out. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Loan Parties until the Professional Fees Account has been fully funded in an amount equal to all obligations benefitting from the Carve-Out.  Further, notwithstanding anything to the contrary herein, (i) disbursements by the Loan Parties from the Professional Fees Account shall not constitute DIP Loans, (ii) the failure of the Professional Fees Account to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out and (iii) in no way shall the Carve-Out, Professional Fees Account, or an Approved Budget or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Loan Parties or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).  Use of the Carve-Out is subject to the limitations set forth in paragraph 16 of this Interim Order.  For the avoidance of doubt, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities, any adequate protection liens, if any, and superpriority claims (whether granted to secure the DIP Facilities or as adequate protection), and any and all DIP Liens.

(b)     The Debtors shall (i) contemporaneously with the initial funding of the DIP Loans, transfer cash proceeds from the DIP Facilities in an amount equal to the total budgeted weekly Professional Fees for the first two weekly periods set forth in the Approved Budget, (ii) thereafter on a weekly basis transfer cash proceeds from the DIP Facilities or cash on hand in an amount equal to the total budgeted weekly Professional Fees for the next unfunded week set forth in the Approved Budget, and (iii) on a monthly basis, or otherwise at the request of the DIP Agent, to the extent, based on the invoices or other statements received from the

Debtor Professionals and Committee Professionals, the aggregate amount of their Professional Fees for any cumulative postpetition period exceed the cumulative budgeted amounts for such time period, transfer the aggregate amount of such excess, in each case into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition Non-ABL Secured Party (the "**_Professional Fees Account_**").  The Debtors shall be authorized to use funds held in the Professional Fees Account to pay Professional Fees and expenses of Committee Members as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; provided that when all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the Professional Fees Account shall revert to the Debtors for use in a manner not inconsistent with this Interim Order; provided further that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Account.  Funds transferred to the Professional Fees Account shall be held in trust for the Professional Persons, including with respect to obligations arising out of the Carve-Out. Funds transferred to the Professional Fees Account shall not be subject to any liens or claims granted to the DIP Secured Parties herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute Cash Collateral; provided that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Account, if any, after all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Court).  The DIP Agent shall be entitled to establish and maintain reserves against borrowing availability under the DIP Facilities on account of the Carve-Out in an amount not to exceed the Post-Carve-Out Trigger Notice Cap. in accordance with the terms of the DIP Credit Agreement.

(c)     No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  The DIP Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Debtor Professionals, Committee Professionals or Committee Members incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed (i) to obligate any DIP Secured Party in any way to pay compensation to, or to reimburse expenses of, any of the Debtor Professionals, the Committee Professionals or Committee Members, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement or (ii) to increase the Post-Carve-Out Trigger Notice Cap if actual allowed fees and expenses of any of the Professional Persons and/or Committee Members are higher in fact than the amounts in the Approved Budget or the Post-Carve-Out Trigger Notice Cap.  Notwithstanding any provision in this Paragraph 7 to the contrary, no portion of the Carve-Out, any Cash Collateral, any DIP Collateral, any proceeds of the DIP Facilities or any Unencumbered Assets (or the proceeds thereof) that are subject to the DIP Superpriority Claim (including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out) shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 16 hereof.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party to object to the allowance and payment of any such fees and expenses.

8.     **Waiver of 506(c) Claims**.  Subject to entry of a Final Order and as a further condition of the DIP Facilities and any obligation of the DIP Secured Parties to make credit

extensions pursuant to the DIP Documents (and the consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided herein) (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties with respect to the DIP Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties.

9.     **After-Acquired Property**.    Except as otherwise expressly provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable and unavoidable Lien that is perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

10.     **Protection of DIP Secured Parties' Rights**.

(a)     Unless the DIP Agent shall have provided its prior written consent or all DIP Obligations have been Paid in Full, there shall not be entered in any of these Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or

any portion of the DIP Collateral or any Unencumbered Assets (including the Unencumbered Foreign Equity) and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens and/or the DIP Superpriority Claims, unless expressly permitted under the DIP Documents (including the Carve-Out); provided that, solely with respect to the DIP Collateral that constitutes Notes Priority Collateral, the foregoing is subject to any Adequate Protection Liens or 1L Adequate Protection Superpriority Claims granted to the Prepetition 1L Secured Parties and/or the Prepetition 2L Secured Parties under this Interim Order in favor of any Prepetition 1L Obligations and/or Prepetition 2L Obligations secured by the Notes Priority Collateral on a senior basis to the Prepetition ABL Revolver; (ii) the grant of any security, collateral interest or other Lien on the Debtors' Avoidance Actions or the proceeds thereof in favor of any party without the consent of the DIP Agent; (iii) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations or as otherwise permitted in the DIP Documents and this Interim Order, or (iv) any modification of any of the DIP Secured Parties' rights under this Interim Order or the DIP Documents with respect any DIP Obligations. Neither the Debtors nor any of their non-Debtor subsidiaries or affiliates shall incur any indebtedness except as expressly permitted in the DIP Documents.  In addition, none of the Debtors shall transfer any assets to, or provide extensions of credit to or guaranty any liabilities of, any non-debtor subsidiary or affiliate except as permitted under the DIP Documents.  Any intercompany claim of any Debtor arising from any transfers to any other Debtor or non-debtor of any DIP Collateral or any extension of credit to any other Debtor or non-debtor that is funded with proceeds of any DIP Collateral or proceeds of the DIP Facilities shall be governed by the terms of the DIP Documents (subject to any applicable provisions of the ABL ICA, 1L ICA, or 2L ICA).

(b)      To the extent any payment, transfer of assets, or extension of credit permitted under the DIP Documents is made (i) by a Debtor to any other Debtor or (ii) by a non-Debtor affiliate to a Debtor, in each case resulting in an intercompany claim against any Debtor, such intercompany claim shall constitute an administrative expense claim under section 503(b)(1) of the Bankruptcy Code, and shall be subject and junior only to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Carve-Out, and any claims that are senior to any of the foregoing pursuant to applicable bankruptcy law, to the extent provided by the DIP Documents.

(c)      The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will, whether or not the DIP Obligations have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) reasonably cooperate with, consult with, and provide to the DIP Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon request by any of the DIP Secured Parties or the Prepetition Secured Parties) to provide under the DIP Documents, or the provisions of this Interim Order, (iii) permit consultants, advisors and other representatives (including third party representatives) of the DIP Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants and other professional advisors (other than legal counsel) as and to the extent required by the DIP Documents, (iv) permit the DIP Agent and its respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on

matters concerning the Debtors' businesses, financial condition, operations and assets, and (v) permit the DIP Agent to conduct, at its discretion and at the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral in accordance with the DIP Documents.  Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent, the Prepetition 1L Agents, the 2L Indenture Trustee, or their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.

11.     **Proceeds of Subsequent Financing**.   Without limiting the provisions and protections of Paragraph 10 above, but subject in all respects to the Carve-Out, if at any time prior to the Payment in Full of all the DIP Obligations (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order or the DIP Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent for application to  the DIP Obligations until Paid in Full.

12.     **Cash Collection**.

(a)     Subject to the Carve-Out in all respects, from and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession,

custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same deposit and/or concentration accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition ABL Loan Documents (collectively, the "**Cash Collection Accounts**"), which accounts shall be subject to the sole dominion and control of the DIP Agent to the extent provided in the DIP Documents (and the funds in such accounts may be used by the Debtors to the extent provided in this Interim Order and the DIP Documents).  All cash of the Debtors shall be subject to the DIP Agent's cash dominion sweep (x) to the extent that at such time the Excess Availability (as defined in the DIP Credit Agreement) is less than 12.5% of the DIP ABL Loan Cap (each as defined in the DIP Credit Agreement) or (y) upon any Event of Default (as defined in the DIP Credit Agreement).  To the extent the Excess Availability exceeds 12.5% of the DIP ABL Loan cap for 20 consecutive days, the cash dominion shall cease to exist, provided that no Event of Default was continuing during such period.

(b)      To the extent provided in the DIP Documents, the Debtors are authorized and directed to enter into such springing control blocked account agreements with the DIP Agent and such financial institutions where the Debtors' Cash Collection Accounts are maintained as the DIP Agent may require, provided that, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Prepetition ABL Agent is a party without the need to enter into new blocked account agreements.  Upon the direction of the DIP Agent, at any time after the occurrence of a Termination Event and subject to the provisions of Paragraph 7, all proceeds in the Cash Collection Accounts shall be remitted to the DIP Agent for application to the DIP Obligations until Payment in Full, and the DIP Agent shall be entitled to take all action that is necessary or appropriate to effectuate the foregoing.  Unless otherwise agreed to in writing by

the DIP Agent, the Debtors shall maintain their cash management system in accordance with the relief granted pursuant to the *Interim Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363, 364, 503, and 507 (I) Authorizing Debtors to (A) Continue Participating in Existing Cash Management System, and Using Bank Accounts and Business Forms, and (B) Continue Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, and (III) Granting Related Relief* (the "**Cash Management Order**").   The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Agent.

13.     **Disposition of DIP Collateral; Right to Credit Bid**.  Unless the DIP Obligations are Paid in Full upon the closing of a sale or other disposition of the DIP Collateral, subject to the Carve-Out, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, except to the extent permitted under the DIP Documents.  Unless otherwise ordered by the Court for cause, and subject to Paragraph 6 of this Interim Order, the DIP Agent (or one or more of its designees, affiliates or assignees) shall have the unqualified right to credit bid any or all of the DIP Obligations under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code.  If the DIP Agent or its respective designees, affiliates or assignees make a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any DIP Collateral, then for purposes of such auction or sale process or any applicable order of this Court, the DIP Agent shall be automatically deemed to be a qualified bidder and its bid shall be automatically deemed to

constitute a qualified bid, regardless of whether the qualified bidder or qualified bid requirements are satisfied.  Any credit bid by the DIP Agent (or one or more of its designees, affiliates or assignees) shall be subject to any applicable provisions of the ABL ICA.

14.    **Termination Events**.  The following shall constitute a termination event under this Interim Order and the DIP Documents unless waived in writing by the DIP Agent (each, a "**Termination Event**"):

(a)    The Scheduled Maturity Date (as defined in the DIP Credit Agreement).

(b)    The date on which substantial consummation (as defined in section 1101 of the Bankruptcy Code) of a plan of reorganization in the Cases that is confirmed pursuant to an order of the Court has occurred, or, if earlier, the effective date of such plan.

(c)    The date on which consummation of a sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code has occurred.

(d)    The date on which acceleration of the DIP Loans, and the termination of the commitments with respect to such DIP Facilities, has occurred.

(e)    A Variance in excess of any Permitted Variance with respect to receipts or disbursements, as applicable, tested pursuant to any Variance Report (this Paragraph 14(e), the "**Budget Covenants**"); provided that it is acknowledged and agreed that compliance with the Budget Covenants shall be tested without regard to (x) Professional Fees paid by the Debtors and restructuring charges arising on account of the Cases (including U.S. Trustee fees and professional fees and expenses incurred by the DIP Agent and/or the DIP Lenders) and (y) disbursements made on account of prepetition claims pursuant to any order of the Court.

(f)    Any other breach by any of the Debtors of the terms and provisions of this Interim Order that does not otherwise constitute an Event of Default under the DIP Documents

(other than Section 7.01(v) of the DIP Credit Agreement), <u>provided</u> <u>that</u>, other than with respect to any breach under Paragraphs 2(d), 2(e), 2(f) 10(a), 11, and 16, and Exhibit A, of this Interim Order (any of which shall result in an immediate Event of Default), such breach shall be subject to cure upon receipt of five (5) business days' written notice thereof.  For the avoidance of doubt, to the extent there is any inconsistency between this subparagraph 14(f) and the terms of the DIP Credit Agreement (including, without limitation, the "Events of Default" under section 7.01 thereof and any cure periods related thereto), the terms of the DIP Credit Agreement shall govern.

(g)    The occurrence and continuance (without waiver pursuant to the term of the DIP Documents) of an "Event of Default" under the DIP Credit Agreement, as set forth therein, including, for avoidance of doubt, the failure to obtain entry of the Final Order (which satisfies the definition thereof set forth above) on or before 45 days after the Petition Date and the Debtors' failure to timely comply with any of the obligations and deadlines set forth in **Exhibit A** attached hereto (the **"Milestones"**).

15.    **Rights and Remedies Upon Termination Event**.

(a)    Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Secured Parties to exercise (i) immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under this Interim Order, the DIP Documents and/or applicable non-bankruptcy law (other than those rights and remedies against the DIP Collateral as provided in subparagraph 15(b) below), including the right to (A)(1) declare all DIP Obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtors, to

the extent any such commitment remains, and/or (3) terminate the DIP Facilities and any other DIP Documents as to any future liability or obligation of the DIP Agent and the other DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; and/or (B) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral other than in accordance with the Approved Budget through and including the fifth business day after the Termination Declaration Date (as defined below) (any such declaration under any of clauses 15(a)(i)(A)(1), (2) or (3) or (a)(i)(B) shall be made to the respective lead counsel to the Debtors, the Committee and the U.S. Trustee, and shall be referred to herein as a "**Termination Declaration**" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "**Termination Declaration Date**").

(b)      In addition to the rights and remedies described above, five (5) business days following the Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing, the DIP Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on, its DIP Liens on all or any portion of the DIP Collateral, including by collecting accounts receivable and applying the proceeds thereof to the DIP Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral, but subject to the Carve-Out in all respects.

(c)      Subject to the Carve-Out in all respects, to the extent a Termination Event results from the occurrence and continuance of any payment Event of Default under the DIP Documents, Borrower (i) upon the request of the DIP Agent, shall be obligated to sell, pursuant to section 363 of the Bankruptcy Code and pursuant to sale procedures reasonably acceptable to

the DIP Agent and the Required DIP Lenders (as defined in the DIP Credit Agreement) and on terms and conditions reasonable acceptable to the DIP Agent and the Required DIP Lenders, the Unencumbered Foreign Equity and (ii) subject to the consent of the Applicable Collateral Agent (as defined in the 1L ICA), shall be obligated to sell all of the equity of Claire's Swiss Holdings LLC and Claire's Stores Canada Corp. pursuant to sale procedures reasonably acceptable to the DIP Agent and the Required DIP Lenders and on terms and conditions reasonable acceptable to the DIP Agent and the Required DIP Lenders, in each case, subject to the mandatory prepayment of the DIP Obligations with respect to the proceeds of the Unencumbered Foreign Equity as set forth in the DIP Documents.  Solely during the five business day period after a Termination Declaration Date, the Debtors and any Committee shall be entitled to an emergency hearing before this Court for the sole purpose of contesting whether a Termination Event has occurred. During such five business day period, the Debtors may not use Cash Collateral or any amounts previously or thereafter advanced under the DIP Facilities except in accordance with the Approved Budget.

(d)     Subject to the Carve-Out and any applicable provisions of the ABL ICA with respect to the proceeds of Notes Priority Collateral, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties shall be turned over <u>first</u> to the DIP Agent for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Documents and this Interim Order until Payment in Full of all of the DIP Obligations and <u>then</u> to the Prepetition 1L Agents for application to the Prepetition 1L Obligations under, and in accordance with the provisions of, the Prepetition 1L Documents and this Interim Order until Payment in Full of the Prepetition 1L Obligations, and then to the Prepetition 2L Obligations

under, and in accordance with the provisions of, the Prepetition 2L Documents and this Interim Order until Payment in Full of the Prepetition 2L Obligations.

(e)    Subject to entry of the Final Order, and notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, upon five business days' written notice to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred and is continuing, the DIP Agent (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to any DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors that are owned by or subject to a Lien of any third party and that are used by Debtors in their businesses, in the case of either subparagraph (i) or (ii) of this Paragraph 15(e) without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, the DIP Agent and DIP Secured Parties can only enter onto any leased premises after a Termination Event has occurred and is continuing, in accordance with (i) a separate agreement with the landlord of the applicable leased premises; (ii) upon entry of an order of this Court after the filing of a motion and appropriate notice and an opportunity for Landlords to object and be heard; or (iii) as permitted by applicable law; provided, further, that

the DIP Agent, on behalf of the DIP Secured Parties, shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by such DIP Agent calculated on a *per diem* basis. Nothing herein shall require the Debtors, the DIP Agent, or the other DIP Secured Parties to assume any lease, license or other contract under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in this Paragraph 15(e).

(f)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Non-ABL Secured Parties under the DIP Documents, the DIP Facilities, and this Interim Order, (ii) authorize the DIP Secured Parties to retain and apply payments made in accordance with the DIP Documents, and/or this Interim Order, (iii) to permit each of the DIP Agent, the other DIP Secured Parties, and the Prepetition Non-ABL Secured Parties to perform any act authorized under this Interim Order and the DIP Documents, (iv) in the event of a draw on the letters of credit issued by the Issuer under the Prepetition LC Agreement, to permit the Issuer to apply amounts in the Collateral Account to satisfy the Prepetition LC Obligations in accordance with the terms of the Prepetition LC Agreement, and (v) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Documents.

16.    **Restriction on Use of Proceeds**.

(a)     Notwithstanding anything herein to the contrary, no portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, any Unencumbered Assets (or proceeds

thereof) or any proceeds from the DIP Facilities (including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out) may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtor Professionals, the Committee Professionals or the Committee Members) to investigate or prosecute any Challenge (including any litigation or other action) in connection with the value of the DIP Lenders' or Prepetition 1L Secured Parties' interest in the DIP Collateral or Prepetition Collateral (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtor Professionals, the Committee Professionals or the Committee Members) to (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(d) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Secured Parties unless all DIP Obligations will be paid in full upon the consummation of such postpetition loans or other financial accommodations, or to seek any modification to this Interim Order not approved by the DIP Agent; (ii) investigate, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, any or all of the DIP Secured Parties, or, solely with respect to any party other than the Debtors, the Prepetition 1L Secured Parties, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence,

omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), each in their capacities as such, including (A) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, or amount of the DIP Obligations, or the validity, enforceability, extent or priority of the DIP Liens or, solely with respect to any party other than the Debtors, the Prepetition 1L Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens or the other DIP Protections; (D) except to contest in good faith the occurrence or continuance of any Termination Event as permitted in Paragraph 15, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties' assertion, enforcement, or realization on the Cash Collateral or the other DIP Collateral in accordance with the DIP Documents or this Interim Order); and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties or, solely with respect to a party other than the Debtors, the Prepetition 1L Secured Parties, hereunder or under the DIP Documents, or any payments made thereunder or in respect thereof; or (iii) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted under the DIP Documents, without the prior written consent of the DIP Agent. Proceeds from the DIP Facilities not to exceed $125,000 in the aggregate (the "**Investigation Budget Cap**") may be used on account of Professional Fees incurred by Committee Professionals in connection with the investigation of Avoidance Actions (but not the prosecution of such actions) on account of the Prepetition 1L Secured Facilities and other Debtors' prepetition facilities (but not the DIP Facilities), which obligations will benefit from the Carve-Out in an amount not to exceed the Investigation Budget Cap to the extent unpaid as of delivery of a Carve-Out Trigger Notice.

17.    **Requests for Payment**.  The DIP Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and this Order shall be deemed to constitute a timely filed request for allowance and/or payment of any DIP Obligations.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) in each of the Cases or Successor Cases a request or aggregate requests for allowance and/or payment of any DIP Obligations.  For the avoidance of doubt, nothing herein shall limit or be deemed to limit the Debtors' rights (including the ability to pay Professional Fees with proceeds of the DIP Loans) to seek determination on the value of the Prepetition Collateral securing the Prepetition 1L Secured Facilities and/or Prepetition 2L Obligations as of the Petition Date or to assert a Challenge with respect to the validity, perfection, and priority of liens potentially securing the 2L Obligations as of the Petition Date).

18.    **Preservation of Rights Granted Under the Interim Order**.

(a)    <u>Modification or Extension of Interim Order</u>.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order (including through any chapter 11 plan of reorganization) without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties.  In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash

authorized or made hereby or pursuant to the DIP Documents, or Lien, claim, priority or other DIP Protections authorized or created hereby or pursuant to the DIP Documents.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facilities, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent as of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Secured Parties shall be entitled to all DIP Protections.

(b)     Dismissal.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (i) the DIP Protections shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order) until all DIP Obligations have been Paid in Full, and such order of dismissal shall so provide (in accordance with sections 105 and 349 of the Bankruptcy Code), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections.

(c)     Survival of Interim Order.  The provisions of this Interim Order and the DIP Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections shall

survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases or any Successor Case in this Court, or terminating the joint administration of these Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP Protections shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order.  The DIP Obligations shall not be discharged by the entry of an order confirming any chapter 11 plan of reorganization, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19. **Insurance Policies**.  Upon entry of this Interim Order, the DIP Agent and the other DIP Secured Parties, shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (with the interests therein of the DIP Secured Parties subject to the ABL ICA), and the Debtors shall take such actions as are reasonably requested by the DIP Agent from time to time to evidence or effectuate the foregoing.

20. **Other Rights and Obligations**.

(a)    Expenses.  As provided in the DIP Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors will pay all reasonable

expenses incurred by the DIP Agent (including the reasonable fees and disbursements of all counsel for the DIP Agent and any internal or third-party appraisers, consultants, advisors and auditors engaged by or for the benefit of the DIP Agent and/or its counsel) in connection with the preparation, execution, delivery, and administration of the DIP Documents, this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Documents are consummated.

(b)    Notice of Professional Fees.  Professionals for the DIP Agent (including professionals engaged by counsel to the DIP Agent) (collectively, the "**Lender Professionals**") or parties seeking payment on account of the First Lien Fees and Expenses shall not be required to submit their invoices in any particular format or submit invoices to this Court, United States Trustee, any Committee, or any other party in interest.  Copies of summary invoices submitted to the Debtors by such parties shall be forwarded by the Debtors to the United States Trustee, counsel for any Committee, and such other parties as this Court may direct.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; provided, however, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  If the Debtors, United States Trustee, or any Committee object to the reasonableness of the fees and expenses of any party subject to this Paragraph 20(b) and cannot resolve such objection within ten days of receipt of such invoices, then the Debtors, United States Trustee, or the Committee, as the case

may be, shall file with this Court and serve on such Lender Professionals an objection (the "**Fee Objection**"), and any failure by any such party to file a Fee Objection within such ten day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals or parties subject to this Paragraph 20(b) shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed. All such unpaid fees, costs, expenses, and charges of the DIP Agent that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee, or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order. Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or the other DIP Secured Parties in connection with or with respect to the DIP Facilities, the DIP Credit Agreement, or the other DIP Documents are hereby approved in full and non-refundable and shall not otherwise be subject to any Challenge.

(c)    Binding Effect. Subject only to Paragraph 6 above, the provisions of this Interim Order, including all findings herein, and the DIP Documents shall be binding upon all parties in interest in these Cases and any Successor Cases, including the DIP Secured Parties, the Prepetition Non-ABL Secured Parties, any Committee, and the Debtors and their respective

estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; provided, however, that except to the extent expressly provided in Paragraph 6, the DIP Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(d)     No Waiver.  The failure of the DIP Secured Parties or the Prepetition 1L Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition 1L Documents, or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Interim Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any DIP Secured Party or Prepetition 1L Secured Party.  Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the DIP Secured Parties or the Prepetition 1L Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Cases or any Successor Cases to cases under chapter 7, dismissal of the Cases or any Successor Cases, or the appointment of a trustee or examiner in the Cases or any Successor Cases, or to oppose the use of Cash Collateral in any Successor Case, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code,

any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties under the DIP Documents, of the Prepetition 1L Secured Parties, or the Prepetition 1L Secured Parties, or the Bankruptcy Code or otherwise.

(e)     <u>No Third Party Rights</u>.  Except as explicitly provided for herein or in any DIP Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition 1L Secured Parties shall not solely by reason thereof (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)     <u>No Marshaling</u>.  The DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g)     <u>Amendments</u>.  The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Documents in accordance with the provisions thereof, in each case unless

such amendment, modification, supplement, or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facilities, (iii) shortens the Maturity Date (as defined in the DIP Credit Agreement), or (iv) adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No waiver, modification, or amendment of any of the provisions of the DIP Documents shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, except as provided herein, approved by this Court.

(h)    _Inconsistency_.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.  In the event of any inconsistency between the terms or conditions of this Interim Order and the terms or conditions of any other order entered by this Court in the nature of a First Day Order, the provisions of this Interim Order shall govern and control.

(i)    _Enforceability_.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable _nunc pro tunc_ to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(k)    _Headings_.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

21.    **Final Hearing**

(a)    The Final Hearing shall be held on **April 19, 2018, at 10:30 a.m. (prevailing Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, (a) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C. (ray.schrock@weil.com), Matthew S. Barr, Esq. (matt.barr@weil.com), Ryan Preston Dahl, Esq. (ryan.dahl@weil.com), and Danielle D. Donovan, Esq. (danielle.donovan@weil.com)),  and (b) Richards, Layton & Finger, P.A., One Rodney Square, 910 N. King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq. (defranceschi@rlf.com), Zachary I. Shapiro, Esq. (shapiro@rlf.com), and Brett M. Haywood, Esq. (haywood@rlf.com)); (ii) counsel to the DIP Agent, (a) Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611 (Attn: Richard A. Levy, Esq. (richard.levy@lw.com)), and (b) Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Attn: Annemarie V. Reilly, Esq. (annemarie.reilly@lw.com)); and (iii) counsel to the Ad Hoc First Lien Group, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Matthew A. Feldman, Esq. (mfeldman@willkie.com) and Brian S. Lennon, Esq. (blennon@willkie.com)), and (b) Morris, Nichols, Arsht & Tunnell, LLP, Rodney Square, 1201 North Market Street, Wilmington, Delaware 19899 (Attn: Robert Dehney, Esq. (rdehney@mnat.com)) so as to be received by **no later than 4:00 p.m. (Prevailing Eastern Time) on April 12, 2018.**

(b)    <u>Final Hearing Notice</u>.  As soon as reasonably practicable, the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**") and (ii) a copy of this Interim Order on the parties having been

given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court **no later than April 12, 2018 at 4:00 p.m. (Prevailing Eastern Time)**, which objections shall be served so that the same are received on or before such date by the parties listed in paragraph 21(a) above, as well as the other Notice Parties, and such objections shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case to allow actual receipt of the foregoing **no later than April 12, 2018, at 4:00 p.m. (Prevailing Eastern Time).**

22.     **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

**Dated: March 20th, 2018
Wilmington, Delaware**

RLF1 19037259V.1

75

**MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE**